## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CYNTHIA DONALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 20 CV 6815 |
| | ) | |
| THE CITY OF CHICAGO, | ) | Hon. Elaine E. Bucko |
| A Municipal Corporation; and | ) | |
| EDDIE JOHNSON, individually | ) | |
| and as an agent of | ) | |
| THE CITY OF CHICAGO, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendants. | ) | |

### DEENDANT EDDIE JOHNSON'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT AT LAW

Defendant, Eddie Johnson, by and through his undersigned attorneys, Michael I. Leonard and Rebecca Alexander of Leonard Trial Lawyers LLC, and Gbenga Longe of The Longe Law Firm, states as follows as his Answer and Affirmative Defenses to Plaintiff's Complaint:

### INTRODUCTION

Eddie Johnson served the citizens of Chicago for more than three decades. The former Superintendent of the Chicago Police Department has worked to uphold justice, protect the vulnerable, and lead with integrity. By engaging in an inappropriate relationship with Plaintiff Cynthia Donald, Mr. Johnson fell short of that work. However, this betrayal of their respective marriages was wholly consensual and mutually sustained.

The testimony and evidence will verify the nature of their relationship, not only proving the allegations of Plaintiff's Complaint to be false, but also revealing Ms. Donald's motivation for asserting these false claims. Further, Mr. Johnson will be shown to have neither the motivation nor the perverse character to engage in the activities described in the Complaint. His

1

well-earned reputation as a man with care and concern for others has accompanied the difficult roles in which he has excelled. He has made tough, unpopular decisions dictated by adherence to the truth. He has shared his own challenges with mental health so that others might be encouraged to seek help related to the often dark and inhumane circumstances witnessed by members of law enforcement.

Finding both kinship and collaboration in their constant contact through stressful times, Mr. Johnson and Ms. Donald took the poor, but completely mutual step, of engaging in an intimate relationship. The parties were friends prior to this mistake and remained so after discontinuing the inappropriate interaction in or about the Winter of 2018.

It was at that time that Mr. Johnson suggested to Ms. Donald that she obtain assistance with her own personal problems, which arose out of various troubling historical events as well as her marital relationship. Going forward, the parties continued to work together and, importantly, remained friends. Thus, they continued to text and talk outside of work, and to socialize - usually with others - from time to time.

After the highly publicized events in October 2019 that ultimately formed the basis for Mr. Johnson's removal from his Chicago Police Superintendent's position, a public spotlight was shone on the parties' relationship. That public scrutiny predictably had consequences for both parties' marriages. Nonetheless, even after Mr. Johnson's ouster, the parties continued to maintain their friendship. Indeed, the parties' texts, as well as Ms. Donald's texts with others, will demonstrate that Ms. Donald continued to enjoy an amiable friendship with Mr. Johnson for many, many months.

Moreover, on some occasions, Ms. Donald directed, or arranged to meet with Mr. Johnson, at discrete locations because she was, *inter alia*, concerned that her husband would find out that she was still interacting and communicating with the Mr. Johnson. At

one point, Ms. Donald even suggested to Mr. Johnson that they get "burner phones" so that they could continue to communicate with each other while avoiding scrutiny.

Furthermore, during this pre-litigation time period, Ms. Donald actually told Mr. Johnson that she was going to be suing the City of Chicago regarding her employment. She told him her attorneys had assured her that she would recover millions of dollars – and that the City would quickly settle with her. In response, Mr. Johnson indicated his skepticism, but did not do anything to dissuade Ms. Donald from pursuing her purported claims against the City. However, as the weeks went by, Ms. Donald began to indicate to Mr. Johnson that her attorneys told her that she might have to say "some things" about Mr. Johnson in order to obtain her multi-million-dollar settlement. Ms. Donald was cagey when Mr. Johnson questioned her about what she could possibly say.

Mr. Johnson also learned, in or about that same time period, that Ms. Donald had suggested to one of their mutual friends that perhaps he could say some things to support her case, though they were untrue. He declined. These events caused Mr. Johnson to determine that Ms. Donald's motives and intentions were highly suspect.

As further set forth below, Ms. Donald's allegations are a fiction, and have clearly been pled by her with nothing more than economic motives in mind.

**ANSWER**

1. For more than three years, Plaintiff, a police officer in the Chicago Police Department ("CPD"), was subjected to unwanted and uninvited sexual advances, abuse, harassment, and a hostile work environment by her superior and supervisor, former CPD Superintendent Eddie Johnson ("Superintendent Johnson").

**ANSWER:**     Denied. Defendant further states that these allegations are patently false and intentionally manufactured.

2.    At all times relevant to this complaint, Superintendent Johnson was the highest-ranking member of the CPD.

**ANSWER:**    Admitted, with respect to certain relevant time periods, and denied with regard to respect to certain other relevant other time periods.

3.    Superintendent Johnson, while serving as Plaintiff's superior and direct supervisor, engaged in shockingly violent, abusive, and harassing conduct towards Plaintiff.

**ANSWER:**    Denied. Defendant further states that these allegations are patently false and intentionally manufactured.

4.    Superintendent Johnson forcibly kissed Plaintiff.

**ANSWER:**    Denied. Defendant further states that these allegations are patently false and intentionally manufactured. The parties had a consensual relationship, and all acts between them were voluntary.

5.    Superintendent Johnson forcibly touched Plaintiff.

**ANSWER:**    Denied. Defendant further states that these allegations are patently false and intentionally manufactured. The parties had a consensual relationship, and all acts between them were voluntary.

6.    Superintendent Johnson forced oral sex on Plaintiff.

**ANSWER:**    Denied. Defendant further states that these allegations are patently false and intentionally manufactured. The parties had a consensual relationship, and all acts between them were voluntary.

7.    Superintendent Johnson forced vaginal sex on Plaintiff.

**ANSWER:**    Denied. Defendant further states that these allegations are patently false and intentionally manufactured. The parties had a consensual relationship, and all acts between them were voluntary.

8.     Superintendent Johnson carried out many unwanted and unwelcomed sexual acts on Plaintiff in his personal office at CPD Headquarters where Plaintiff was also assigned.

**ANSWER:**     Denied. Defendant further states that these allegations are patently false and intentionally manufactured. The parties had a consensual relationship, and all acts between them were voluntary.

9.     Superintendent Johnson texted nude photos of himself, including of his penis, to Plaintiff.

**ANSWER:**     Denied, except to admit that, on one occasion and at the urging and request of the Plaintiff - and while Defendant was hospitalized - Defendant sent such a picture. Defendant further states that it now appears that the request made by Plaintiff for such a picture was made by her for ulterior motives. Moreover, the texts of the parties, as well as those of non-parties, will further demonstrate that Plaintiff's allegations are wholly contrived and without merit.

10.     Superintendent Johnson referred to Plaintiff by sexually derogatory names and in sexually demeaning contexts, including in the presence of other City of Chicago employees.

**ANSWER:**     Denied. Defendant further states that these allegations are patently false and intentionally manufactured.

11.     Superintendent Johnson used his position of power and authority over Plaintiff to pressure her into engaging in these sexual acts by conditioning her employment and advancements within CPD upon her submission to unwanted and unwelcomed sexual activity, promising her promotions, and berating her whenever she summoned the courage to resist his advances.

**ANSWER:**     Denied. Defendant further states that these allegations are patently false and intentionally manufactured.

12.     Not only is Superintendent Johnson individually liable to Plaintiff for his violent, abusive, and harassing conduct, but because Superintendent Johnson was Plaintiff's

supervisor and highest-ranking member of the CFD with final policymaking authority, the City of Chicago is liable as well.

**ANSWER:** Denied. Not only are the Defendants not liable, but Plaintiff's allegations are patently false and intentionally manufactured. At the conclusion of this action, Defendant believes that he will have a substantial basis for seeking sanctions against the Plaintiff.

13. What's more, when the City of Chicago learned of various details relating to Plaintiff and Superintendent Johnson through a highly publicized incident occurring on October 16, 2019, Defendant (directly through Mayor Lori Lightfoot) worked to deflect blame from the City of Chicago instead of protecting Plaintiff – the victim of Superintendent Johnson's wrongful conduct.

**ANSWER:** Denied with respect to this Defendant. With respect to the actions of Mayor Lightfoot and the City of Chicago, Defendant is without sufficient knowledge and information to respond to the allegations of this Paragraph.

14. Following the October 16, 2019 incident, Mayor Lightfoot publicly acknowledged that Superintendent Johnson lied to her and lied to the public in an effort to cover up his misconduct.

**ANSWER:** Defendant is without sufficient knowledge and information to fully respond to these allegations because they are devoid of factual detail. However, Defendant states that he was at all times completely truthful with Mayor Lightfoot and the public, and never engaged in any acts to "cover up" his conduct. Nevertheless, Mayor Lightfoot reneged on an agreement with Defendant with respect to when he would voluntarily give up his position, and publicly and falsely accused the Defendant of being untruthful. But for statute of limitations and professional courtesy issues, Defendant could have asserted claims against Mayor Lightfoot and the City for defamation and slander.

15.    It was reported that Mayor Lightfoot said, "It has become clear that Mr. Johnson engaged in a series of actions that are intolerable for any leader in a position of trust."

**ANSWER:**    Defendant is without sufficient knowledge and information to respond to the allegations of this Paragraph because, as alleged, these "facts" are vague, devoid of specificity, and without foundation. Therefore, to the extent an Answer is required, Defendant denies them.

16. However, in the days following the Eddie Johnson incident, neither Mayor Lightfoot, the City of Chicago, nor the CPD ever formally interviewed or even informally spoke with Plaintiff about the incident or the pattern of abuse she suffered from Superintendent Johnson.

**ANSWER:**    Defendant is without sufficient knowledge and information to respond to the allegations of this Paragraph. However, upon information and belief only, including what the Plaintiff told Defendant, it appears that no such formal interview was conducted. However, there was no "pattern of abuse" to question the Plaintiff about, and Plaintiff herself knows that any such allegation is patently false and wholly manufactured.

17. Instead, Mayor Lightfoot exacerbated the hostile work environment by ordering Superintendent Johnson to "dump" Plaintiff by having her relocated away from CPD Headquarters.

**ANSWER:**    Denied. Defendant further states that there was no hostile work environment, much less one that could be "exacerbated." Plaintiff herself knows that any such allegation is patently false and wholly manufactured. Defendant denies that Mayor Lightfoot told Defendant to "dump" the Plaintiff. However, as Defendant at the time explained to the Plaintiff, Mayor Lightfoot referred to the Plaintiff as a "bitch" during a meeting with the Defendant, and indicated to the Defendant that Plaintiff needed to immediately be put into a different location within CPD. In response to the Mayor's tirade, Defendant spoke to the Plaintiff about what other positions or locations she would like to work in. Plaintiff told Defendant that she wanted to work

in a specific position and location, and the Defendant City of Chicago accommodated that specific request.

18. Thereafter, Karen Konow, Chief of CPD's Bureau of Internal Affairs, requested that the Office for the Inspector General for the City of Chicago "conduct an investigation of an incident in which CPD Superintendent Eddie Johnson is alleged to have parked illegally and slept behind the wheel of a CPD vehicle."

**ANSWER:**    Defendant is without sufficient personal knowledge and information to respond to these allegations. However, upon information and belief only, Defendant believes that these allegations likely accurately summarize the chain of events referenced.

19. On or around November 14, 2019 the Office of the Inspector General then notified Plaintiff that eight "allegations" were being made against her related to the incident during which Superintendent Johnson parked illegally and was found asleep behind the wheel of a CPD vehicle.

**ANSWER:**    Defendant is without sufficient personal knowledge and information to respond to these allegations because they relate to what a third-party allegedly stated to the Plaintiff. Therefore, to the extent an Answer is required, Defendant denies these allegations.

20. Several attorneys with the Office of the Inspector General conducted multiple lengthy interrogations and cross-examinations of Plaintiff, including on November 25, 2019 and on April 15, 2020.

**ANSWER:**    Defendant is without sufficient personal knowledge and information to respond to these allegations because they relate to the activities of third-parties and the Plaintiff. Therefore, to the extent an Answer is required, Defendant denies these allegations.

21. Also in or around April 15, 2020, an attorney from an outside private law firm hand-picked and retained by the City of Chicago threatened Plaintiff that she could be subject to

additional adverse employment action if she refused to sit for a third interrogation and cross-examination.

**ANSWER:**     Defendant is without sufficient personal knowledge and information to respond to these allegations because they relate to the activities of third-parties and the Plaintiff. Therefore, to the extent an Answer is required, Defendant denies these allegations.

22. Plaintiff confirmed for the Inspector General that she was "ordered" by Superintendent Johnson to accompany him on the evening of October 16, 2019 as he had done many times before as Plaintiff's superior and boss.

**ANSWER:**     Defendant is without sufficient personal knowledge and information to respond to these allegations because they relate to statements allegedly made by the Plaintiff to third-parties. Therefore, to the extent an Answer is required, Defendant denies these allegations. Defendant further states that, to the extent Plaintiff made such a statement that she had been "ordered" to accompany the Plaintiff, it was a false statement.

23. On December 2, 2019, Mayor Lightfoot terminated Superintendent Johnson for lying about what happened on the night of October 16, 2019.

**ANSWER:**     Denied. When Defendant met with Mayor Lightfoot for the final time, Mayor Lightfoot told Defendant that he was terminated. In response, Defendant explained to the Mayor, in a professional manner, that she had no authority to terminate his employment. Mayor Lightfoot did not offer any reason for her attempted termination of the Defendant. In any event, as Defendant left the Mayor's office, one of the Mayor's high-ranking aides stood up and requested Mr. Jonson's star. Defendant professionally provided it, and exited the meeting.

24. On or around June 29, 2020, CPD released bodycam footage showing Superintendent Johnson asleep behind the wheel of his parked car.

**ANSWER:**     Admitted that, on or about such date, such footage was released.

25. This Court has jurisdiction over this case pursuant to Section 2-209 of the Illinois Code of Civil Procedure. 735 ILCS 5/2-209.

**ANSWER:**    Denied.

26. Venue is proper under 735 ILCS 5/2-101. All parties reside in this county and the events pertaining to the claims made in this complaint occurred in this county.

**ANSWER:**    Denied.

27.    All conditions precedent to filing suit have been met.

**ANSWER:**    Defendant states that these allegations call for a legal conclusion to which no Answer is required. To the extent an Answer is required, denied.

28. On February 19, 2020, Plaintiff filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights.

**ANSWER:**    Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them.

29. A "right to sue letter" was issued to Plaintiff by the United States Department of Justice, Civil Rights Division, on July 20, 2020. (Exhibit A, Right to Sue Letter).

**ANSWER:**    Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states that the referenced Exhibit speaks for itself.

30. Plaintiff is a female employee of the Defendant City of Chicago, holding the position of police officer.

**ANSWER:**    Admitted.

31. The City of Chicago is an employer as defined by Title VII of the Civil Rights Act of 1964 and was at all times relevant to this complaint, Plaintiff's employer.

**ANSWER:**    Admitted.

32. At all times relevant to the complaint, Superintendent Johnson was the Superintendent of the CPD and was serving in a supervisory capacity over Plaintiff.

**ANSWER:** Defendant admits that he held that position during certain of the time periods relevant to this lawsuit. Defendant further states that whether he was "serving in a supervisory capacity over Plaintiff" during certain time periods calls for a legal conclusion. Defendant denies any remaining allegations.

33. At all times relevant to the complaint, Superintendent Johnson was a person with final policymaking authority within the City of Chicago and the CPD.

**ANSWER:** Denied. Defendant further states that these allegations call for a legal conclusion.

34. The City of Chicago and the CPD conducted its police functions under color of state law through its officers and employees.

**ANSWER:** Defendant states that these allegations call for a legal conclusion.

35. The City of Chicago employed and conferred authority upon Superintendent Johnson to act with final policymaking authority, to act in a supervisory capacity to CPD police officers, including Plaintiff, and at all times relevant to the complaint, the Defendants were acting under color of state law.

**ANSWER:** Denied. Defendant further states that these allegations call for a legal conclusion.

## BACKGROUND

### I. The City of Chicago's Recognition of Sexual Misconduct in Police Department Settings

36. The City of Chicago is well aware of the prevalence and reality of law enforcement sexual misconduct.

**ANSWER:** Defendant states that these allegations are not directed to him, but rather to the purported knowledge of the City of Chicago, and therefore denies them.

37. Indeed, the City of Chicago's own training materials regarding sexual misconduct in law enforcement explicitly acknowledge the seriousness of the issue:



**ANSWER:** Defendant states that whatever "training manuals" Plaintiff is referring to have not been specifically identified. Therefore, Defendant denies the allegations of this Paragraph. Defendant further states that Plaintiff has not provided any foundation for those materials.

38. The City of Chicago's own training materials further acknowledge that law enforcement sexual misconduct has been a problem "for DECADES."



**ANSWER:**    Defendant states that Plaintiff has not specifically identified all of the training materials" to which she refers in this Paragraph. Therefore, Defendant denies the allegations of this Paragraph. Defendant further states that the cited materials above speak for themselves, but are without any foundation offered by the Plaintiff.

39. The City of Chicago's own training materials cite to the International Association of Chiefs of Police ("IACP") statement that, "[t]he problem of sexual misconduct by officers warrants the full attention of law enforcement leadership. It represents a grave abuse of authority and violation of the civil rights of those victimized."



**ANSWER:**    Defendant states that Plaintiff has not specifically identified all of the training materials" to which she is referring in this Paragraph. Therefore, Defendant denies the allegations of this Paragraph. Defendant further states that the cited materials above speak for themselves, but are without any foundation offered by the Plaintiff.

40. The City of Chicago's own training materials cite the IACP's definitions of law enforcement sexual misconduct as:

> ### Law Enforcement Sexual Misconduct Defined:
>
> "*Any behavior* by an officer that takes advantage of the officer's position to *misuse authority and power* in order to *commit a sexual act*, *initiate sexual contact with another person*, or *respond to perceived sexually motivated cue from another person...*
>
> Addressing Sexual Offenses and misconduct by Law Enforcement
> IACP Executive Guide, published June 2011

> ### Law Enforcement Sexual Misconduct Defined:
>
> "*...It also includes any communication or behavior that would likely be construed as lewd, lascivious, inappropriate, or conduct unbecoming an officer and violates general principles of acceptable conduct common to law enforcement*"
>
> Addressing Sexual Offenses and misconduct by Law Enforcement
> IACP Executive Guide, published June 2011

**ANSWER:**     Defendant states that Plaintiff has not specifically identified all of the training materials to which she is referring, and therefore denies the allegations of this Paragraph. Defendant further states that the cited materials above speak for themselves, but are without any foundation offered by the Plaintiff.

41. The City of Chicago's Policy on Sexual Harassment states that, "each employee has the right to work in an environment free of discrimination, including sexual harassment. No person should be required to endure **sexual harassment by supervisors** or coworkers or work in a hostile environment as a condition of employment." (emphasis added):

14



### CITY OF CHICAGO
### POLICY ON SEXUAL HARASSMENT

I.   **STATEMENT OF POLICY**

A.   The City of Chicago is committed to providing a workplace in which all individuals are treated with respect and dignity. Each employee has the right to work in an environment free of discrimination, including sexual harassment. No person should be required to endure sexual harassment by supervisors or coworkers or work in a hostile environment as a condition of employment. Furthermore, this Policy applies to all phases of employment, including but not limited to recruitment, testing, hiring, upgrading, promotion or demotion, transfer, layoff, termination, rates of pay, benefits, and selection for training. The City of Chicago also is committed to preventing sexual harassment of persons receiving City services.

**ANSWER:**    Defendant states that the cited materials speak for themselves, and denies any remaining allegations of this Paragraph. Defendant further states that Plaintiff has not provided any foundation for the cited materials.

42.   The City of Chicago's Policy on Sexual Harassment prohibits:

> "any unwelcome sexual advance or request for sexual favors or conduct of a sexual nature when submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment . . . or when submission to or rejection of such conduct by an individual is used as the basis of any employment or service decision affecting the individual; or when such conduct has the purpose or effect of substantially interfering with the work performance of an employee or creating an intimidating, hostile, or offensive work environment."

**ANSWER:**    Defendant states that the cited materials speak for themselves, and denies any remaining allegations of this Paragraph. Defendant further states that Plaintiff has not provided any foundation for those materials.

43.   The City of Chicago's Policy on Sexual Harassment prohibits:

> "sexual harassment" as "a broad range of conduct which can, in certain circumstances, be considered sexual harassment under this Policy. This includes, but is not limited to, sexually suggestive or offensive remarks or rumors, sexually suggestive pictures or graffiti, sexual suggestive gesturing, verbal

15

> harassment or abuse of a sexual nature, the displaying of sexual
> objects, subtle or direct propositions for sexual favors, stalking,
> sexual assault, touching, patting, or pinching, and sending
> sexually suggestive e-mail messages."

**ANSWER:** Defendant states that the cited materials speak for themselves, and denies any remaining allegations of this Paragraph. Defendant further states that Plaintiff has not provided any foundation for those materials.

44. The City of Chicago acknowledges how sexually harassing behavior is likely to develop, including in the law enforcement setting:



**ANSWER:** Defendant states that the cited materials speak for themselves, and denies any remaining allegations of this Paragraph. Defendant further states that Plaintiff has not provided any foundation for those materials.

45. As detailed below, the timeline and narrative of Superintendent Johnson's sexual misconduct against Plaintiff is the classic scenario, one which the City of Chicago's own policies and training documents acknowledge is an existing problem in the law enforcement setting.

**ANSWER:** Denied. Defendant further states that Plaintiff well knows that Defendant never engaged in any sexual misconduct with respect to the Plaintiff.

46. Indeed, it is widely known and reported that there is a pattern of sexual abuse, harassment, retaliation and hostile work environment within the CPD perpetrated by male

superiors against female subordinates.

> **ANSWER:** Defendant denies these allegations because Plaintiff provides no support or foundation for these allegations, or who it is that has purportedly "widely known and reported" on the "facts" alleged in this Paragraph.

47. One recent example is the case of CPD Officer Kelly Hespe who alleged that her superior and supervisor, CPD Sergeant Gerald Breimon, forced Officer Hespe to engage in sexual acts while on duty <u>over the course of a three year period</u>, approximately the same duration of Superintendent Johnson's abuse of Plaintiff.

> **ANSWER:** Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states that such allegations, even if true, have no relevance to the present action.

48. The City of Chicago reportedly settled Officer Hespe's lawsuit for $300,000 of taxpayers' money.

> **ANSWER:** Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states that such allegations, even if true, have no relevance to the present action.

49. Another example is the case of CPD Officer Laura Kubiak who alleged she was fired for reporting a fellow superior CPD officer who called her a "stupid b*itch" and threatened her while on duty.

> **ANSWER:** Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states that such allegations, even if true, have no relevance to the present action.

50. It was alleged that after Officer Kubiak reported the incident she was ousted from her job while the accused high ranking CPD officer, who had a lengthy history of misconduct

complaints, kept his same job.

**ANSWER:** Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states that such allegations, even if true, have no relevance to the present action.

51. The City of Chicago reportedly settled Officer Kubiak's lawsuit for nearly $4,000,000 of Chicago taxpayers' money.

**ANSWER:** Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states that such allegations, even if true, have no relevance to the present action.

52. CPD Officer Shannon Spalding reportedly stated that "there is nowhere in the department where [anyone] can go and say 'this is what happened' without losing their job, possibly even their life."

**ANSWER:** Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states that such allegations, even if true, have no relevance to the present action.

53. When Officer Spalding reported the misconduct of CPD Sergeant Ronald Watts and others, she was labeled a "rat" by her superiors within the CPD and she was demoted to less desirable jobs.

**ANSWER:** Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states that such allegations, even if true, have no relevance to the present action.

54. The City of Chicago settled Officer Spalding's lawsuit for $2,000,000 of taxpayers' money, allowing then Mayor Rahm Emanuel to escape from having to testify in a public courtroom under oath regarding the code of silence within CPD which Mayor Emanuel

admitted exists.

**ANSWER:** Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states that such allegations, even if true, have no relevance to the present action.

55. In a comprehensive data analysis conducted by the Chicago Alliance Against Sexual Exploitation ("CAASE") which was published in October 2020, over the last decade a staggering 80% to 90% of survivors of sexual violence in Chicago never saw an initial arrest in their case.

**ANSWER:** Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states that such allegations, even if true, have no relevance to the present action.

56. Notably, Superintendent Johnson was CPD's highest ranking police officer for nearly 5 years of the 10-year period analyzed by CAASE.

**ANSWER:** Denied.

57. CAASE determined that only 3% to 6% of all sexual assaults that occur in Chicago lead to *any* intervention by Chicago law enforcement.

**ANSWER:** Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states that such allegations, even if true, have no relevance to the present action.

58. As such, CAASE has concluded, "if the purported purpose of law enforcement is to investigate and arrest people who have caused [sexual] harm, Chicago police are failing."

**ANSWER:** Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states that such allegations, even if true, have no relevance to the present action.

59. CAASE noted that criminal sexual assault in which the victim and perpetrator know one another (commonly referred to as acquaintance or date rape) is frequently depicted in our society as a misunderstanding between friends, or a hazy evening clouded by intoxication or other factors, rather than what it is: rape.

**ANSWER:**    Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states that such allegations, even if true, have no relevance to the present action.

60.    CAASE concluded that the Chicago police are failing and changes need to be made.

**ANSWER:**    Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states that such allegations, even if true, have no relevance to the present action.

61. Accordingly, CAASE has set out a multi-point strategic plan for Chicago leaders, and specifically Mayor Lori Lightfoot, to address the crisis of CPD's failure to adequately handle sexual assaults.

**ANSWER:**    Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states that such allegations, even if true, have no relevance to the present action.

62. Mayor Lightfoot has confessed that the City of Chicago needs to do better to ensure that officers who report misconduct have the support they need.

**ANSWER:**    Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states that such allegations, even if true, have no relevance to the present action. Defendant further states that Plaintiff has failed to provide any foundation for this alleged confession by the Mayor.

63.   In fact, so much improvement is needed that as of September 2020 Mayor Lightfoot admitted that the issue needs to be addressed in contract talks with the Fraternal Order of Police.

**ANSWER:** Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states that such allegations, even if true, have no relevance to the present action. Defendant further states that Plaintiff has failed to provide any foundation for this alleged admission by the Mayor.

## II.   **Factual Background**

64.   In or around November 2006, Plaintiff began her career as a police officer with the CPD.

**ANSWER:**  Upon information and belief, admitted.

65.   During the summer of 2015, based on information and belief, Superintendent Johnson first noticed Plaintiff working as a CPD officer while she was assigned to the First District.

**ANSWER:**  Denied.

66.   Around that time, and on information and belief, Superintendent Johnson called a friend of his, described Plaintiff's physical appearance, and stated in a sexually suggestive and demeaning manner, "How did we miss *this* one?"

**ANSWER:**   Denied. Defendant further states that Plaintiff has failed to provide a foundation for these allegations.

67.   Superintendent Johnson then masterminded a plan to have Plaintiff assigned to his unit so that he could be close to her, keep her under his control, dictate her work hours and schedule, ply her with alcohol, and perpetrate his sexual harassment and abuse of her.

**ANSWER:**   Denied.

68.   In or around May 2016, Superintendent Johnson arranged for Plaintiff to be assigned to his detail.

21

**ANSWER:** Admitted.

69. Approximately six months later, Superintendent Johnson arranged for Plaintiff to be his personal driver.

**ANSWER:** Denied. Defendant further states that Plaintiff requested to be considered for the job.

70. Shortly thereafter, Superintendent Johnson began using his authority as Plaintiff's supervisor to engage in years of sexually harassing and abusive conduct directed at Plaintiff creating an ongoing pattern of emotional, physical and sexual abuse of Plaintiff.

**ANSWER:** Denied.

**A.** **Superintendent Johnson Sexually Assaults and Harasses Plaintiff**

71. The first incident occurred around the end of June or early July of 2016 before Plaintiff drove Superintendent Johnson to an event that he was scheduled to attend in his capacity as the Superintendent of the CPD.

**ANSWER:** Denied.

72. Before leaving CPD Headquarters for the event, Superintendent Johnson requested that Plaintiff come to his personal office, located in the CPD Headquarters building.

**ANSWER:** Denied

73. Upon entering Superintendent Johnson's office, Plaintiff excused herself to a side room to make sure she looked appropriate for the event.

**ANSWER:** Denied.

74. While Plaintiff was readying herself for the event, Superintendent Johnson entered the room, forced Plaintiff onto a nearby couch, pulled Plaintiff's pants down without her consent, and forcibly performed unwanted oral sex on her.

**ANSWER:** Denied.

75.    Superintendent Johnson then ejaculated onto Plaintiff's body and told her, "now you know you belong to me."

**ANSWER:**    Denied.

76.    Thereafter, Superintendent Johnson engaged in regular and frequent sexually harassing, abusive, and humiliating conduct towards Plaintiff, conduct which was persistent and unwanted and continued through the end of 2019.

**ANSWER:**    Denied.

77.    On multiple occasions from 2016 through 2019, and while on City of Chicago property, Superintendent Johnson forcibly pried Plaintiff's legs open and performed unwanted oral sex on her.

**ANSWER:**    Denied.

78.    On multiple occasions from 2016 through 2019, Superintendent Johnson locked Plaintiff in his personal office and conditioned her release from his office on Plaintiff performing sexual acts on him.

**ANSWER:**    Denied.

79.    On multiple occasions from 2016 through 2019, Superintendent Johnson required Plaintiff to travel with him on work related trips that were sanctioned and paid for by the City of Chicago.

**ANSWER:**    Denied.

80.    On multiple occasions from 2016 through 2019, while on work-related trips, Superintendent Johnson's conduct demonstrated that he expected Plaintiff to perform sexual acts on him.

**ANSWER:**    Denied.

81. On multiple occasions from 2016 through 2019, while on work-related trips,

Superintendent Johnson ordered Plaintiff to come into his hotel room and engage in sexual activity.

**ANSWER:**    Denied.

82.    On occasions during these work-related trips that Plaintiff was able to avoid Superintendent Johnson's sexual advances, Superintendent Johnson would tell Plaintiff that she "got away this time."

**ANSWER:**    Denied.

83. On multiple occasions, after Superintendent Johnson forced Plaintiff to perform a sexual act on him, Superintendent Johnson made sexually suggestive and harassing remarks to Plaintiff such as, "The City owes you another check for making my workday easier" and "you get me through this job."

**ANSWER:**    Denied.

84. Superintendent Johnson regularly sent Plaintiff unwanted and harassing text messages.

**ANSWER:**    Denied.

85. Superintendent Johnson sent Plaintiff nude pictures of himself, including of his naked penis.

**ANSWER:**    Denied, except for one occasion as referenced above.

86. Superintendent Johnson regularly and frequently forcefully touched and kissed Plaintiff, including while on City of Chicago property.

**ANSWER:**    Denied.

87. Superintendent Johnson regularly referred to Plaintiff by sexually derogatory names and in sexually demeaning contexts. For instance:

a.  When Plaintiff did not have to wear her police uniform for various City of

Chicago work events, Superintendent Johnson would tell Plaintiff to "wear something cute" and that her wearing such "cute" outfits for him was, "the nature of the job."

b. Superintendent Johnson told Plaintiff that other police officers wanted to "give him p*ssy" but that his focus was on Plaintiff;

c. Superintendent Johnson told other City of Chicago employees that Plaintiff was "his girl;" and

d. Superintendent Johnson told Plaintiff, "you gonna give me some and like it."

**ANSWER:**    Denied.

88. On an occasion when Superintendent Johnson had a verbal altercation with his secretary, the secretary said to him, "I see you're having a bad day, let me go get Cynthia [Plaintiff] – your eye candy."

**ANSWER:**    Denied. Defendant further states that Plaintiff has failed to provide any foundation for this alleged incident.

89. Superintendent Johnson regularly and frequently asked Plaintiff what color underwear she was wearing, including while on City of Chicago property and during work hours.

**ANSWER:**    Denied.

90. Superintendent Johnson kept alcoholic beverages in his office at CPD Headquarters and on several occasions plied Plaintiff with alcohol into performing unwanted sexual acts.

**ANSWER:**    Admitted that Defendant had alcohol in his office, and denies the remaining allegations of this Paragraph.

**B.    Superintendent Johnson's Actions Towards Plaintiff were Unwanted**

91.    On multiple occasions between 2016 and 2019, Plaintiff asked Superintendent Johnson to stop sexually harassing and assaulting her.

**ANSWER:**    Denied.

92.    On multiple occasions between 2016 and 2019, Plaintiff asked Superintendent Johnson to stop kissing her.

**ANSWER:**    Denied.

93.    On multiple occasions between 2016 and 2019, Plaintiff asked Superintendent Johnson to stop asking her about her underwear.

**ANSWER:**    Denied.

**C.    Superintendent Johnson Used his Position of Power and Authority over Plaintiff to Pressure Plaintiff into Engaging in Sexual Acts**

94.    In or around the fall of 2019, Superintendent Johnson learned that Plaintiff was interested in taking the CPD Sergeant's exam.

**ANSWER:**    Admitted.

95.    Plaintiff expressed reservations about taking the exam because she did not think she had time to study. Superintendent Johnson, however, pressured Plaintiff into studying for the exam anyway.

**ANSWER:**    Denied.

96.    While Plaintiff was studying for the CPD Sergeant's exam, Superintendent Johnson told Plaintiff that she needed to "stay on his good side" if she wanted to make merit Sergeant, and that he could make that happen for Plaintiff.

**ANSWER:**    Denied.

26

97. Superintendent Johnson repeatedly told Plaintiff that "the list of favors" that Plaintiff owed him was growing longer with each person he moved to a different unit to clear the way for Plaintiff to be promoted to Sergeant.

**ANSWER:**   Denied.

98. In exchange, Superintendent Johnson demanded that Plaintiff "pay up soon," which communicated to Plaintiff that she would have to perform sexual acts on him.

**ANSWER:**   Denied.

99. Superintendent Johnson regularly talked to Plaintiff about female CPD officers who wanted to "give him some" in exchange for promotions or "comfortable assignments."

**ANSWER:**   Denied.

100.      When Superintendent Johnson believed another male CPD officer was showing an interest in Plaintiff, Superintendent Johnson would tell Plaintiff, "don't have me put him somewhere on midnights [shifts]." Plaintiff took such comments to be an outward expression and threat of the power Superintendent had over Plaintiff and the entire CPD to retaliate against and demote anyone he chose for any reason he chose, including Plaintiff.

**ANSWER:**   Denied.

101.   On occasions that Plaintiff would resist Superintendent Johnson's sexual overtures, Superintendent Johnson would throw tantrums and berate Plaintiff until she acquiesced and participated in unwanted sexual acts.

**ANSWER:**   Denied.

**D.      October 16, 2019 Incident and Resulting Fallout**

102.   On October 16, 2019, Plaintiff was sitting at her office desk when Superintendent Johnson ordered her to leave her desk and get in his car. Superintendent Johnson then drove Plaintiff to a restaurant.

**ANSWER:** Denied,

103. After the restaurant, Superintendent Johnson drove Plaintiff back to her car and Plaintiff drove herself home.

**ANSWER:** Admitted.

104. Superintendent Johnson, however, did not go home. He was found hours later by CPD police officers asleep in his car and allegedly intoxicated.

**ANSWER:** Admitted in part, denied in part. Defendant was on his way home when he stopped. He was questioned by CPD officers after falling asleep. Defendant denies any remaining allegations of this Paragraph.

105. Superintendent Johnson's behavior on October 16, 2019 caused the City of Chicago great embarrassment and led to an investigation by the City of Chicago through which Mayor Lightfoot learned of Superintendent Johnson's highly inappropriate behavior towards Plaintiff.

**ANSWER:** Defendant is without sufficient knowledge and information to respond to the allegations regarding Mayor Lightfoot's reaction, and therefore denies them. Defendant denies the remaining allegations of this Paragraph.

106. While the City's own training materials reference empowering victims and survivors to report instances of sexual misconduct by "help[ing] victims feel physically, psychologically, and emotionally safe in the reporting process" and to avoid "victim blaming," here, the City did the opposite.

**ANSWER:** Defendant is without sufficient knowledge and information to respond to Plaintiff's allegations that reference, without foundation, certain training materials. Defendant denies the remaining allegations of this Paragraph.

107. Mayor Lightfoot directed Superintendent Johnson to "dump" Plaintiff by removing Plaintiff from Superintendent Johnson's detail and sending Plaintiff back to the First

28

District, a demotion, away from CPD Headquarters.

**ANSWER:**  Denied.

108.     Approximately one month later, around November 14, 2019, Plaintiff was notified of various allegations of misconduct being brought against her.

**ANSWER:**  Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them.

109.     These allegations of misconduct were brought in retaliation for Plaintiff's connection to the October 16, 2019 incident and to deflect blame from Superintendent Johnson, Mayor Lightfoot, and the City of Chicago, and represent an ongoing practice of discrimination and constitute a continuing violation.

**ANSWER:**  Denied.

110.     After Mayor Lightfoot ordered Superintendent Johnson to remove Plaintiff from his detail and demote Plaintiff to the First District, Superintendent Johnson made the following derogatory remarks to Plaintiff, referring to Plaintiff as his "music":

"that bitch [Mayor Lori Lightfoot] is trying to steal 'my music'"

and

"this tiny negro [Mayor Lori Lightfoot] is still clowning"

**ANSWER:**  Denied.

111.     Superintendent Johnson, however, was not ready to let Plaintiff go. Instead of transferring Plaintiff out of CPD Headquarters (where Superintendent Johnson's personal office was located), Superintendent Johnson placed Plaintiff in the records department on the second floor of Headquarters where he could continue to sexually harass her.

**ANSWER:**  Denied. Defendant further states that the position referenced, which Plaintiff filled, was the one that Plaintiff specifically requested that she be allowed to fill.

112.    Superintendent Johnson continued to demand that Plaintiff come to his fifth-floor office so he could continue to sexually harass and assault her.

**ANSWER:**  Denied.

113.    On one such occasion, Plaintiff's young son was visiting Plaintiff at work when Superintendent Johnson called on Plaintiff to come to his fifth-floor office with her son.

**ANSWER:**  Defendant admits that, on an occasion, Plaintiff was with her son at Defendant's office. Defendant denies the remaining allegations of this Paragraph.

114.    Superintendent Johnson then attempted to touch Plaintiff's buttocks while her son was facing another direction but with the possibility of Plaintiff's son witnessing this nonconsensual and unwanted sexual assault.

**ANSWER:**  Denied.

115.    As more details relating to the October 16, 2019 incident came to light in the media, Superintendent Johnson confessed to Plaintiff that he damaged or destroyed evidence contained in his cell phone.

**ANSWER:**  Denied. Defendant further states that these allegations constitute an utter fabrication.

116.    As part of its investigation into the October 16, 2019 incident, the City of Chicago Inspector General requested possession of Plaintiff's cell phone.

**ANSWER:**  Upon information and belief only, admitted.

117.    Plaintiff left her cell phone on her desk at CPD Headquarters.

**ANSWER:** Defendant is without sufficient personal knowledge to know whether Plaintiff actually did so, and therefore denies the allegations of this Paragraph.

118.     The Inspector General has since claimed that the SIM card in Plaintiff's cell phone was damaged or destroyed.

**ANSWER:** Defendant is without sufficient knowledge or information to respond to these allegations, including based upon the lack of foundation provided for these allegations.

119.     In order for Superintendent Johnson to destroy all evidence of his text message and/or email exchanges with Plaintiff he would have to destroy the evidence of his sexual assaults and sexual harassment contained in both his cell phone and Plaintiff's cell phone.

**ANSWER:** Denied. Defendant further states that the texts of Plaintiff, Defendant, and those of others will corroborate Defendant's denials of Plaintiff's allegations in this case and put the lie to those allegations.

### E.     Plaintiff's Injuries

120.     Plaintiff's constitutional right to her bodily integrity was taken from her by Superintendent Johnson.

**ANSWER:** Denied.

121.     Plaintiff's dignity as a human being was taken away from her by Superintendent Johnson.

**ANSWER:** Denied.

122.     Following his termination from CPD, Superintendent Johnson stalked Plaintiff by constantly calling, texting and showing up to locations where he knew Plaintiff would be, resulting in Plaintiff fearing for her personal safety.

**ANSWER:**     Denied. Defendant further states that Plaintiff's allegations are knowingly and intentionally false. Indeed, as referenced above, after Defendant was removed from his Superintendent's position, Plaintiff continued to seek out, and to continue to engage in a friendship with, the Defendant. In fact, on some occasions, Plaintiff directed, or agreed to meet with Defendant, at discrete locations because she was, *inter alia*, concerned that her husband would find out that she was interacting and communicating with the Defendant. At one point, Plaintiff suggested to the Defendant that they get "burner phones" so that they could continue to communicate with each other. As Defendant later learned, Plaintiff was making that suggestion while simultaneously meeting with her lawyers in this case to provide them with false allegations about the Defendant. Plaintiff also lobbied Defendant's friends to allow her to attend the funeral of Defendant's brother. Subsequently, on her own, Plaintiff showed up at a bar where Defendant's friends had taken him to commiserate regarding the death of his brother. Plaintiff attempted to show up on that occasion "incognito" in a wig. Plaintiff then spent a substantial period of time with Defendant and the group, socially, drinking, and interacting. Plaintiff also sought and received a loan from the Defendant. Incredibly, Defendant later learned that, shortly after receiving that loan from Defendant, Plaintiff had Defendant drive her to a location for a meeting. As it now turns out, that was a meeting Plaintiff had with the lawyers representing her in this case. After that meeting with her attorneys, Plaintiff then went with Defendant to a cell phone store and spent additional tine with him. In short, Plaintiff was hoodwinking her own attorneys, and keeping it from them that she was continuing to have a friendly and cordial relationship with the Defendant. Plaintiff also met with Defendant during this time period to receive a Christmas present from the Defendant. Moreover, the texts of Plaintiff, Defendant, and others during this time period will further corroborate the fact that Plaintiff and Defendant

continued to have a friendly, non-sexual relationship. During this time period, Plaintiff even made comments to the Defendant suggesting that, despite the fact that they were both still married and no longer in a sexual relationship that they would end up together. In the context of those statements, Plaintiff referred to the Defendant's wife and the look she would have on her face when she saw the Plaintiff and Defendant together.

123.    As a result of the conduct described above, Plaintiff has been treated by multiple mental health professionals.

**ANSWER:**    Defendant is without sufficient knowledge and information to respond to these allegations, and therefore denies them. Defendant further states, however, that to the extent Plaintiff has received such treatment, it has nothing to do with the Defendant or with Plaintiff's employment. Upon information and belief, as well as based upon information that Plaintiff shared with the Defendant, to the extent that Plaintiff has received such treatment, it either arose out of numerous issues and circumstances that Plaintiff has experienced - some bizarre and troubling – or it was received per the direction of her counsel in this case.

124.    Defendants' actions have damaged Plaintiff and caused Plaintiff to suffer physical and psychiatric injuries.

**ANSWER:**    Denied.

125.    Plaintiff has been diagnosed as having Chronic "Post Traumatic Stress Disorder" as a direct result of Defendants' actions and course of conduct.

**ANSWER:**    Defendant is without sufficient knowledge and information to respond to the allegations of this Paragraph, and therefore denies them. Defendant denies that, if Plaintiff has PTSD or a diagnosis of it, it has anything to do with the Defendant or Plaintiff's employment. In fact, Plaintiff shared information with the Defendant - some bizarre and deeply

troubling - that would suggest that, if Plaintiff has ever actually and legitimately suffered from PTSD, it arose out of various others events and traumas suffered by Plaintiff which have absolutely nothing to do with the Defendant or with Plaintiff's employment.

126. Post-Traumatic Stress Disorder ("PTSD") is a mental illness that can develop after a person is exposed to one or more traumatic events, such as sexual assault.

**ANSWER:** Defendant admits that, based upon his layman's understanding and upon information and belief, a person who legitimately and actually has PTSD may have been exposed to such events, and denies any remaining allegations. Defendant denies that, if Plaintiff has PTSD or a diagnosis of it, that it has anything to do with the Defendant or Plaintiff's employment. In fact, Plaintiff shared information with the Defendant – some bizarre and deeply troubling - that would suggest that, if Plaintiff has ever actually and legitimately suffered from PTSD, it arose out of various others events and traumas suffered by Plaintiff which have absolutely nothing to do with the Defendant or with Plaintiff's employment.

127. PTSD symptoms include disturbing flashbacks, avoidance, or numbing of memories of the event, and hyperarousal which continue for more than a month after the occurrence of a traumatic event.

**ANSWER:** Defendant admits that, based upon his layman's understanding and upon information and belief, a person who legitimately and actually has PTSD might suffer from one or more such symptoms, and denies any remaining allegations. Defendant denies that, if Plaintiff has PTSD or a diagnosis of it, that it has anything to do with the Defendant or Plaintiff's employment. Plaintiff shared information with the Defendant – some bizarre and deeply troubling - that would suggest that, if Plaintiff has ever actually and legitimately suffered from

PTSD, it arose out of various others events and traumas suffered by Plaintiff which have absolutely nothing to do with the Defendant or with Plaintiff's employment.

128.   Plaintiff has also been diagnosed as having Confirmed "Adult Psychological Abuse" as a direct result of Defendants' actions and course of conduct.

**ANSWER:**    Defendant is without sufficient knowledge and information to respond to Plaintiff's allegations, and therefore denies them.

129.   Adult Psychological Abuse, also referred to as psychological violence emotional abuse or mental abuse, is a form of abuse characterized by a person subjecting or exposing another to behavior that may result in psychological trauma, including anxiety, chronic depression, or post-traumatic stress disorder.

**ANSWER:**    Defendant is without sufficient knowledge and information to respond to Plaintiff's allegations, and therefore denies them.

130.   Adult Psychological Abuse is often associated with situations of power imbalance, such as abusive relationships, bullying, and abuse in the workplace.

**ANSWER:**    Defendant is without sufficient knowledge and information to respond to Plaintiff's allegations, and therefore denies them.

131.   Plaintiff lives in a constant state of fear for her personal safety and her son's safety.

**ANSWER:**    Denied. Defendant further states that, to the extent Plaintiff does so, it has nothing to do with the Defendant or with her employment with the City of Chicago.

132.   Plaintiff suffers from severe depression, anxiety, and stress.

**ANSWER:**    Defendant is without sufficient knowledge and information to respond to Plaintiff's allegation regarding what she allegedly currently "suffers from," and therefore denies them. However, Defendant further states that, to the extent she is actually experiencing any such

mental health issue, they have nothing to do with the Defendant. Moreover, Plaintiff had already

suffered from certain of those conditions without regard to the Defendant or to Plaintiff's

employment with the City of Chicago.

133. Plaintiff's symptoms include regular nightmares about Superintendent Johnson,

hair loss, weight gain, and embarrassment.

**ANSWER:** Defendant is without sufficient knowledge and information to respond to

Plaintiff's allegation, and therefore denies them. However, Defendant further states that, to the

extent she is actually experiencing any such "symptoms," they have nothing to do with the

Defendant. Moreover, Plaintiff had already suffered from certain of those symptoms without

regard to the Defendant or to Plaintiff's employment with the City of Chicago.

## COUNT I
### Title VII, 42 U.S.C. §2000(e) *et seq.* – Sexual Discrimination, Harassment, and Hostile Work Environment Claim Against Defendant City of Chicago

134. Each of the foregoing paragraphs are incorporated herein as if fully restated.

**ANSWER:** This Count is not directed to Defendant, and therefore no Answer is

required.

135. At all relevant times, Superintendent Johnson was Plaintiff's supervisor and

employed by the City of Chicago.

**ANSWER:** This Count is not directed to Defendant, and therefore no Answer is

required.

136. As described above, Superintendent Johnson's conduct toward Plaintiff was

unwelcome and occurred because of and based upon Plaintiff's gender.

**ANSWER:**     This Count is not directed to Defendant, and therefore no Answer is required.

137.   Superintendent Johnson's conduct occurred over several years, constituting a continuing course of discrimination towards Plaintiff.

**ANSWER:**     This Count is not directed to Defendant, and therefore no Answer is required.

138.   Superintendent Johnson committed an unlawful employment practice by treating Plaintiff differently because of her sex, causing a change in the condition of her employment and subjecting her to a hostile work environment.

**ANSWER:**     This Count is not directed to Defendant, and therefore no Answer is required.

139.   Plaintiff was subjected to a sexually objectionable environment that was both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that Plaintiff in fact did perceive to be so.

**ANSWER:**     This Count is not directed to Defendant, and therefore no Answer is required.

140.   The conduct of Plaintiff's employer had the purpose or effect of unreasonably interfering with Plaintiff's work performance.

**ANSWER:**     This Count is not directed to Defendant, and therefore no Answer is required.

141.   The conduct of Plaintiff's employer had the purpose or effect of creating an intimidating, hostile and offensive work environment.

**ANSWER:** This Count is not directed to Defendant, and therefore no Answer is required.

142. The actions of Plaintiff's employer permeated the workplace with discriminatory intimidation, ridicule and insult that was sufficiently severe or pervasive and regular to alter the conditions of Plaintiff's employment and create an abusive working environment.

**ANSWER:** This Count is not directed to Defendant, and therefore no Answer is required.

143. Defendant has therefore denied Plaintiff her rights under the Civil Rights Act of 1964 and she has suffered damages as a direct result of her rights being violated, including those set forth in paragraphs 120-133, which are likely to continue into the future.

**ANSWER:** This Count is not directed to Defendant, and therefore no Answer is required.

### COUNT II
### 42 U.S.C. §1983 – Equal Protection Claim
### Against Defendant Superintendent
### Johnson

144. Each of the foregoing paragraphs are incorporated herein as if fully restated.

**ANSWER:** Defendant admits that Plaintiff has restated the above Paragraphs, and denies any remaining allegations.

145. Plaintiff is a female and is a member of a protected class.

**ANSWER:** Admitted.

146. Plaintiff was similarly situated to individuals not of the protected class such as male coworkers.

**ANSWER:** Defendant states that these allegations call for legal conclusions to which no Answer is required. To the extent an Answer is required, Defendant denies these allegations,

and further states that Plaintiff has failed to identify those to whom she is or was similarly situated.

147.    Superintendent Johnson treated Plaintiff differently than other similarly situated male employees without a legitimate governmental purpose of doing so.

**ANSWER:**    Denied.

148.    Superintendent Johnson was personally involved in the constitutional violations of Plaintiff.

**ANSWER:**    Denied.

149.    Superintendent Johnson's actions with respect to Plaintiff were motivated by a discriminatory purpose, in violation of Plaintiff's constitutional rights to equal protection under the law and her right to bodily integrity.

**ANSWER:**    Denied.

150.    Superintendent Johnson acted with discriminatory intent.

**ANSWER:**    Denied.

151.    As a direct and proximate result of this equal protection violation, Plaintiff suffered damages, including those set forth in paragraphs 120-133.

**ANSWER:**    Denied.


**COUNT III**
**42 U.S.C. §1983 – *Monell* Claim**
**Against Defendant City of**
**Chicago**

152.    Each of the foregoing paragraphs are incorporated herein as if fully restated.

**ANSWER:**    This Count is not directed to Defendant, and therefore no Answer is required.

153.   At all times relevant to the complaint Superintendent Johnson was a person with final policymaking authority within the City of Chicago and CPD.

**ANSWER:**   This Count is not directed to Defendant, and therefore no Answer is required.

154.   At all times relevant to the complaint Superintendent Johnson was a policymaker for the City of Chicago.

**ANSWER:**   This Count is not directed to Defendant, and therefore no Answer is required.

155.   By compelling and demanding that Plaintiff engage in sexual activity, Superintendent Johnson, an agent of the City of Chicago, violated Plaintiff's Fourteenth Amendment rights to substantive due process, liberty interests, and bodily integrity.

**ANSWER:**   This Count is not directed to Defendant, and therefore no Answer is required.

156.   By treating Plaintiff differently because of her sex, Superintendent Johnson, an agent of the City of Chicago, violated Plaintiff's rights to equal protection under the Fourteenth Amendment.

**ANSWER:**   This Count is not directed to Defendant, and therefore no Answer is required.

157.   As a direct and proximate result of the decisions and actions of Superintendent Johnson, an agent of the City of Chicago with final policymaking authority, Plaintiff suffered damages, including those set forth in paragraphs 120- 133.

**ANSWER:**   This Count is not directed to Defendant, and therefore no Answer is required.

## COUNT IV
## Illinois Gender Violence Act 749 ILCS
## 82/5 Against Defendant Superintendent
## Johnson

158. Each of the foregoing paragraphs are incorporated herein as if fully restated.

**ANSWER:** Defendant admits that Plaintiff has incorporated her above allegations, and denies any remaining allegations.

159. Superintendent Johnson's conduct, as described in the foregoing paragraphs, was insulting, offensive, done intentionally and knowingly, and without Plaintiff's consent.

**ANSWER:** Denied.

160. Superintendent Johnson's conduct, as described in the foregoing paragraphs, satisfies the elements of battery under the laws of Illinois.

**ANSWER:** Denied.

161. Superintendent Johnson's conduct, as described in the foregoing paragraphs, was committed on the basis of Plaintiff's sex.

**ANSWER:** Denied.

162. Superintendent Johnson's conduct, as described in the foregoing paragraphs, was of a sexual nature.

**ANSWER:** Defendant admits that Plaintiff has alleged conduct of a sexual nature, and denies any remaining allegations.

163. Superintendent Johnson's conduct was committed under coercive conditions in that Superintendent Johnson was Plaintiff's supervisor and took advantage of his authority over Plaintiff.

**ANSWER:** Denied.

164. Superintendent Johnson's conduct, as described in the foregoing paragraphs,

included threats which caused Plaintiff a realistic apprehension that Superintendent Johnson would commit the acts threatened.

**ANSWER:**    Denied.

165.   As a direct and proximate result, Plaintiff suffered damages, including those set forth in paragraphs 120-133.

**ANSWER:**    Denied.

## COUNT V
### Spoliation of Evidence
### Against Defendant Superintendent Johnson

166.   Each of the foregoing paragraphs are incorporated herein as if fully restated.

**ANSWER:**    Defendant admits that Plaintiff has incorporated her above allegations, and denies any remaining allegations.

167.   Plaintiff and Superintendent Johnson were in possession of text messages on their respective cell phones relating to Superintendent Johnson's sexually abusive, harassing, and discriminatory conduct towards Plaintiff that created a hostile work environment.

**ANSWER:**    Defendant admits that Plaintiff and Defendant were in possession of text messages. Defendant denies the remaining allegations of this Paragraph. Indeed, the parties' text messages will reveal the consensual nature of the parties' relationship, and that Plaintiff's allegations in this Complaint are false, contrived, and made in an attempt to bring her financial gain.

168.   Said text messages were critical evidence in establishing Superintendent Johnson's sexually abusive, harassing, and discriminatory conduct towards Plaintiff and the resulting hostile work environment.

**ANSWER:**    Denied.

169.    Superintendent Johnson had a pre-suit duty to preserve said text messages given their relevance and probity to Plaintiff's case.

**ANSWER:**    Denied. Defendant further states that these allegations call for a legal conclusion.

170.    Superintendent Johnson breached the duty by engaging in an active cover up when he erased, damaged, and/or destroyed his own cell phone which electronically stored said text messages.

**ANSWER:**    Denied. Defendant further states that these allegations call for a legal conclusion.

171.    As a direct and proximate result of Superintendent Johnson's breach of duty, Plaintiff has been severely injured because if Superintendent Johnson had not destroyed his own cell phone, Plaintiff would have been able to introduce additional evidence of her sexual discrimination and harassment case against Defendants.

**ANSWER:**    Denied. Defendant further states that these allegations call for a legal conclusion.

**WHEREFORE**, Defendant Eddie Johnson, by and through his attorneys, respectfully request that the Court deny Plaintiff's request for relief against Defendant Eddie Johnson; enter judgment in his favor and against the Plaintiff; and award him his attorneys' fees and costs for defending Plaintiff's intentionally false allegations.

**AFFIRMATIVE DEFENSES**

1.      Plaintiff's allegations fail to state a claim upon which relief can be based with respect to this Defendant.

2.      Plaintiff's claims are preempted by Title VII.

3.      Plaintiff's claims are barred because she failed to avail herself of he internal reporting mechanisms that the City of Chicago afforded its employees for reporting alleged harassment or discrimination.

4.      Plaintiff's claims are barred because Plaintiff failed to exhaust her administrative remedies provided for her in the collective bargaining agreement governing her employment.

5.      Plaintiff's claims are barred because Plaintiff failed to exhaust her administrative remedies provided for her by the federal EEOC and Illinois Department of Human Rights.

6.      Plaintiff's claims are barred because she failed to timely file a Charge with the EEOC and/or the Illinois Department of Human Rights.

7.      Plaintiff's claims fail because there is no individual liability for Defendant, who is not the employer of the Plaintiff.

8.      Plaintiff's claims fails because she has not suffered, and has not properly alleged that she suffered, any adverse employment action.

9.      Plaintiff's claims are barred to the extent that they have not been filed within the applicable statute of limitations.

10.      Plaintiff is estopped from asserting her claims against Defendant because, by her acts and by her inaction, she clearly caused Defendant to believe that all of her sexual encounters with him were welcome and consensual, and she therefore caused Defendant to rely upon her

44

acts and inaction to his detriment.

11.    Plaintiff's claims are barred by waiver. Here, by her acts and inaction, Plaintiff clearly indicated to Defendant and caused him to believe that all of her sexual encounters with him were welcome and consensual, and she knowingly and voluntarily relinquished her rights to assert that they were otherwise.

12.    Plaintiff's claims are barred to the extent they were not raised in a timely filed administrative Charge.

13.    Plaintiff's claims are barred to the extent that she has failed to mitigate her alleged damages.

14.    Plaintiff's claims for emotional distress damages are barred to the extent that they arise out of issues, incidents, and occurrences other than the alleged conduct of the Defendants.

**WHEREFORE**, Defendant Eddie Johnson, by and through his attorneys, respectfully request that the Court deny Plaintiff's request for relief against Defendant Eddie Johnson; enter judgment in his favor and against the Plaintiff; and award him his attorneys' fees and costs for defending Plaintiff's intentionally false allegations.

**January 15, 2020**                    **RESPECTFULLY SUBMITTED,**

                              **By:    s/*Michael I. Leonard*_____**
                                    **Counsel for Defendant Eddie Johnson**

**LEONARD TRIAL LAWYERS, LLC**
Michael I. Leonard
Rebecca Alexander
120 North LaSalle St., Suite 2000
Chicago, Illinois 60602
(312)380-6659 (direct)
(312)264-0671 (fax)
mleonard@leonardtriallawyers.com
ralexander@leonardtriallawyers.com

**THE LONGE LAW FIRM, LLC**
Gbenga Longe
1655 S. Blue Island Ave
Chicago, Illinois 60608
(708)803-5029
glonge@longelaw.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that a true and correct copy of the above and foregoing document was e-filed with this Court using its ECF system, and thus served on all counsel of record on January 15, 2021:

      **By:**    <u>s/*Michael I. Leonard*</u>
              **Counsel for Defendant Johnson**