```
 1    IN THE MATTER OF THE ARBITRATION    )
                                          )
 2         Between                        )
                                          ) Grievant:
 3    POLICEMEN'S BENEVOLENT &            ) Eddie Johnson
      PROTECTIVE ASSOCIATION,             )
 4    LIEUTENANTS, UNIT 156B,             ) Grievance Number
                                          ) 546-20-014
 5                    Union,              )
                                          )
 6         and                           )
                                          )
 7                                        )
      CITY OF CHICAGO,                    )
 8                                        )
                      Employer.           )
 9
```

10            REPORT OF PROCEEDINGS had at the

11   arbitration of the above-entitled matter before

12   GEORGE T. ROUMELL, JR., Arbitrator, taken via Zoom

13   videoconference, on January 7, 2021, at 10:00 a.m.

14

15

16

17

18

19

20

21

22

23

24

**DON.DEF003387**

Arbitration        Lt. E. Johnson & PB & PA v. CPD

Page 2

1  APPEARANCES: (via videoconference)

2  POLICEMEN'S BENEVOLENT & PROTECTIVE ASSOCATION
   LABOR COMMITTEE
3  BY: MR. JASON WILLIAM LEE
      MR. JOSEPH ANDRUZZI
4      MS. DONNA DOWD
       200 West Jackson Boulevard, Suite 720
5      Chicago, Illinois 60606
       312.453.7751
6      jlee@pbpa.org
       jandruzzi@pbpa.org
7      ddowd@pbpa.org

8          Appearing on behalf of the
           Policemen's Benevolent & Protective
9          Association, Lieutenants, Unit 156B;

10 FRANCZEK P.C.
   BY: MR. DAVID A. JOHNSON
11    MS. JENNIFER A. DUNN
      300 South Wacker Drive, Suite 3400
12    Chicago, Illinois 60606
      312.986.0300
13    daj@franczek.com
      jad@franczek.com
14

15         Appearing on behalf of the City of
           Chicago.

16

17 ALSO PRESENT:

18    Mr. Eddie Johnson
      Ms. Donna Rowling
19    Mr. Anthony Riccio
      Ms. Susan O'Keefe
20    Ms. Jennifer Kenedy

21          * * * * *

22

23

24 Reported By: Valerie M. Calabria, CSR, RPR
   License No.: 084-003928

Page 3

1          INDEX

2  OPENING STATEMENT BY MR. LEE          15

3  OPENING STATEMENT BY MR. JOHNSON      23

4

5  WITNESS               EXAMINATION

6  SUSAN O'KEEFE

7    DIRECT BY MR. JOHNSON        44

8    CROSS BY MR. LEE             52

9    EXAMINATION BY ARBITRATOR ROUMELL    66

10   REDIRECT BY MR. JOHNSON      68

11 EDDIE JOHNSON

12   DIRECT BY MR. LEE            73

13   CROSS BY MS. KENEDY          107

14   CROSS BY MR. JOHNSON         121

15 ANTHONY GUGLIELMI

16   DIRECT BY MR. ANDRUZZI       129

17 ANTHONY RICCIO

18   DIRECT BY MR. ANDRUZZI       136

19   CROSS BY MR. JOHNSON         145

20   EXAMINATION BY ARBITRATOR ROUMELL    150

21   RECROSS BY MR. JOHNSON       151

22   REDIRECT BY MR. ANDRUZZI     153

23

24

Page 4

1          INDEX

2  WITNESS               EXAMINATION

3  DONNA ROWLING

4    DIRECT BY MR. JOHNSON        169

5    CROSS BY MR. LEE             179

6    REDIRECT BY MR. JOHNSON      184

7    RECROSS BY MR. LEE           187

8

9          EXHIBITS

10 NUMBER/DESCRIPTION              ADMITTED

11 City Exhibits 1 and 2          13

12 Union Exhibits 1 through 4     8

13

14

15

16

17

18

19

20

21

22

23

24

Page 5

1      ARBITRATOR ROUMELL: I'm ready for opening

2  statements. You want to agree on the exhibits,

3  Mr. Lee, Mr. Johnson?

4      MR. JOHNSON: The City has no objection to the

5  joint exhibits. We do have objection to the

6  union's exhibits.

7      ARBITRATOR ROUMELL: Which ones?

8      MR. ANDRUZZI: Mr. Arbitrator, before we

9  continue, we do have a witness online.

10     ARBITRATOR ROUMELL: Okay.

11     MR. ANDRUZZI: I don't know how we remove him

12 from the screen or --

13     ARBITRATOR ROUMELL: What do you want to do?

14     MR. ANDRUZZI: Unless the City has no

15 objection to him sitting in on the Zoom right now.

16     MR. JOHNSON: We have no objection to the

17 witnesses being there. We're not sequestering

18 anybody on Zoom.

19     ARBITRATOR ROUMELL: Okay. What exhibits are

20 you objecting to?

21     MR. JOHNSON: We -- the first exhibit, as I

22 understand it, Union Exhibit 1, I believe, is the

23 job description for the superintendent of police.

24 It's the -- our objection to that is very short and

**DON.DEF003388**

Page 6

1  sweet.  As the arbitrator knows from the motion to
2  quash that we filed on December 31st, we view this
3  grievance -- this proceeding, this grievance, as
4  not substantively arbitrable.  What someone does,
5  actions by an individual while not a member of the
6  bargaining unit can't be the subject of a grievance
7  in our view.  That's the only objection I've got to
8  Union 1.
9      ARBITRATOR ROUMELL:  Okay.  I'm going to rule.
10  I understand the objection, but I'll receive it
11  subject to your objection.
12          What's number two?
13      MR. JOHNSON:  Union 2, I believe, is the
14  detail history, I think, for Officer Donald, who is
15  the plaintiff in the civil action.  Again for the
16  same reason as with respect to Union Exhibit 1, we
17  don't view that as relevant or material to the
18  issues before you.
19      ARBITRATOR ROUMELL:  All right.  Well, I
20  understand your objection, Mr. Johnson, but the
21  question of relevancy is really up to me.  Of
22  course, you're entitled to know how relevant I
23  might think it is.  I don't know yet, but I'll
24  receive it subject to your objection.

Page 7

1      MR. JOHNSON:  Then Union Exhibit 3 is a
2  compilation of the attendance and assignment sheets
3  again for the civil plaintiff, Officer Donald.  We
4  object to Union 3 for the same reasons we objected
5  to Union 1 and 2.
6      ARBITRATOR ROUMELL:  All right.  What about
7  the next one?
8      MR. JOHNSON:  Union Exhibit 4 is the letter
9  from the mayor -- the December 2nd, 2019, letter
10  from the mayor addressing the superintendent,
11  terminating him from the position of superintendent
12  for cause.  Again, we don't see the issue of his
13  termination as superintendent as relevant to the
14  issues before you.
15      ARBITRATOR ROUMELL:  All right.  Keep on
16  going.
17      MR. JOHNSON:  And those are the four exhibits,
18  I believe.
19      ARBITRATOR ROUMELL:  Mr. Lee, you want to make
20  a statement on the record?
21      MR. LEE:  Yeah.  We believe Exhibits 1, 2, 3,
22  and 4 are relevant and can address our theory with
23  respect to arbitrability and whether Mr. Johnson
24  was acting within the scope of employment.

Page 8

1      ARBITRATOR ROUMELL:  All right.  As I began to
2  rule on these, I'll admit them.  I understand the
3  City's objection.  I understand your theory.  I'll
4  receive them and I'll determine the relevancy.
5  Okay.
6      MR. LEE:  Thank you.
7          (Whereupon documents so offered
8          were received in evidence as
9          Union Exhibits 1 through 4.)
10      ARBITRATOR ROUMELL:  What about the City
11  exhibits?
12      MR. LEE:  There are two City exhibits.  One is
13  a transcript of --
14      ARBITRATOR ROUMELL:  One is what?
15      MR. LEE:  A transcript of an interest
16  arbitration hearing that was held before you in
17  regards to Article 22 of the lieutenant CBA.
18      ARBITRATOR ROUMELL:  You're objecting because
19  of relevance?
20      MR. LEE:  Absolutely, we object to relevance.
21      MR. JOHNSON:  If I can just respond briefly on
22  that one, Mr. Arbitrator.  That transcript in
23  question, this is a direct response to the
24  conference call we all had with you on I believe it

Page 9

1  was Tuesday afternoon in connection with the
2  request to -- our motion to quash the request for
3  production of documents.  In that -- during the
4  course of that conversation, we mentioned, I
5  mentioned, that the issue of a potential
6  modification or amendment to Article 22 in the
7  lieutenants collective bargaining agreement had
8  been part and parcel of the interest arbitration
9  proceeding over which you presided.
10          And you directed me, directed the
11  City, to say that if we were going to rely upon any
12  of the evidence or any of the testimony in the
13  interest arbitration bearing on that contract
14  proposal that it was incumbent upon us to alert or
15  to apprise the union as to which parts -- you know,
16  which specific parts of the transcript would be
17  relied on, and that's what we did.
18          In a separate e-mail, which you don't
19  have, we advised counsel for the union the specific
20  page range.  I believe it's pages 454, I think,
21  through 473 in that transcript as being the portion
22  of the transcript that -- in which there was
23  testimony about the union's proposal to modify
24  Article 22.

**DON.DEF003389**

Page 10

1 ARBITRATOR ROUMELL: All right. I'm going to
2 receive it subject to the objection.
3 Go ahead. What's the next one.
4 MR. JOHNSON: Well, the next exhibit is a
5 compilation of the -- if you will, the ordinance
6 and statutory provisions addressing, outlining, the
7 respective zones of authority, if you will, of the
8 mayor and of the superintendent.
9 MR. ANDRUZZI: Mr. Arbitrator, can I just tell
10 you for the last -- unfortunately, for the last
11 minute or so of Mr. Johnson's statements we had no
12 audio at all. It wasn't his fault. It's an
13 internet issue here in our office. So,
14 unfortunately, I would ask that he repeat what he
15 just said.
16 MR. JOHNSON: Sure, Joe. I'm happy to do
17 that, Joe. I started talking about our Exhibit 1,
18 which is a transcript from the interest
19 arbitration. Did you catch any part of that?
20 MR. ANDRUZZI: We did. We did up until the
21 point where you said you had sent us something with
22 the page range.
23 MR. JOHNSON: Correct. I think I sent that
24 yesterday when I attached the transcript to the

Page 11

1 e-mail. And the -- it's the page range --
2 ironically enough, Joe, it's where you testified
3 during the interest arbitration proceeding with
4 respect to the union's proposal to modify, to
5 amend, Article 22. And if I'm correct, I believe
6 that begins at page 454 of that transcript and goes
7 on to page -- excuse me here -- page 473.
8 ARBITRATOR ROUMELL: Well, I'm --
9 MR. JOHNSON: It's only offered as bargaining
10 history.
11 ARBITRATOR ROUMELL: I'm going to receive it
12 subject to the objection. Frankly, there are two
13 views among arbitrators. The fact that one party
14 or another in a dispute tries to modify the
15 language in the contract doesn't necessarily mean
16 that the party attempting to modify is recognizing
17 that the contract doesn't say what they claim it
18 says. In fact, I can give you authority to that
19 effect. So I don't know how relevant that really
20 is, but I'll receive it.
21 What other objection do you have?
22 MR. LEE: No further objections with respect
23 to Employer Exhibit 1. We do object to Employer
24 Exhibit 2. I don't know if Mr. Johnson made an

Page 12

1 argument in favor of admitting it yet or not.
2 ARBITRATOR ROUMELL: Wait a minute. What is
3 Exhibit 2?
4 MR. JOHNSON: Exhibit 2 is a compilation --
5 ARBITRATOR ROUMELL: Now, wait a minute. I
6 want to hear their objection.
7 MR. JOHNSON: Sure.
8 MR. LEE: Yes, your Honor. Yes, your Honor.
9 We object to relevance. It's basically a summation
10 of what the City believes are applicable municipal
11 codes and state laws that pertain to the
12 superintendent's authority and the mayor's
13 authority.
14 ARBITRATOR ROUMELL: I'm going to cut it
15 short. I always take judicial notice of that.
16 It's a public record. If I think it's relevant, I
17 will. If I don't think it's relevant, okay.
18 So we're going to admit all the
19 exhibits and you can argue later on what I should
20 consider. Obviously, you're getting the message
21 that I'm going to let a lot in and then I'll sort
22 it out. There's no jury here.
23
24

Page 13

1 (Whereupon documents so offered
2 were received in evidence as
3 City Exhibits 1 and 2.)
4 ARBITRATOR ROUMELL: Okay. I'm ready for
5 opening statements. Who's going to make it for the
6 union?
7 MR. LEE: I'll be making it, Jason Lee.
8 MR. JOHNSON: There's a --
9 ARBITRATOR ROUMELL: There's an echo? I don't
10 think it's coming from me.
11 MR. LEE: Joe, can you mute your microphone?
12 All right. I'll begin with my
13 opening statement. Are you ready, Mr. Arbitrator?
14 ARBITRATOR ROUMELL: There's one person that's
15 not in here. "Franczek guest." I don't know who
16 that is.
17 Okay. I'm ready.
18 MR. ANDRUZZI: Excuse me, Mr. Arbitrator. We
19 would like to know. If we're going to have
20 somebody in the room, I think it's all right to
21 know who is listed as "Franczek guest." There's
22 two people.
23 MR. JOHNSON: Oh, I fully agree. I fully
24 agree, Joe.

**DON.DEF003390**

Page 14

1  So we have four people in the room.
2  You have yours truly. You have Jennifer Dunn. You
3  have Commander Rowling. And we have Susan O'Keefe,
4  the deputy corporation counsel who wrote the
5  declination letter.
6  The other Franczek guest, it's a
7  placeholder for Jennifer Kenedy if we get to that
8  point, but she is not currently in the room.
9  MR. ANDRUZZI: Okay.
10 ARBITRATOR ROUMELL: Who is it?
11 MR. JOHNSON: Her name is Jennifer Kenedy. I
12 suggest we can deal with that issue perhaps a
13 little bit later in this proceeding, but she's not
14 here now. She is not here now. And I give you my
15 word that we will alert you the minute -- the
16 moment she arrives or is on screen.
17 ARBITRATOR ROUMELL: I don't dare ask Joe the
18 next question, but I will anyway.
19 Do you accept his word?
20 MR. JOHNSON: I want to know now.
21 MR. ANDRUZZI: I do. I do. And for the
22 record, we have another witness that we told him we
23 would let him know when he needs to join and that
24 witness would be Anthony Guglielmi. I can never

Page 15

1  say his last name.
2  ARBITRATOR ROUMELL: Okay.
3  MR. JOHNSON: As long as it's not Rudy
4  Giuliani.
5  ARBITRATOR ROUMELL: No, no, no. If it's him,
6  you're disbarred.
7  Mr. Lee, I tend to be a little bit
8  informal. Okay, Mr. Lee. You're making the
9  opening statement. Go ahead.
10 MR. LEE: Yes, sir.
11 OPENING STATEMENT
12 BY MR. LEE:
13 Mr. Arbitrator, this grievance is
14 predicated on the filing of a civil lawsuit by the
15 Chicago Police Department member Cynthia Donald
16 against the City of Chicago and Mr. Eddie Johnson,
17 retired lieutenant and former superintendent of the
18 Chicago Police Department. The civil action was
19 filed by Ms. Donald on October 14, 2020 --
20 ARBITRATOR ROUMELL: Hold on, Mr. Lee. Is
21 there a chance that you could remove your mask
22 while you're speaking? If you're uncomfortable
23 doing it, say so.
24 MR. LEE: It's fine.

Page 16

1  ARBITRATOR ROUMELL: Go ahead.
2  MR. LEE: Shall I begin again?
3  ARBITRATOR ROUMELL: Please. Go ahead.
4  MR. LEE: Mr. Arbitrator, this grievance is
5  predicated upon the filing of a civil lawsuit by
6  the Chicago Police Department member Cynthia Donald
7  against the City of Chicago and Mr. Eddie Johnson,
8  retired lieutenant and former superintendent of the
9  Chicago Police Department. The civil action was
10 filed by Ms. Donald on October 14th, 2020, after
11 Mr. Johnson retired as a lieutenant from the
12 Chicago Police Department.
13 In her complaint Ms. Donald brings
14 five counts: a sexual discrimination, harassment
15 and hostile work environment claim against the City
16 of Chicago, a Monell claim against the City of
17 Chicago, an Illinois Gender Violence Act claim,
18 equal protection claim, and a spoliation claim
19 against Mr. Johnson.
20 The underlying allegation by Mr. --
21 (video disruption).
22 ARBITRATOR ROUMELL: Are you still talking?
23 I've lost the audio. What happened?
24 MR. LEE: Internet went down again. I'll

Page 17

1  continue.
2  ARBITRATOR ROUMELL: Well, Trump is only mad
3  at Michigan. He's not mad at Illinois.
4  MR. LEE: Not yet.
5  ARBITRATOR ROUMELL: Go ahead.
6  MR. LEE: The underlying allegations by
7  Ms. Donald claim that Mr. Johnson sexually
8  assaulted and harassed her while on duty and off
9  duty as a member of Mr. Johnson's detail. But more
10 importantly and more pertinent to this arbitration
11 is that Ms. Donald makes a claim in the complaint,
12 in the four corners of the document, that Mayor
13 Lightfoot retaliated against her by way of ordering
14 Mr. Johnson to remove her from the superintendent's
15 unit.
16 As further pled in the complaint, the
17 reassignment alleged to have exacerbated the
18 hostile work environment and was retaliatory and
19 purposeful to deflect blame from the mayor and the
20 City of Chicago following a media-hyped incident
21 involving Mr. Johnson and Ms. Donald.
22 Evidence will be presented that
23 Ms. Donald was reassigned by Mr. Johnson at the
24 direction of Mayor Lightfoot to the records

Page 18

1  department within the Chicago Police Department.
2  Evidence will be presented that Mr. Johnson was
3  given no choice but to comply with the order from
4  the mayor, his immediate and only supervisor, and
5  reassign Ms. Donald or face discipline.
6       Evidence will further be presented
7  that on or about December 2nd, 2019, Mayor
8  Lightfoot attempted to fire Mr. Johnson from the
9  Chicago Police Department informing him, in fact,
10 that he was fired from the Chicago Police
11 Department.  However, and shockingly unbeknownst to
12 Mayor Lightfoot, Mr. Johnson informed her she did
13 not have the authority or power to fire him.  Mayor
14 Lightfoot then subsequently removed -- (video
15 disruption).
16      ARBITRATOR ROUMELL:  What's going on now?  I
17 can't hear.
18      MS. DUNN:  He's frozen.
19      ARBITRATOR ROUMELL:  I've got everything on.
20      MR. ANDRUZZI:  It's not you.  It's a situation
21 in our office.  We're changing computers.
22      MR. LEE:  I'll continue.
23      However, and shockingly unbeknownst
24 to Mayor Lightfoot, Mr. Johnson -- are you hearing

Page 19

1  me?
2       ARBITRATOR ROUMELL:  I am, except now you're
3  Donna Dowd.  That's all right.
4       MR. LEE:  However, and shockingly unbeknownst
5  to Mayor Lightfoot, Mr. Johnson informed her she
6  did not have the authority or power to fire him.
7  Mayor Lightfoot then subsequently removed
8  Mr. Johnson from the position of superintendent and
9  a new superintendent of the Chicago Police
10 Department was installed.
11      During the time he was in the
12 position of superintendent, he maintained the rank
13 of lieutenant.  And when he was removed from the
14 position of superintendent, he still maintained the
15 rank of lieutenant.
16      In November 2020 Mr. Johnson received
17 a denial letter from deputy corporation counsel
18 Susan O'Keefe who informed Mr. Johnson that after
19 reviewing the allegations complained of in
20 Ms. Donald's lawsuit the City of Chicago would not
21 provide him with legal representation for the
22 lawsuit because the allegations state that
23 Mr. Johnson acted outside the scope of his
24 employment at the time of the alleged action.

Page 20

1       The City concluded that at this stage
2  based on the allegations Mr. Johnson was not acting
3  in his capacity as superintendent of police at the
4  time of the events described in Ms. Donald's
5  complaint and does not meet the required conditions
6  for representation and the City of Chicago would
7  not pay for Mr. Johnson's legal representation in
8  this lawsuit.
9       The City further clarified their
10 position by saying that if at some point in the
11 future facts come to light that demonstrate
12 Mr. Johnson was acting in the scope of his duties
13 the City will revisit this decision.
14      You will hear that Ms. O'Keefe made
15 no mention in her denial letter that Ms. Donald
16 pled in her complaint that Mr. Johnson was ordered
17 to remove Ms. Donald from her position by the mayor
18 or that this conduct was retaliatory and
19 purposeful.  Ms. O'Keefe made no mention in her
20 denial letter that she considered or did not
21 consider this.
22      Ms. O'Keefe further did not raise in
23 her denial letter that Mr. Johnson was not afforded
24 the protections of the lieutenants collective

Page 21

1  bargaining agreement; rather, she merely focused on
2  the City of Chicago's narrative in obviating the
3  City from the responsibility and obligation to
4  provide Mr. Johnson with legal representation.  Her
5  analysis focused on whether some and not all of the
6  allegations complained in the complaint were within
7  or not within the scope of employment, utilizing
8  the same or substantially the same language found
9  in Article 22 of the lieutenants collective
10 bargaining agreement.
11      And finally, evidence will be
12 presented that Mr. Johnson filed his grievance
13 alleging a violation of Article 22 on
14 November 16th, 2020.  Mr. Johnson received a
15 response denying the grievance, once again
16 obviating the City from its responsibility and
17 obligation to provide him with legal
18 representation.
19      That denial did not include any
20 suggestion that the lieutenant CBA was not
21 applicable; rather, the denial of the grievance was
22 predicated upon Article 22 of the lieutenant's CBA.
23 There was not a claim by the City at that point
24 that Mr. Johnson's conduct was not applicable to

Page 22

1  the lieutenant CPA. In fact, the denial of the
2  grievance -- in the denial of the grievance
3  Commander Rowling states that Article 22 has not
4  been violated nor has any other section of the
5  contract been violated.
6      ARBITRATOR ROUMELL: Let me ask you a
7  question.
8      MR. LEE: Yes, sir.
9      ARBITRATOR ROUMELL: Are you maintaining that
10 while Superintendent Johnson was superintendent he
11 continued with the rank of lieutenant? Is that
12 what I heard?
13     MR. LEE: Yes. When he was in the position of
14 superintendent, he maintained the rank of
15 lieutenant.
16     ARBITRATOR ROUMELL: You'll have proof of
17 that?
18     MR. LEE: We will have evidence presented.
19     ARBITRATOR ROUMELL: Fine. Fine.
20         David Johnson, are you going to make
21 the opening statement for the City? Are you
22 speaking now? I can't hear you.
23     MR. JOHNSON: Yes, I would like to make an
24 opening. I threw myself off the screen there for a

Page 23

1  second. I apologize.
2      ARBITRATOR ROUMELL: All right.
3          OPENING STATEMENT
4  BY MR. JOHNSON:
5          On behalf of the City of Chicago. From
6  our perspective, I think you have two issues before
7  you. I think there's -- the first issue, frankly,
8  is dispositive, but the first issue and certainly
9  the way I would frame the issue or issues before
10 you in this proceeding is is this grievance
11 subsequently arbitrable. If it is, did the City
12 violate Article 22 when it refused to represent or
13 pay for the representation of former superintendent
14 Eddie Johnson in the civil action Donald v. City of
15 Chicago, et al. If so, what shall be the remedy.
16         I'd like to first address the
17 substantive arbitrability issue. As you know, back
18 on December 31st we put the union on notice that we
19 do not view this matter, this grievance, as
20 substantively arbitrable. They've been on notice
21 since then.
22         The complaint could not be any clearer
23 in that it makes it abundantly clear that all of
24 the actions about which the plaintiff complains

Page 24

1  are -- occurred while Mr. Johnson was in the
2  position of superintendent. He was superintendent
3  from beginning in 20- -- spring of 2016 through
4  December 2nd of 2019 as we know from I think it's
5  Union Exhibit 4, the letter from the mayor
6  separating him from his position as superintendent.
7  Yes. He reverted then to his career service
8  position, his career service rank of lieutenant,
9  which he held for all of two days when he retired
10 from the police department on December 4th, 2019.
11         Nothing in the complaint alleges conduct
12 by Mr. Johnson during the 48 hours that he occupied
13 the rank of lieutenant. All of the allegations and
14 we -- as you acknowledged, you read the pleadings.
15 I assume that you read the complaint. Paragraph 2
16 in that complaint could not be any clearer.
17 Paragraph 2, "At all times relevant to this
18 complaint, Superintendent Johnson was the highest
19 ranking member of the CPD." An allegation that's
20 repeated in paragraph 32. And quoting from
21 paragraph 32 of the complaint, "At all times
22 relevant to the complaint, Superintendent Johnson
23 was the superintendent of the CPD and was serving
24 in a supervisory capacity over plaintiff." There's

Page 25

1  no contest, there is no dispute over that.
2          The lieutenants collective bargaining
3  agreement has nothing to do with the terms and
4  conditions of employment of an individual while
5  that individual is outside the bargaining unit and
6  specifically while that individual is serving as a
7  superintendent.
8          The lieutenants collective bargaining
9  agreement did not govern the salary received by
10 Superintendent Johnson. It didn't -- had nothing
11 to do with how they -- he observed by
12 Superintendent Johnson and certainly had nothing to
13 do with overtime privileges or overtime rights in
14 his capacity as superintendent.
15         The union's position has to be before
16 you that one article, one provision and only one
17 provision of that collective bargaining agreement
18 is applicable here and that being Article 22, and
19 that can't be true. The contract either applies or
20 it doesn't.
21         With respect to the substantive
22 arbitrability argument, and this is why it's not
23 substantively arbitrable, we all know -- and this
24 is commonplace and in the briefs we'll certainly

**DON.DEF003393**

Page 26

1 present you with a wealth of authority for this
2 proposition. As you know, the individual's
3 rights -- the substantive arbitrability of a
4 grievance is not determined by the individual's
5 status at the time he or she files the grievance.
6 For example, if someone is discharged and then
7 three days after the discharge files a grievance
8 with respect to that discharge, presuming that the
9 collective bargaining agreement authorizes an
10 arbitration proceeding for discharges, it's no
11 defense by the employer that, hey, you're fired,
12 you're an ex-employee.
13 In fact, when this grievance was
14 filed -- when that suit was filed, Mr. Johnson was
15 a retired member of the department. We don't take
16 the position that a retired member has no rights
17 under the collective bargaining agreement. Had the
18 complaint addressed or complained of performance of
19 duties or actions taken by Mr. Johnson while he was
20 a lieutenant and if those -- if the complaint
21 alleged performance that -- if the loss arose out
22 of the performance of duties and if the evidence
23 showed that he was within the scope of employment
24 when he did the actions complained of and that he

Page 27

1 cooperated in the defense of the case, then yes,
2 the fact that he was retired when the lawsuit was
3 filed or when the grievance was filed would have no
4 bearing on his right or his entitlement to
5 representation under Article 22 of the collective
6 bargaining agreement.
7 You look to -- for the substantive
8 arbitrability, what you look to is whether the
9 alleged violation is with respect to -- occurred
10 during a time -- goes to a period of time when the
11 individual was a member of the bargaining unit. In
12 this case the entirety of the complaint has to do
13 with Mr. Johnson's conduct as alleged, whether it
14 occurred or not, but is alleged while he was a
15 superintendent, while the superintendent, not a
16 lieutenant.
17 Because nothing in this complaint
18 suggests that this lawsuit arises out of the
19 performance of duties as a lieutenant, it can't be
20 arbitrable under the terms of provisions of this
21 collective bargaining agreement.
22 In our briefs we will embellish on this
23 point. It is well established in Illinois law, for
24 example, that with respect to the bargaining

Page 28

1 obligation, an employer is under no obligation to
2 bargain with a union with respect to promotion to a
3 position outside the bargaining unit.
4 MR. ANDRUZZI: Excuse me, Mr. Arbitrator.
5 We've lost all audio from Mr. Johnson.
6 MR. JOHNSON: What point -- are you hearing me
7 now, Joe?
8 Mr. Arbitrator, can you hear me?
9 ARBITRATOR ROUMELL: I haven't lost anything.
10 MR. JOHNSON: Okay. Joe, can you hear me?
11 MR. ANDRUZZI: I can hear you now.
12 MR. JOHNSON: Okay.
13 ARBITRATOR ROUMELL: Well, you made your
14 point. You made your point there. What about the
15 substance?
16 MR. JOHNSON: Okay. So even if this case were
17 arbitrable, the question then becomes does this
18 arise -- does the lawsuit arise out of the
19 performance of police duties.
20 As we attached to our motion to
21 quash, this issue has come up repeatedly over the
22 years. And, in fact -- in fact, it came up during
23 the interest arbitration proceeding, it's
24 referenced in your interest arbitration award in

Page 29

1 this case for as your basis for denying the union's
2 attempt to modify, to amend Article 22.
3 And just briefly, you pointed out
4 correctly, mind you, that there are two schools of
5 thought among arbitrators with respect to the
6 significance to be attached to an unsuccessful
7 proposal to amend a collective bargaining
8 agreement. Our evidence, the transcript in this
9 proceeding, goes further than simply the
10 unsuccessful advancement of a proposal. It has to
11 do with statements made on the record acknowledging
12 what the appropriate analysis consists of for an
13 arbitrator in deciding whether or not to issue --
14 to decide whether or not the individual is entitled
15 to legal representation.
16 Specifically, I would address you to
17 page 470 of the transcript, which is Union
18 Exhibit 1. It's where Mr. Pleines, counsel for the
19 union, is redirect examination of Mr. Andruzzi, who
20 is the witness on behalf of -- making the
21 presentation on Article 22. And Mr. Pleines, Tom,
22 says at lines 3 to 7 on page 470, says, "Joe,
23 Mr. Johnson is correct. There are literally dozens
24 of these awards going back many years. And one

**DON.DEF003394**

Page 30

thing that the awards make very clear is the City's decision needs to turn on the language of the complaint," end of quote.

That's what we look at. This is what governs your analysis, your disposition of this grievance if you find it arbitrable. It's a question of what is alleged. It doesn't particularly matter, it's not particularly material whether the allegations are true or not. It may be that the allegations are completely false. That does not bear on the issue of whether or not the complaint alleges a performance of duty.

And here the -- the allegations in the complaint are quite clear that what this case is about is as set forth in paragraph 1 of the complaint. "For more than three years the plaintiff was subjected to unwanted and uninvited sexual advances, abuse, harassment, and a hostile work environment by her superior and supervisor, former CPD Superintendent Eddie Johnson."

Paragraph 4 alleges forcible kissing. Paragraph 5 alleges --

ARBITRATOR ROUMELL: I've read that all.

MR. JOHNSON: Okay. Paragraphs 4 through 11

Page 31

are really the thrust, the gist of the complaint. This is sexual conduct. This is personal matter. This is not the performance of duties as the superintendent.

There are plenty of cases where the -- a superintendent -- in fact, Mr. Johnson is currently defendant and being represented by the City in pending litigation, but those are cases where the allegations in the complaint have to do with his performance of duties as a superintendent.

We know from a wealth of cases -- you've seen them. You've had these cases cited to you before in prior proceedings. They're referenced in your interest arbitration award. Arbitrator Gerstenberger's award in the Ackerman case, for example, which is really the lead case. Where the allegations in the complaint smack of sexual misconduct, a personal matter, sexual affairs, consensual or not, those do not rise to -- those do not trigger an obligation to provide legal representation because they aren't the performance of duties. They can't be. And there's a string of cites of Illinois cases that we will present for that.

Page 32

ARBITRATOR ROUMELL: All right.

MR. JOHNSON: I want to say one brief thing. I understand Mr. Lee's reference to the demotion or the dumping I believe as it's characterized in the complaint of Officer Donald. That does not appear, I believe, until paragraph 132 or so in the complaint. To suggest that this complaint, this civil action, Donald vs. City of Chicago and Eddie Johnson, to suggest that this complaint is about the demotion, the dumping of Officer Donald is like saying Citizen Kane was about a flood. No, this case is quite clear -- crystal clear in this complaint what the thrust, what the nature of the allegations is about.

This attempt to wag the tail of the dog here can't be acknowledged by you. I'm glad that Mr. Lee went through the individual complaints that are alleged here. The sexual -- there are four counts in which Mr. Johnson is mentioned, one count where -- a Monell claim against the City, which is not against Mr. Johnson. The four counts that are against him are sexual discrimination, you know, harassment and hostile work environment, equal protection discrimination on the basis of

Page 33

sex, Gender Violence -- a claim under the Gender Violence Act where in paragraph 162 it alleges that Mr. Johnson's conduct was of a sexual nature, and finally, claim on spoliation of evidence. None of those rise to the level of being performance of duties as a police officer let alone as a superintendent.

We've shown you in the transcript of the interest arbitration proceeding where the union is well-aware of how these cases are analyzed. You look at the complaint. The complaint governs the decision. We rest on that.

ARBITRATOR ROUMELL: All right. Was this a closing statement or opening?

MR. JOHNSON: That was an opening.

ARBITRATOR ROUMELL: Well, I want to ask you one question. I think it was the second or third paragraph it mentioned that Eddie Johnson suggested that the plaintiff join his unit. Is that when he was lieutenant or when he was superintendent?

MR. JOHNSON: I'm sorry. I didn't catch the question.

ARBITRATOR ROUMELL: The question was did I read the -- I think it was the second or third

DON.DEF003395

Arbitration                                                          Lt. E. Johnson & PB & PA v. CPD

Page 34

1  paragraph where Eddie Johnson is alleged to have
2  suggested that she join his unit. Was that when he
3  was superintendent or when he was a lieutenant?
4      MR. JOHNSON: Based upon the allegations of
5  the complaint, that occurred while he was
6  superintendent.
7      ARBITRATOR ROUMELL: Well, the fact I asked
8  the question is -- I'm very interested in that.
9      Okay. We're ready for the first
10  witness. Who is going to be our first witness?
11      MR. LEE: That will be Mr. Eddie Johnson.
12      MR. JOHNSON: Excuse me. Okay. I need to
13  speak in -- break in at this point.
14      As I spoke with Mr. Andruzzi
15  yesterday, we found out that Mr. Johnson would be
16  called to testify on the conference call on
17  Tuesday. I had conference -- a couple of
18  conversations with Mr. Andruzzi yesterday. To the
19  extent Mr. Johnson is going to testify about any
20  aspect of the complaint or of any of the
21  allegations set forth in the complaint, I told
22  Joe -- I told Mr. Andruzzi that what I'm -- what we
23  have asked for -- this is basically our fourth
24  individual, the missing individual in our room,

Page 35

1  Ms. Jennifer Kenedy. She's a lawyer. She's a
2  litigator with the firm of Locke Lord. She
3  represents the City in cases -- in the EEOC matter
4  involving Officer Donald brought by -- brought
5  against the City and Officer Johnson. She is
6  well-versed in that -- the circumstances, the
7  underlying facts of those -- that case and of the
8  allegations.
9      As I've said, made the point
10  repeatedly and I'll try not to be a broken record
11  on this, but we do not view as there being a need
12  for any testimony about any of the allegations in
13  the complaint. The dozens of arbitration awards
14  couldn't be any clearer that it's neither here nor
15  there whether they're true or factual or not. The
16  only -- the only question is with respect to --
17  does it -- the first threshold test is do the
18  allegations suggest that the complaint arises out
19  of the performance of duties. They either do or
20  they don't. Whether they're true or false has
21  nothing to do with anything.
22      But as I told Mr. Andruzzi, if
23  there's going to be testimony like that, then I've
24  asked that Ms. Kenedy be available to conduct

Page 36

1  the cross-exam -- A, to hear Mr. Johnson's
2  testimony and to conduct any cross-examination as
3  appropriate as she is much more versed in this than
4  I am.
5      ARBITRATOR ROUMELL: All right. So what's the
6  point?
7      MR. JOHNSON: The point is this. I would ask
8  if Mr. Johnson is going to testify and if it's
9  going to be testimony about anything alleged in the
10  complaint that we hold off, we put him off until
11  12:30 which is when I expect that Ms. Kenedy would
12  be available to listen in on the testimony. We can
13  put all the other evidence on before then.
14      ARBITRATOR ROUMELL: She's not available now?
15      MR. JOHNSON: She's not available now because
16  she got -- as we know, this was handled on an
17  expedited basis. She found out about this -- I
18  found out about the testimony on Tuesday. She
19  found out about it yesterday. She is actually
20  doing a deposition today which she would have been
21  willing to kick except it's in relation to an
22  injunction proceeding and it couldn't be kicked.
23  12:30 really is the earliest that she can be
24  available.

Page 37

1      MR. ANDRUZZI: May I respond?
2      ARBITRATOR ROUMELL: Yes.
3      MR. ANDRUZZI: Mr. Johnson did contact my
4  office yesterday. I did tell him at that time we'd
5  be objecting to that cross by her. We don't --
6  while the City has every right to have an attorney
7  cross our client -- or our witness, the allegations
8  regarding the sexual -- alleged sexual misconduct
9  are not going to be raised on direct. There is
10  nothing that -- based on Mr. Johnson's testimony
11  right now, there's nothing that Ms. O'Keefe can
12  gain regarding the EEOC complaint. That's a
13  separate matter, and we're not here to hold -- to
14  allow the City to obtain evidence in a separate
15  matter when we're just here to talk about legal
16  representation.
17      MR. JOHNSON: Well, I notice a certain
18  subtlety in Joe's response. My concern was that
19  there would be any testimony about the matters set
20  forth in the complaint and Joe is talking about
21  maybe there won't be any allegations about the
22  sexual harassment, sexual misconduct, sexual
23  affair, sexual relationship.
24      I'm not -- is there any other aspect

Arbitration                                                    Lt. E. Johnson & PB & PA v. CPD

Page 38

1  covered in this complaint that the former
2  superintendent will testify to?  And if he's not,
3  then what's the relevance of the testimony?
4      MR. ANDRUZZI:  There is an aspect of the
5  complaint that he's going to testify to, and that's
6  the issue of whether he was operating under the
7  scope of employment with regard to Officer Donald
8  and her movement within the department.
9      Mr. Arbitrator, we have two very
10 capable attorneys present right now that can do a
11 cross of Mr. Johnson.  We're prepared to put
12 Mr. Johnson on right now.  And we have other
13 witnesses to follow, but it's based on
14 Mr. Johnson's testimony.
15     ARBITRATOR ROUMELL:  Let me ask you this.  I'm
16 not inclined to prohibit anybody from having the
17 attorney they want, number one.  Number two, can we
18 put on the other witnesses and let me hear them and
19 then --
20     MR. ANDRUZZI:  I would say no.  Our strategy
21 or our case here is built -- is compounding.  We
22 plan on putting on Mr. Johnson.  The City was going
23 to either cross or not cross.  And based on that
24 examination, that would then make other

Page 39

1  determinations with our other witnesses as to what
2  we're going to do our direct examination about.  It
3  would be unfair for us to put other witnesses on
4  when that was not the order that we had planned on.
5      MR. JOHNSON:  I don't understand.  Witnesses
6  are called out of order all the time.  Evidence is
7  evidence.  Testimony is testimony.
8      MR. ANDRUZZI:  Testimony is testimony, but our
9  witnesses are not in the room.  We have somebody
10 that's dealing with issues on the east coast that
11 can't just be waiting or abruptly called to testify
12 right now.
13     ARBITRATOR ROUMELL:  And then you're telling,
14 Mr. Andruzzi, that they can't have their attorney
15 here?
16     MR. ANDRUZZI:  I'm not saying that,
17 Mr. Arbitrator.  What I'm saying is that the
18 reasoning for having that specific attorney, I
19 question what their motive is there.  We've already
20 acknowledged we will not be directing any questions
21 regarding any of the sexual alleged misconduct.
22     ARBITRATOR ROUMELL:  Well, it's 11:00 right
23 now.  Yeah, it's 11:00 in Chicago right now.  I
24 want to be fair to both parties.  He wants their

Page 40

1  attorney to be here.  You give me two choices.  I
2  adjourn it until 12:30.  Mr. Johnson, you can put
3  on -- you have one witness, Mr. Johnson?
4      MR. JOHNSON:  That's correct.
5      ARBITRATOR ROUMELL:  Are you prepared to call
6  that witness?
7      MR. JOHNSON:  If you direct, we could, sure.
8      MR. ANDRUZZI:  We would be okay with that.
9      ARBITRATOR ROUMELL:  Would you be okay with
10 that, Mr. Johnson?
11     MR. JOHNSON:  Yeah, we'd be fine with that.
12     ARBITRATOR ROUMELL:  Would you be okay with
13 that, Mr. Andruzzi?
14     MR. ANDRUZZI:  We would.
15     ARBITRATOR ROUMELL:  And then when this
16 attorney shows up, if we're not done with your
17 witness, we'll put your witness off and then we'll
18 go with Eddie Johnson.  Is that fair?
19     MR. LEE:  I think if we start the direct and
20 the cross-examination of their witness, we should
21 complete that before we begin the testimony of
22 Mr. Johnson.
23     ARBITRATOR ROUMELL:  I take it, Dave Johnson,
24 that your witness has no relationship to what

Page 41

1  Mr. Johnson may testify to?
2      MR. JOHNSON:  I have no idea what Mr. Johnson
3  is going to testify to.
4      ARBITRATOR ROUMELL:  All right.  Here's what
5  I -- we're going to take a short break, but here is
6  what I propose.  Number one, I'm not going to
7  proceed with the Johnson -- with the Eddie Johnson
8  testimony until the City has the attorneys they
9  want in the room.  Let's start with that.
10     Number two, I suggest we use the time
11 by having the City call Ms. O'Keefe and we do the
12 direct and cross and then Eddie Johnson will
13 testify and the union will make up its mind whether
14 they want to call other witnesses because, as I
15 understand it, it depends on what Eddie Johnson
16 testifies to and what David Johnson cross-examines.
17     Now, if after that testimony you want
18 to re-call your witness, I'll permit that.  Okay?
19     MR. JOHNSON:  That was directed at me, I
20 assume, right?
21     ARBITRATOR ROUMELL:  What?
22     MR. JOHNSON:  That last remark was directed at
23 me, I assume, correct, about calling Ms. O'Keefe if
24 need be?

**DON.DEF003397**

Arbitration                                          Lt. E. Johnson & PB & PA v. CPD

Page 42

1    ARBITRATOR ROUMELL: Yes. Now, I'm concerned
2    about two things. What about your other witnesses?
3    Will they be available?
4        MR. ANDRUZZI: If you can give me a short
5    amount of time, I can confirm that.
6        ARBITRATOR ROUMELL: I see one witness here
7    already. I want everybody -- I keep on -- I'm like
8    a broken record. I want all of you to put the case
9    on the way you want to put it on and I'm not -- I
10   want all of you to be comfortable. But we
11   certainly are going to hear from Ms. O'Keefe why
12   the City denied representation. So I think why not
13   hear from her now and then when the other attorney
14   shows up, whenever you're done examining,
15   cross-examining Ms. O'Keefe, then we put on Eddie
16   Johnson when the other attorney shows up.
17       Now, you want to take a five-minute
18   break, make sure you're satisfied with that
19   arrangement?
20       MR. JOHNSON: Yeah. If you give me five or
21   ten minutes.
22       ARBITRATOR ROUMELL: Sure. Take ten.
23       MR. JOHNSON: Thank you.
24       ARBITRATOR ROUMELL: What about you, Mr. Lee

Page 43

1    and Ms. Dowd?
2        MR. LEE: That's acceptable. We'll come back
3    in ten minutes.
4        ARBITRATOR ROUMELL: All right. Fine. Thank
5    you.
6            (Short recess.)
7        ARBITRATOR ROUMELL: Tell me this, Mr. Lee.
8    Do you want Eddie Johnson to be here?
9        MR. LEE: Yeah, he's present. He's in the
10   room.
11       ARBITRATOR ROUMELL: Okay. Fine. All right.
12   You want to call your --
13           (Brief interruption.)
14       ARBITRATOR ROUMELL: You're calling your
15   witness?
16       MR. JOHNSON: Correct.
17       ARBITRATOR ROUMELL: May I have her name,
18   please?
19       MR. JOHNSON: Sure. Susan O'Keefe.
20       ARBITRATOR ROUMELL: Susan. The first
21   question I'm asking is why didn't you run for
22   Congress with that name.
23       THE WITNESS: Who says I'm not going to?
24       ARBITRATOR ROUMELL: You could have gotten

Page 44

1    elected. Okay.
2            (Witness duly sworn.)
3        ARBITRATOR ROUMELL: Proceed.
4            SUSAN O'KEEFE,
5    called as a witness herein, having been first duly
6    sworn, was examined and testified as follows:
7            DIRECT EXAMINATION
8    BY MR. JOHNSON:
9        Q.   Susan, do you have a job?
10       A.   I do.
11       Q.   What might that be?
12       A.   I am the deputy corporation counsel in
13   the City of Chicago Department of Law over the
14   employment litigation division.
15       Q.   For approximately how long have you held
16   that position?
17       A.   Approximately four years.
18       Q.   And any previous positions prior to your
19   employment with the City's law department?
20       A.   Yes. I started in the City's law
21   department back in 1994, and I was assistant
22   corporation counsel for a number of years in a
23   number of divisions. The last division in an
24   assistant corporation counsel position was in the

Page 45

1    employment litigation division.
2            Then I took a job with the Board of
3    Education. So still with the City of Chicago, but
4    a different entity, different administration. And
5    I was there for 15 years. And then I came back to
6    the City in February 2017.
7        Q.   And as the deputy corp counsel in
8    employment litigation, give us a sense of what your
9    duties and responsibilities are.
10       A.   Sure. I manage a small team -- I call
11   it small but mighty -- team of litigators who are
12   responsible for the defense of the City and its
13   agents in employment litigation matters in either
14   federal or state court.
15       Q.   And do those duties include determining
16   whether to provide legal representation to sworn
17   Chicago police officers in civil lawsuits?
18       A.   Yes. Whenever an individual is named as
19   a defendant in one of our lawsuits and it's not
20   official capacity, in individual capacity, I need
21   to assess whether they're going to get
22   representation from the City of Chicago whether
23   police officers or not police officers, as long as
24   they're city employees.

**DON.DEF003398**

Page 46

Q.   And did you -- we have one of the joint exhibits is your letter of declination.  Did you have a role in deciding whether to provide legal representation to Eddie Johnson?

A.   I did.

Q.   Okay.  So how did you become aware of the civil complaint?

A.   I believe it was the day that it was filed.  It was originally filed in state court.  I believe the plaintiff's attorneys sent a copy to the front office.  Sorry about that.  To corporation counsel's office for the City of Chicago.

Q.   And did you review the civil complaint at that time?

A.   I did.

Q.   And this is the civil complaint in Donald vs. City of Chicago, correct?

A.   That's right.

Q.   And did you decide or make the effective recommendation with respect to whether the City would provide legal representation?

A.   I did.  I was part of that process.  Mark Flessner was the corporation counsel at the

Page 47

time, so it was ultimately his decision to represent Superintendent Johnson or not.  But I addressed the complaint, I had conversations with my managing deputy, and I made the recommendation to my managing deputy that we decline and it was -- she agreed and it was ultimately approved by Mr. Flessner.

Q.   And that led to your authoring of the letter of declination?

A.   Right.  The letter was a collaborative effort.  My chief Mark Bereyso assisted me, and Caryn Jacobs, the managing deputy, edited it.

Q.   So in making the decision to decline representation, what did you review, what did you look at?

A.   Yes.  I reviewed the complaint that was filed by the plaintiff in that matter.  Quite a lengthy complaint and I read it very carefully.  And I also considered the legal research that my chief Mark Bereyso conducted at my direction to confirm, you know, my understanding of scope and that it hadn't changed in the years or months that I had had to think about scope in my role as a deputy.  It doesn't come up that often.

Page 48

Q.   When you reference research with respect to scope, these would be court decisions or labor arbitration or what decisions?

A.   These were court decisions.

Q.   Now, at the time did you review the collective bargaining agreement between the City of Chicago and the lieutenants?

A.   No, I did not.

Q.   Why not?

A.   My assessment of this complaint against Superintendent Johnson was that this complaint was about conduct he allegedly committed while he was a superintendent.  I only thought about him as a superintendent.  So it did not -- it did not -- I made the decision there was no need to do that.

Q.   In arriving at the decision to decline representation -- sorry.

        What was the basis for your decision?

A.   So the allegations contained in the complaint filed by the plaintiff against the City and Superintendent Johnson were not allegations that he was conducting duties, performing duties of a superintendent, of his role.  They were allegations of sexual misconduct, sexual assault.

Page 49

And that was not within his role as a superintendent, not within his scope, and that is why I recommended that we decline.

Q.   Did you consider any of the allegations in the complaint to constitute the performance of police duties?

A.   Oh, definitely not.

Q.   Why not?

A.   The allegations -- he is alleged to have engaged in a pattern of repeated forcible sexual misconduct, including forcible oral sex, forcible vaginal sex.  He was alleged to have ejaculated on this woman and called her his own, like branding.  They didn't use false imprisonment, but there was an allegation that she was prevented from leaving rooms until she performed sexual acts with Superintendent Johnson.  These are not duties and responsibility of a superintendent.  This is not within the scope of Superintendent Johnson's job.

Q.   Prior to your decision to decline representation, did it make a difference to you whether the allegations in the civil complaint were true or false?

A.   No.

**DON.DEF003399**

Page 50

1    Q.   Why not?

2    A.   This complaint -- I understand there are

3 allegations. It's my job to defend, you know,

4 complaints that come in against the City. I

5 understand there are allegations. But true or

6 false, the allegations are factual misconduct,

7 whether it's sexual assault, rape, sexual

8 harassment. None of that alleged conduct is within

9 the scope, none of it.

10   Q.   Do you have before you your copy of your

11 letter of declination?

12   A.   I do.

13   Q.   Which I believe is Joint Exhibit -- help

14 me out here?

15   MR. LEE:  6.  I'm sorry.  Exhibit 4.

16   MR. JOHNSON:  Got it.  Got it.

17 BY MR. JOHNSON:

18   Q.   I don't want to go into considerable

19 detail here. If I could direct your attention to

20 the second page.

21   A.   Yes.

22   Q.   The second full paragraph beginning

23 "Although Ms. Donald's complaint."

24   A.   Yes.

Page 51

1    Q.   I notice the references here to

2 Section 745 -- 745 ILCS 10/9. What statute is

3 that?

4    A.   The Tort Immunity Act.

5    Q.   That would be the statute applicable to

6 employees -- public employees generally?

7    A.   Correct.

8    ARBITRATOR ROUMELL:  Wait a minute.  What was

9 it referring to?

10   MR. JOHNSON:  The Tort Immunity Act.

11   ARBITRATOR ROUMELL:  The what?

12   MR. JOHNSON:  The Illinois Tort Immunity Act.

13   ARBITRATOR ROUMELL:  Okay.  Okay.

14   MR. JOHNSON:  Which you'll note parallels the

15 provisions in the collective bargaining agreement

16 but it's separate.

17   ARBITRATOR ROUMELL:  Go ahead.

18   MR. JOHNSON:  Just a moment.  Can I have one

19 moment?

20   ARBITRATOR ROUMELL:  Sure.

21        (Brief pause in proceedings.)

22   MR. JOHNSON:  I have nothing further.

23   ARBITRATOR ROUMELL:  Do you need a few

24 minutes, Mr. Lee, or are you ready?

Page 52

1    MR. LEE:  I'm ready.

2    ARBITRATOR ROUMELL:  Okay.  Go ahead and

3 cross.

4              CROSS-EXAMINATION

5 BY MR. LEE:

6    Q.   Okay.  Does the superintendent of the

7 Chicago Police report to the mayor of Chicago?

8    A.   That's correct.

9    Q.   Does the superintendent of Chicago

10 Police Department, is he required to take direction

11 from the mayor of the City of Chicago?

12   A.   Regarding his duties as a

13 superintendent, yes. I'm sorry. As well as the

14 general orders and special orders. Not just her.

15   Q.   The superintendent of the Chicago Police

16 Department, is he or she required to follow the

17 orders issued by the mayor of Chicago?

18   A.   If those orders were in line with his

19 duties, that's correct.

20   Q.   Is following a lawful order within the

21 scope of employment of a Chicago Police Department

22 officer?

23   A.   A lawful order, can you tell me what you

24 mean by that?

Page 53

1    Q.   If a superior directs a Chicago Police

2 Department member to perform something, orders them

3 to do something and that's a lawful legal order to

4 do something, are they required -- strike that --

5 is following that order within the scope of their

6 employment?

7    A.   Yes. It is within their duties

8 performing as an officer, yes.

9    Q.   How did you derive or decide what the

10 duties are of the superintendent of the Chicago

11 Police Department?

12   A.   I did not look at a document. I believe

13 his duties as a superintendent were at that time to

14 direct the operations of the Chicago Police

15 Department.

16   Q.   Did you --

17   A.   To defend the city. Sorry.

18   Q.   Did you perform any research to

19 determine what his duties were prior to issuing

20 your declination letter?

21   A.   No. I did not need to do that.

22   Q.   Why did you not need to do that?

23   A.   Based on these allegations, I didn't

24 need to consult a document to see if he was allowed

Page 54

1 to engage in sexual misconduct as superintendent of
2 police. I did not.
3     Q.   Is following a lawful order within the
4 scope of employment of the Chicago Police
5 Department lieutenant?
6     A.   Could you give me an example? I --
7 legal order is very vague.
8     Q.   Not legal order. Lawful order.
9     A.   Lawful order.
10    Q.   Lawful. Did you need me to define what
11 that means.
12    A.   I'd like to know the jurisdiction. If
13 you're saying a lieutenant was ordered to follow a
14 directive --
15    Q.   I'll phrase it this way. I'll phrase it
16 this way. Is transferring a department member if a
17 Chicago Police Department has the authority to do
18 that, is that within the scope of employment?
19    A.   Yes.
20    Q.   Is transferring a department member if a
21 lieutenant has the authority to do so, is that
22 within his or her scope of employment?
23    A.   Yes.
24    Q.   Is the act of transferring a Chicago

Page 55

1 Police Department member to another unit within the
2 scope of employment of the superintendent of the
3 police department?
4     A.   Yes.
5     Q.   Your job was to determine whether
6 Mr. Johnson's -- whether Mr. Johnson performed acts
7 within the scope of employment during the
8 situations complained of in the complaint, correct?
9     A.   Yes.
10    Q.   And in the past the City has paid for
11 legal representation of retired Chicago police
12 departments [sic], correct?
13    A.   I'm trying to think of personally -- if
14 I have personal knowledge of that in my four years
15 if I had that situation come up. I'm not a labor
16 lawyer.
17    Q.   Is that you don't know?
18    A.   I don't know. I don't know. I don't
19 know.
20    Q.   Do you know if the City has paid for
21 legal representation of exempt members?
22    A.   Oh, definitely. Mr. -- Superintendent
23 Johnson.
24    Q.   Has the City paid for legal

Page 56

1 representation for retired department members that
2 were party to the CBA upon retirement?
3     A.   Again I'm trying to think if I have a
4 case like that in the four years. I currently have
5 a case, but they're all exempt. I'd have to go
6 back in my case to see if I have personal knowledge
7 of what you just described.
8     Q.   When determining whether the City of
9 Chicago is required to pay for legal representation
10 of a Chicago Police Department member who is party
11 to collective bargaining agreement, the criteria
12 used to make that determination is found in the
13 member's CBA; is that correct?
14    A.   I don't know. I didn't look at a CBA.
15 I'm not a labor lawyer. He wasn't a lieutenant.
16 He was a superintendent.
17    Q.   Let me ask you if a lieutenant -- a
18 lieutenant is a party to a collective bargaining
19 agreement with the City of Chicago, correct?
20    A.   That's what I understand.
21         Am I frozen?
22    Q.   No.
23    A.   He's frozen.
24    Q.   One second.

Page 57

1         How did you determine what criteria
2 to use to assess whether the City was going to
3 represent or decline -- strike that.
4         What criteria did you use to
5 establish your analysis?
6     A.   So I read the complaint, as I indicated,
7 and then I asked my chief Mark Bereyso to do new
8 original research on scope and how the court had
9 defined scope to make sure that there wasn't a new
10 case that I wasn't aware of because I knew that
11 sexual misconduct allegations, sexual assault, that
12 those types of allegations gave the City the
13 authority to decline, but I wanted to confirm that
14 that hadn't changed in the couple of years it had
15 been that I have had to think about that.
16    Q.   Was Mr. Johnson a retired lieutenant of
17 the Chicago Police Department at the time the City
18 was notified of the lawsuit?
19    A.   When we received a lawsuit, I understood
20 Superintendent Johnson to be, yes, retired from the
21 CPD.
22    Q.   Did you know his rank upon retirement?
23    A.   No.
24    Q.   Did you take any steps to try and

**DON.DEF003401**

Page 58

1  identify what his rank was upon retirement?
2      A.   No.
3      Q.   Do you know what his position with the
4  Chicago Police Department was upon retirement?
5      A.   Superintendent.
6      Q.   Did you take any research -- did you
7  take any steps to determine or research what his
8  position was when he retired from the Chicago
9  Police Department?
10     A.   I knew him as a superintendent when he
11 announced his retirement in the news.
12     Q.   So is that a no, you didn't perform any
13 research to determine what position he held upon
14 retirement from the Chicago Police Department?
15     A.   To confirm my understanding, no.  That
16 he was superintendent, no.
17     Q.   I'd like you to go to Joint Exhibit 4,
18 please, which is your declination letter.
19         Do you have that in front of you?
20     A.   I do.  I have it right here.
21     Q.   On page 2 of that, which is
22 Bates-stamped 185, the third full paragraph you
23 state and conclude that Mr. Johnson was not acting
24 in his capacity as superintendent of police at the

Page 59

1  time of the events described in Ms. Donald's
2  complaint and this does not meet the required
3  conditions for representation and the City of
4  Chicago will not pay for Mr. Johnson's legal
5  representation in this lawsuit.
6         Does that paragraph say that?
7      A.   That is correct.
8      Q.   What were those required conditions that
9  you stated?
10     A.   The allegations need to allege duties
11 and responsibilities, that he allegedly engaged
12 in -- usually a complaint they're complaining about
13 it.  So if they alleged he engaged in his
14 performance of duties or responsibilities
15 negligently or --
16     Q.   Duties and responsibilities as
17 superintendent?
18     A.   Correct.
19     Q.   One moment, please.
20         Ms. O'Keefe, did the complaint allege
21 in any capacity that Mr. Johnson was acting within
22 his scope of employment?
23     A.   I believe the complaint said he was an
24 agent.  I think I said that in the letter.

Page 60

1      Q.   The mere allegation of being an agent,
2  you don't consider that to be within the scope of
3  employment?
4      A.   No, based on the 200 paragraphs included
5  in this complaint.
6      Q.   Please go to the Joint Exhibit No. 2.
7         Do you have it?
8      A.   I don't think I do.
9      MR. LEE:  Mr. Johnson, can you tender a copy?
10 Thank you.
11     MR. JOHNSON:  Yes.
12     THE WITNESS:  Thanks.
13 BY MR. LEE:
14     Q.   Do you have that document in front of
15 you?
16     A.   I do.
17     Q.   Joint Exhibit No. 2, that's a copy of
18 the complaint that's been filed in this action,
19 correct?
20     A.   Correct.
21     Q.   And this is a copy of the complaint that
22 you read -- that you read and made your assessment
23 based off of, correct?
24     A.   That's correct.  It might have had an

Page 61

1  attachment, an exhibit at the end, but this is the
2  body of the complaint.  It might have had a right
3  to sue letter is what I'm saying.
4      Q.   I'd like you to go to Bates stamp 132,
5  paragraph 107, please.
6      A.   Yes.
7      Q.   I'd like you to read that to yourself
8  for a moment, and I'll read it for the record.
9         107 states, "Mayor Lightfoot directed
10 Superintendent Johnson to dump plaintiff by
11 removing plaintiff from Superintendent Johnson's
12 detail and sending plaintiff back to the First
13 District, a demotion, away from CPD headquarters."
14         Is that what paragraph 107 says?
15     A.   It does.
16     Q.   Did you verify if that allegation
17 complained of was true or not?
18     A.   I did not talk to the mayor, no.  I did
19 not -- I did not conduct an investigation of this
20 complaint.
21     Q.   Did you just rely on the four corners of
22 the document, for lack of a better word, that
23 whatever was in the complaint was in the complaint?
24 You didn't do any outside investigation?

Arbitration                                                     Lt. E. Johnson & PB & PA v. CPD

Page 62

1    A.   Right.  Right.  In arriving at the
2  decision to decline, I definitely read and
3  evaluated the allegations in the complaint that was
4  filed in October.
5    Q.   You didn't look at any police reports?
6    A.   No.
7    Q.   You didn't look at any job description
8  or roles of a position within the Chicago Police
9  Department?
10   A.   No.
11   Q.   Back to paragraph 107.  You failed to
12 consider this allegation when denying the payment
13 of legal representation to Mr. Johnson, correct?
14   A.   Oh, no, no, not at all.
15   Q.   Well, you didn't indicate that you
16 considered this allegation in the declination
17 letter to Mr. Johnson, correct?
18   A.   There was many paragraphs I didn't cite
19 to in this declination letter; I don't think I
20 mentioned the ejaculation, no, along with many
21 others.
22   Q.   Paragraph 110, same Bates stamp.  I'll
23 let you read that to yourself, and I'll read it for
24 the record.

Page 63

1    "After Mayor Lightfoot ordered
2  Superintendent Johnson to remove plaintiff from his
3  detail and demote plaintiff to the First District,
4  Superintendent Johnson made the following
5  derogatory remarks to the plaintiff referring to
6  plaintiff as his music:  'That bitch, Mayor Lori
7  Lightfoot, is trying to steal my music' and 'this
8  tiny negro, Mayor Lori Lightfoot, is still
9  clowning.'"
10   Is that what paragraph 110 says?
11   A.   Yes, that's what it says.
12   Q.   You didn't verify if these allegations
13 were true and correct?
14   A.   I cannot investigate the allegations in
15 the complaint, no, before declining representation.
16 No, I did not.
17   Q.   You did not verify if these allegations
18 were true?
19   A.   No.  I based my decision on the
20 allegations, my decision to recommend declining.
21   Q.   You failed to consider paragraph 110 in
22 your analysis when denying payment of legal
23 representation to Mr. Johnson?
24   A.   No, I definitely did not fail to

Page 64

1  consider all the paragraphs.
2    Q.   But you didn't indicate that you
3  considered, or didn't consider paragraph 110 in
4  your declination letter to Mr. Johnson, correct?
5    A.   I didn't include several paragraphs, not
6  just this one.
7    Q.   So is it your statement today that you
8  didn't include paragraph 110 in your declination
9  letter?
10   MR. JOHNSON:  Asked and answered.
11   ARBITRATOR ROUMELL:  Go ahead and ask the
12 question again.
13 BY MR. LEE:
14   Q.   Did you include paragraph 110 -- that
15 you considered it in your declination letter to
16 Mr. Johnson?
17   A.   I did not identify paragraph 110 in my
18 letter, no.
19   Q.   In the declination letter to
20 Mr. Johnson, you did not inform him that the City
21 was not going to pay for legal representation
22 because Mr. Johnson was not a party to the
23 lieutenants collective bargaining agreement?
24   A.   No, I did not mention CBAs.

Page 65

1    Q.   Did you communicate with Commander
2  Rowling of the labor relations division regarding
3  the declination?
4    A.   No.  She was the superintendent.  I did
5  not believe I needed to do that.
6    Q.   Did you take any steps to verify if
7  Mr. Johnson was ordered to remove Ms. Donald from
8  her then current position?
9    A.   I'm sorry.  Could you repeat that?
10   Q.   Sure.
11   Did you take any steps to verify if
12 Mr. Johnson was ordered to remove Ms. Donald from
13 her then current position as complained of in the
14 complaint?
15   A.   I did not investigate the veracity of
16 the allegations in the complaint in making my
17 declination.  I think I've said that a couple
18 times.  I read the complaint, looked at the
19 allegations carefully, consulted with my chief and
20 then my boss.
21   Q.   So is that a no, you didn't verify if
22 Mr. Johnson was ordered to remove Ms. Donald from
23 her then current position?
24   A.   I did not investigate the allegations in

Arbitration                                                  Lt. E. Johnson & PB & PA v. CPD

Page 66

1  any of the paragraphs.
2      MR. LEE:  One moment, please.  I tender the
3  witness.  No further questions.
4      ARBITRATOR ROUMELL:  I have some.
5          EXAMINATION
6  BY ARBITRATOR ROUMELL:
7      Q.   Ms. O'Keefe, do I understand that you
8  based your decision on the reviewing and studying
9  the complaint?
10     A.   That's correct.
11     Q.   You did no further investigation?
12     A.   That's correct.
13     Q.   You did not discuss the facts with Eddie
14 Johnson?
15     A.   No, I did not.
16     Q.   Let me ask you this.  You have four
17 years in your position.  Have you had occasion
18 where a police officer had been sued along with the
19 City for excessive force?
20     A.   No.  That's a different division
21 under -- in the law department.  I don't handle
22 excessive force cases or represent teams who do.
23     Q.   Let me ask you this.  What type of cases
24 do you review?

Page 67

1      A.   I have several Chicago Police Department
2  cases.  Most of them involve whistleblower
3  allegations, that a superior took action against
4  them because the plaintiff alerted some agency to
5  misconduct within their unit or group.
6      Q.   Did you ever talk to the party that is
7  the subject of the complaint?  Do you ever talk to
8  the superior?  Do you make your recommendations or
9  talk to the individual to find out the veracity of
10 the complaint?
11     A.   We do need to do that to answer the
12 complaint, so that happens.  But that's after the
13 decision is made that the allegations are within
14 scope and that representation is offered and I
15 believe always accepted.  I don't remember anyone
16 not accepting it when offered.
17     Q.   So, in other words, you -- in the cases
18 you reviewed, prior to determining whether to
19 represent, you based it on the four corners of the
20 complaint?
21     A.   That's correct.
22     Q.   So I want to make sure I leave this
23 correctly.  Prior to your decisions, you do not
24 talk to the defendants?

Page 68

1      A.   That's correct.
2      Q.   And you don't know what the people that
3  are handling excessive force, you don't know what
4  they do?
5      A.   No.
6      ARBITRATOR ROUMELL:  Any other questions?
7      MR. JOHNSON:  I have a couple of questions on
8  redirect.
9          REDIRECT EXAMINATION
10 BY MR. JOHNSON:
11     Q.   Susan, do you have Joint Exhibit 2
12 before you, the complaint?
13     A.   I do.
14     Q.   Okay.  If I can ask you to turn to
15 paragraph 110.  You were asked a couple questions
16 about that particular allegation.
17     A.   Yes.  It's right here.
18     Q.   So, Susan, with respect to your decision
19 to decline representation, did it make a difference
20 to you whether the allegation in paragraph 110 was
21 true or false?
22     A.   No, it didn't.  107 -- 110 needs to be
23 read with 111, 12, 13, and 14, also.
24     Q.   You were asked a few questions about the

Page 69

1  complaint alleging that Mr. Johnson was an agent of
2  the City.  Do you recall that?
3      A.   Yes.
4      Q.   Have you ever seen a complaint against a
5  City of Chicago employee that didn't include that
6  allegation?
7      A.   No.  They often say this defendant was
8  acting in the color of law or within the scope of
9  their duties or they're an agent.  They definitely
10 want the deep pocket to be responsible.
11     Q.   For that allegation?
12     A.   Right.
13     Q.   You were asked some questions whether
14 you undertook any actions or measures to
15 investigate whether Mr. Johnson was anything other
16 than a superintendent.  Do you recall that?
17     A.   Yes.
18     Q.   Again going to the complaint, does
19 anything in the complaint allege any action taken
20 by Mr. Johnson in any capacity other than
21 superintendent?
22     A.   No.
23     Q.   You indicated you have other employment
24 cases.  In other cases do you have -- do any of

Page 70

1  those other cases involve lawsuits in which
2  Mr. Johnson is a defendant?
3     A.  Yes.
4     Q.  And those are current cases?
5     A.  We have one current case where
6  Superintendent Johnson is an individually named
7  defendant and we are representing him in that case.
8  We just got him dismissed out of a case in late
9  2019. And we had another case with Superintendent
10 Johnson. I believe it was resolved two years ago.
11 And he was named individually and sued personally
12 in all three of those cases.
13    Q.  And did the City provide representation
14 in all three cases?
15    A.  Yes.
16    Q.  Did any of those three cases involve
17 sexual conduct?
18    A.  No.
19    Q.  One second.
20    ARBITRATOR ROUMELL:  Second's over.
21    MR. JOHNSON:  I have nothing further.
22    ARBITRATOR ROUMELL:  Mr. Lee?
23    MR. LEE:  I have nothing based on that.
24    ARBITRATOR ROUMELL:  How long did you work for

Page 71

1  the Board of Education?
2     THE WITNESS:  15 years.
3     ARBITRATOR ROUMELL:  This is a trick question.
4  Have you ever heard of the Supreme Court case
5  Bradley vs. Milliken?
6     THE WITNESS:  Bradley versus who?
7     ARBITRATOR ROUMELL:  Milliken.
8     THE WITNESS:  No. Should I?
9     ARBITRATOR ROUMELL:  Particularly if I was the
10 arbitrator you should.
11    MR. JOHNSON:  This is a failure on my part. I
12 should have prepped her for that.
13    ARBITRATOR ROUMELL:  No, that's one of the --
14 you've heard of Brown vs. Topeka Board of
15 Education.
16    THE WITNESS:  Yes.
17    ARBITRATOR ROUMELL:  That's the subsequent
18 case that I argued.
19    THE WITNESS:  Thank you for your service.
20    ARBITRATOR ROUMELL:  Thank you. Thank you
21 very much.
22    MR. LEE:  Ms. Court Reporter, we have
23 Mr. Riccio in the waiting room. Can you let him
24 in?

Page 72

1     COURT REPORTER:  Sure.
2     MR. LEE:  Thank you.
3     ARBITRATOR ROUMELL:  Are you going to call
4  him?
5     MR. LEE:  Not right now.
6     ARBITRATOR ROUMELL:  Thank you.
7        Mr. Johnson, do you have any other
8  witness at this time?
9     MR. JOHNSON:  No, subject to rebuttal.
10    ARBITRATOR ROUMELL:  According to my watch,
11 it's about five minutes to 12 in Chicago. Could
12 you check to see whether -- where your attorney is?
13    MR. JOHNSON:  Doing so right now.
14    ARBITRATOR ROUMELL:  All right. Fine.
15        (Discussion had off the record.)
16        (Lunch recess taken from
17         11:57 a.m. to 12:38 p.m.)
18
19
20
21
22
23
24

Page 73

1        A F T E R N O O N   S E S S I O N
2        (Whereupon Ms. Jennifer Kenedy
3         joined the deposition
4         proceedings.)
5        (Witness duly sworn.)
6     ARBITRATOR ROUMELL:  Eddie Johnson, right?
7     THE WITNESS:  Correct.
8     ARBITRATOR ROUMELL:  Proceed.
9        EDDIE JOHNSON,
10 called as a witness herein, having been first duly
11 sworn, was examined and testified as follows:
12        DIRECT EXAMINATION
13 BY MR. LEE:
14    Q.  Mr. Johnson, are you currently employed
15 by the Chicago Police Department?
16    A.  No. I'm retired.
17    Q.  When did you retire from the Chicago
18 Police Department?
19    A.  My official date was the 6th of
20 December, 2019.
21    ARBITRATOR ROUMELL:  Could you speak a little
22 louder because I can't hear you.
23    MR. LEE:  We'll try a different microphone.
24

**DON.DEF003405**

Arbitration                                                      Lt. E. Johnson & PB & PA v. CPD

Page 74

BY MR. LEE:

Q. Mr. Johnson, are you currently employed by the Chicago Police Department?

A. No. I'm retired.

Q. When did you retire?

A. My official last day of employment was the 6th of December, 2019.

Q. And what was your rank when you retired from the Chicago Police Department?

A. Lieutenant.

Q. Prior to retiring as lieutenant from the Chicago Police Department, did you hold the position of superintendent?

A. Yes, I did.

Q. What was the date you first held the position of superintendent of the Chicago Police Department?

A. 13 April 2016.

Q. What was your rank immediately -- strike that.

What was your rank immediately after you accepted the position of superintendent?

A. My position was superintendent, but I still held the rank of lieutenant.

Page 75

Q. So you maintained the rank of lieutenant until you were no longer in the position of superintendent?

A. Correct.

Q. And then after you were no longer in the position of superintendent, you were still under the rank of lieutenant?

A. Correct.

Q. While you were in the position of superintendent, were you a member of the Lieutenants Unit 156B?

A. Yes.

Q. Did you pay union dues to the lieutenants unit when you were in the position of superintendent?

A. Yes.

Q. Why was that?

A. Because when you get moved to an exempt rank you no longer have the protections of union assistance unless you continue to pay into your union dues.

Q. Did you continue to receive the benefits of being in the lieutenants association?

A. Yes. You're still afforded all the

Page 76

rights and protections of the union.

Q. Did you still have your lieutenant's star when you were in the position of superintendent?

A. Yes.

Q. Did you still have your lieutenant's ID when you were in the position of superintendent?

A. Yes.

Q. When you took the position of superintendent, did the City ask you to tender your lieutenant's star?

A. No.

Q. When you were in the position of superintendent, did the City ask you to tender your lieutenant's ID?

A. No.

Q. Can you explain the difference between a rank and a position?

A. So basically you have in the Chicago Police Department rank of patrolman, sergeant, lieutenant, captain. And the difference is those positions can never be taken from you. Once you make exempt, you can be removed from that position at the whim of the superintendent if it's below the

Page 77

superintendent or at the whim of the mayor at any time.

Q. How long did you serve as superintendent of the Chicago Police Department?

A. From 13 April 2016 to I believe it was the 2nd of December of 2019.

Q. And under what mayoral administrations did you serve as superintendent of the Chicago Police Department?

A. Initially Mayor Rahm Emanuel and then Mayor Lori Lightfoot.

Q. As superintendent of the Chicago Police Department, what were your duties?

A. Basically I was the CEO of the Chicago Police Department responsible for policy making. Also the official spokesperson for the department.

Q. Did you move subordinates within the department, if needed?

A. Yes.

Q. Did you make recommendations?

A. Yes.

Q. To whom did you make those recommendations?

A. The city mayor.

Arbitration                                    Lt. E. Johnson & PB & PA v. CPD

Page 78

1  Q.  You just talked about some of the duties
2  you had as superintendent.  Where did those duties
3  emanate from?
4  A.  City ordinance, general orders, and
5  things of that nature.
6  Q.  As superintendent, were part of your
7  duties traveling within the state?
8  A.  Yes.
9  Q.  For what purpose?
10  A.  The mayor's office will require me
11  sometimes to go to Springfield and give testimony
12  at legislative hearings.
13  Q.  As superintendent, were part of your
14  duties traveling outside the state?
15  A.  Yes.
16  Q.  For what purpose?
17  A.  Sometimes they would have conferences
18  with all the major city chiefs and, you know,
19  different topics would be discussed.
20  Q.  As superintendent, did you have the
21  power to promote department members?
22  A.  Yes.
23  Q.  As superintendent, did you have the
24  power to demote department members?

Page 79

1  A.  Yes.
2  Q.  As superintendent, did you have the
3  power to transfer department members?
4  A.  Yes.
5  Q.  As superintendent, are all department
6  members your subordinates?
7  A.  Yes.
8  Q.  Did you have a superior?
9  A.  Yes.  The mayor of the City of Chicago.
10  Q.  What made you believe she was your
11  superior?
12  A.  That was designated by city ordinance.
13  Q.  So under the Lori Lightfoot mayoral
14  administration, was Mayor Lori Lightfoot your
15  superior?
16  A.  Yes.
17  Q.  During her administration, did you take
18  any orders from her?
19  A.  Yes.
20  Q.  Generally, what type of orders would you
21  take from the mayor?
22  A.  Example would be if we were anticipating
23  protests, we had, you know, intelligence indicating
24  we might have possible upheaval in the city, she

Page 80

1  would give me direction on where she expected
2  police personnel to be.  She may tell me what time
3  she wanted different places throughout the city
4  heavily protected, you know, things of that nature.
5  Q.  Prior to October 17, 2019, did Mayor
6  Lightfoot ever give you an order to hire an
7  individual to the Chicago Police Department?
8  A.  Yes.
9  Q.  And who was that?
10  A.  At the time there was a retired US
11  Marshal Jim Smith who was a civilian, and she
12  indicated to me that she wanted him to be the
13  commander of her detail unit.  So initially I had
14  to get him hired with the City of Chicago Police
15  Department, and then after that was taken care of,
16  then I appointed him as the commander of her
17  detail.
18  Q.  If you didn't follow these orders that
19  were issued by the mayor, what could have happened
20  to you?
21  A.  I could have been removed from the
22  position of superintendent.
23  Q.  On or after October 17, 2019, did Mayor
24  Lightfoot ever give you an order to transfer a

Page 81

1  Chicago Police Department member?
2  A.  Yes.
3  Q.  When was that?
4  A.  On October 17th I was summoned to a
5  meeting with her, and we discussed the incident
6  that had occurred the night before where I was the
7  subject of a traffic stop by the Chicago Police
8  Department.  And during that meeting, we discussed
9  what my future with the City would be.  And after
10  we discussed all of that, she indicated to me that
11  she wanted me to remove Officer Cynthia Donald from
12  my detail.
13  Q.  Let me just step back a little bit.  How
14  were you informed that this meeting was to take
15  place with the mayor?
16  A.  Either my chief of staff informed me or
17  my director of communications, Anthony Guglielmi.
18  The chief of staff at that time was Robert Boik.
19  Q.  Was it Mr. Guglielmi or Mr. Boik, either
20  of them, did they tell you that you were to have a
21  meeting with the mayor?
22  A.  Correct.
23  Q.  How was that information communicated to
24  you?

**DON.DEF003407**

Page 82

A.   Verbally.

Q.   Did you subsequently go to this meeting with the mayor?

A.   Yes.

Q.   Who was present at this meeting with the mayor?

A.   It was myself, Mayor Lightfoot, and her chief of staff Maurice Classen.

Q.   Where did this meeting take place?

A.   It was at a building in the downtown area, but I can't recall the specific place.

Q.   At this meeting did Mayor Lightfoot direct you to do something with a department member?

A.   Yes.

Q.   And did you perceive that direction to be an order from Mayor Lightfoot?

A.   Oh, yes, definitely.

Q.   And what was that order?

A.   She told me that she had sources that said -- had told her Officer Donald and I were having a sexual relationship. She said that at this time I want you to -- she actually said, I want you to send her back to the First District and

Page 83

I want that fucking shit done today. There will be no debate about it, no conversation. I want it done and I want it done by the end of today.

Q.   Did you know who she was talking about -- strike that.

Did you know who Mayor Lightfoot was talking about?

A.   Yes. She referenced Officer Donald several times during the conversation.

Q.   And would that be Ms. Cynthia Donald?

A.   Correct.

Q.   On October 17th, 2019, did you know Ms. Cynthia Donald?

A.   Yes.

Q.   In what capacity?

A.   She was at the time assigned as one of my drivers. She was an alternate driver for my detail.

Q.   Was she detailed to the superintendent's office?

A.   Correct. She was detailed to Unit 111, which would be the superintendent's office.

Q.   Was she your subordinate?

A.   Yes.

Page 84

Q.   How long had she worked in the department as of October 17th, 2019?

A.   In my office or just the department in general?

Q.   In Unit 111.

A.   111, she had been there since I believe May of 2016.

Q.   Do you know what her job duties were or her roles within Unit 111?

A.   Yeah. Initially when she came -- at the time of my appointment as superintendent I was involved in a lot of community meetings, a lot of legislative meetings. And at the time Mayor Rahm Emanuel, one of his staffers told me I needed to get someone to go with me to these meetings that would do nothing but take notes in the event that I had to make responses to people afterwards.

And so when she initially came, that was her job duty. She would go to meetings, accompany me to these meetings, and take down possible questions that citizens or aldermen had. And then later on we would sit down and talk about what those questions were and I would tell her how to respond to them.

Page 85

Q.   When the mayor on October 17th, 2019, ordered you to move Ms. Donald, what was your response?

A.   I told her, You're the mayor. You want her moved, I'll take care of that by the end -- close of business today.

Q.   Did you ask her anything?

A.   Yes. When she told me she wanted her sent back to the First District, I just asked her, I said, Listen, can I talk to her to see where she wants to go so it wouldn't be perceived that there was any retaliation involved? Because it was an abrupt thing, caught me totally off guard. So I just asked her could I at least talk to her to see if she had any preferences to where she might want to go.

Q.   Did the mayor respond to your request?

A.   Yes.

Q.   And what did she say?

A.   She said, Okay. I'll let you do that, but I want this shit done by the end of today.

Q.   At this point I would like to turn your attention to Union Exhibit 1, which is Bates-stamped 003.

**DON.DEF003408**

Arbitration                                                    Lt. E. Johnson & PB & PA v. CPD

Page 86

1   In front of you do you have Union
2   Exhibit 1?
3       A.   Yes.
4       Q.   What is this document?
5       A.   The title of it is "Class Title:
6   Superintendent of Police." And it's basically a
7   summation of the duties of superintendent.
8       Q.   Does this document contain a description
9   of the characteristics of the class of
10  superintendent of police?
11      A.   Yes.
12      Q.   And what does that say, that paragraph
13  say?
14      A.   "Under direction of the mayor, the
15  position functions as a chief executive officer of
16  the Chicago Police Department responsible for the
17  general management and control of the department.
18  The position has full and complete authority to
19  administer the department in a manner consistent
20  with the ordinances of the city, the laws of the
21  state, the US Constitution, and the rules and
22  regulations of the board."
23      Q.   Based on Union Exhibit 1 in front of
24  you, did you believe when you were in the position

Page 87

1   of superintendent you served at the pleasure of the
2   mayor?
3       A.   Yes.
4       Q.   Based on the documentation in front of
5   you, Union Exhibit 1, when you were in the position
6   of superintendent, did you believe you had to
7   follow the orders of the mayor?
8       A.   Yes.
9       Q.   Mr. Johnson, what made you believe you
10  had the authority to move Ms. Donald after the
11  mayor had given you that order?
12      A.   Because as superintendent I had the
13  ability to move officers throughout the department.
14      Q.   When you were in the position of
15  superintendent, you weren't permanently assigned to
16  that position, correct?
17      A.   No.
18      Q.   Is it a fair comparison to say that you
19  were detailed to the position of superintendent?
20      A.   Yeah, that's fair to say.
21      Q.   With respect to that meeting on
22  October 17th, 2019, how long did that meeting last?
23      A.   Approximately an hour at the most.
24      Q.   Were other things discussed at this

Page 88

1   meeting?
2       A.   Yes. We discussed briefly the incident
3   that occurred the night before when the police
4   stopped me, but the bulk of the meeting was
5   discussing my future going forward and if I was
6   going to retire and when that retirement would be.
7       Q.   Eventually the meeting concluded,
8   correct?
9       A.   Correct.
10      Q.   When the meeting concluded -- strike
11  that.
12           When the meeting concluded, what were
13  your thoughts as to your duties that you had to
14  perform once you left that meeting?
15      A.   Well, I knew when I left the meeting I
16  had to do a couple of things. One was advise my
17  executive staff what was going on. But the thing
18  that was going through my mind mostly was the fact
19  that I had to move Officer Cynthia Donald out of my
20  unit.
21      Q.   And once you left the meeting what did
22  you do?
23      A.   Called my chief of staff and told him I
24  wanted him, the first deputy Anthony Riccio, the

Page 89

1   director of communications Anthony Guglielmi, and
2   the chief of patrol Fred Waller to meet me in my
3   office.
4       Q.   Did you eventually return to
5   headquarters?
6       A.   Yes.
7       Q.   What happened when you returned to
8   headquarters?
9       A.   I gave them a brief summation of what
10  occurred at the meeting with the mayor, and I told
11  them at that point that I would be retiring at the
12  end of the year. I also told them that the mayor
13  ordered me to remove Cynthia Donald from my detail.
14      Q.   And who was present at this meeting at
15  headquarters?
16      A.   Anthony Riccio, Robert Boik, Fred
17  Waller, and Anthony Guglielmi.
18      Q.   How long did that meeting last?
19      A.   Probably somewhere between 30 and
20  45 minutes.
21      Q.   At the conclusion of that meeting did
22  you speak with anyone else individually?
23      A.   Yes.
24      Q.   And who was that?

Bridges Court Reporting

**DON.DEF003409**

1    A.   I spoke to Anthony Riccio individually,
2  Fred Waller individually and -- Riccio, Waller, and
3  Anthony Guglielmi, spoke to all of them
4  individually.
5    Q.   Let's start with Mr. Riccio.  What did
6  you discuss with Mr. Riccio?
7    A.   So I talked to him about -- I told him I
8  was going to talk to Officer Donald and see if she
9  had a preference as to where she wanted to go, and
10 after speaking to her, I would let him know some of
11 the options that she discussed and see if we can
12 get it done.
13   Q.   Did he have any response?
14   A.   He said, yeah, just let me know where
15 she wants to go and I'll ensure that it happens.
16   Q.   You said you had an individual meeting
17 with Mr. Anthony Guglielmi?
18   A.   Guglielmi, yes.  Yes, I did.
19   Q.   What was discussed in that individual
20 meeting?
21   A.   Basically he said to me, Supe, listen,
22 the mayor is ordering you to get rid of Cynthia, so
23 I wouldn't screw around with that.  I would get
24 that done as soon as possible.

1    Q.   After you had these individual meetings
2  with the individuals you just described, did you
3  inform Ms. Donald that she was going to be
4  transferred?
5    A.   Yes.
6    Q.   When did you inform her?
7    A.   Approximately 10 or 15 minutes after I
8  spoke to the larger group that we just talked
9  about, then I walked outside of my door and I saw
10 her sitting at her cubicle and I just kind of waved
11 for her to come to the office.
12   Q.   Did she subsequently come to the office?
13   A.   Yes.
14   Q.   How did you relay the information to her
15 that was going to be transferred?
16   A.   I just told her, I said, Listen, I just
17 left the meeting with the mayor.  And people are
18 telling her that you and I are sleeping together.
19 I said, So she ordered me to move you.  So I know
20 this is, you know, quite sudden.  I know you have
21 child issues, but I have to move you by
22 the end of the day.  I said, So I know you've had
23 some thoughts about that before.  So if you have
24 some thoughts about where you want to go, let me

1  know.
2    Q.   How long did this meeting last?
3    A.   Maybe about 10 minutes.  10, 15 minutes
4  at the most.
5    Q.   Who was present for the meeting?
6    A.   Just she and I.
7    Q.   At the conclusion of the meeting did you
8  begin the process of transferring Ms. Donald?
9    A.   Yes.
10   Q.   And why were you beginning the process
11 to transfer Ms. Donald?
12   A.   Because the mayor had ordered me to have
13 her moved by the close of business that day.
14   Q.   How did you begin the process of
15 transferring Ms. Donald?
16   A.   So after she gave me some suggestions on
17 where she may want to go, I talked to the first
18 deputy Anthony Riccio, I talked to the chief of
19 patrol at the time Fred Waller, and I also talked
20 to -- she mentioned records.  I didn't know what
21 that entailed, but she mentioned that unit to me.
22 And at the time Chief Jonathan Lewin was in charge
23 of that particular unit, so I spoke to him also.
24   Q.   What steps -- were any additional steps

1  taken?
2    A.   Yes.  So after she informed me of the
3  one that she thought would best suit her schedule,
4  I talked to Anthony Riccio and Jonathan Lewin about
5  moving to the records unit.
6    Q.   Was Ms. Donald eventually transferred?
7    A.   Yes.
8    Q.   To where?
9    A.   To records.  I don't remember the unit
10 number, but it was on the second floor of the same
11 building.
12   Q.   And to the best of your recollection, do
13 you know when she was transferred?
14   A.   The transfer was done by close of
15 business that day.  So the next day she was to
16 report to that unit.
17   Q.   I'd like to turn your attention to Union
18 Exhibit 2, Bates-stamped 007.
19       Do you have Union Exhibit 2 in front
20 of you?
21   A.   Yes.
22   Q.   What document is this?
23   A.   Chicago Police Department employee
24 assignment or detail history for Officer Cynthia

**DON.DEF003410**

Arbitration                                                    Lt. E. Johnson & PB & PA v. CPD

Page 94

Donald.

Q.   And is there a date on this document?

A.   Yes.  The document was generated 5 January 2021.

Q.   Does this document list a detail end date for Ms. Donald for detail ending on 19 October 2019?

A.   Yes, it does.

Q.   And what detail was ended on 19 October 2019?

A.   Her detail to Unit 111, Office of the Superintendent, was ended on that date.

Q.   Does the document in front of you indicate a new detail for Ms. Donald?

A.   Yes.

Q.   And what was the effective date of that new detail?

A.   20 October 2019.

Q.   I'd like to turn your attention to Union Exhibit 3, Bates-stamped 009.

        Are you at Union Exhibit 3?

A.   Yes.

Q.   What document do you have in front of you?

Page 95

A.   It's the A&A sheet involving -- (video disruption).

COURT REPORTER:  I'm sorry.  The answer cut out.  I didn't hear the answer.

BY MR. LEE:

Q.   Please turn your attention to Union Exhibit 3.

A.   Okay.

Q.   Starting on Bates stamp 009.  What is this document in front of you?

A.   It's an A&A sheet, or assignment and attendance sheet for Officer Cynthia Donald.

Q.   For what time period is listed on this A&A sheet?

A.   It says from 1 April 2016 through 31 December 2016.

Q.   Please go to Bates stamp 51, 51.  I'm sorry.  Bates stamp 65.

        You just stated that the time period began on May 11, 2016.  Does, to the best of your knowledge, Union Exhibit 3 contain the A&A for a period from May 11, 2016, up to and including 21 October 2019?

A.   Yes.

Page 96

Q.   And that's for Ms. Cynthia Donald, correct?

A.   Correct.

Q.   And the A&As, briefly explain what that is.

A.   That's attendance and assignment sheet.  So it basically shows where the officer is and whether or not they were at work on a particular day.

Q.   Does Bates stamp 65 of the A&A indicate anything relative to the detailing of Ms. Donald?

A.   Yes.  It indicates where she was detailed from.

Q.   Does it indicate when her detail ended from?

A.   Yes.

Q.   What was that date?

A.   Detail ended 20 October '19.

Q.   Does the document indicate that Ms. Donald attended work on 17 October 2019?

A.   Yes.

Q.   Was she present at work on that day?

A.   Yes.

Q.   Does the document indicate that

Page 97

Ms. Donald did not attend work for the dates of 18 October 2019 until 21 October 2019?

A.   Yes.  It indicates that she was not at work on those days.

Q.   After Ms. Donald was transferred, did you inform Mayor Lightfoot that Ms. Donald had been transferred?

A.   I didn't inform her personally, no.

Q.   Do you know if she was informed?

A.   Yes.

Q.   How do you know that?

A.   Either my chief of staff Bob Boik or the director of communications Anthony Guglielmi informed me that they let her chief of staff Maurice Classen know and that he informed her.

Q.   Mr. Johnson, you previously stated that you were in the position of superintendent until December 2nd, 2019; is that correct?

A.   Correct.

Q.   Were you eventually removed from that position as superintendent?

A.   Yes.

Q.   When was that?

A.   That was the same day, 2nd of December,

Bridges Court Reporting

Arbitration                                          Lt. E. Johnson & PB & PA v. CPD

Page 98

1  2019.
2      Q.   And how were you notified that you were
3  no longer going to be in the position of
4  superintendent?
5      A.   I was summoned to City Hall in the
6  mayor's conference room and she verbally told me.
7      Q.   How were you informed that this meeting
8  was to take place at City Hall?
9      A.   Either my chief of staff again or the
10 director of communications informed me to attend
11 the meeting.
12     Q.   When did this meeting take place?
13     A.   The 2nd of December.
14     Q.   Who was present at this meeting?
15     A.   Myself, Mayor Lightfoot, her chief of
16 staff Maurice Classen, and her director of
17 communications, a female, but I don't recall her
18 name.
19     Q.   What happened at the meeting?
20     A.   So at that time she read off a prepared
21 letter stating, in summary, that due to the
22 incident that occurred on the night of October 16th
23 I would be relieved of my duties, terminated as
24 superintendent of the Chicago Police Department.

Page 99

1      Q.   I'd like to turn your attention to Union
2  Exhibit 4, Bates-stamped 067.
3          I'm showing you Union Exhibit 4,
4  Bates-stamped 067; is that correct?
5      A.   Correct.
6      Q.   Have you seen this document before?
7      A.   Yes.
8      Q.   What is this document?
9      A.   It's a document that the mayor read off
10 to me explaining her cause for terminating me as
11 superintendent.
12     Q.   When did you receive this document?
13     A.   At that meeting.
14     Q.   That meeting was at City Hall?
15     A.   City Hall in her conference room on the
16 2nd of December.
17     Q.   Is there a signature indicated on this
18 document?
19     A.   Yes.
20     Q.   Whose signature is that?
21     A.   Lori Lightfoot.
22     Q.   Is there a letterhead on this document?
23     A.   Yes.
24     Q.   And whose letterhead is that?

Page 100

1      A.   Office of the Mayor, City of Chicago,
2  Lori Lightfoot, Mayor.
3      Q.   In this letter does the mayor indicate
4  that you are relieved of your duties?
5      A.   Yes.
6      Q.   In this letter does the mayor indicate
7  you are terminated from your employment for cause?
8      A.   Yes.
9      Q.   What did you believe this to mean?
10     A.   I believed it to mean that I was
11 relieved of my duties as Chicago Police Department
12 superintendent.
13     Q.   Is there a reason why you had that
14 belief?
15     A.   Yes.
16     Q.   What was that reason?
17     A.   Because I knew that serving as the
18 superintendent was like a detail and you could be
19 removed by the mayor at any time.
20     MR. LEE:  Arbitrator Roumell, I just want to
21 be clear.  We did move to admit this previously and
22 this has been admitted, correct?
23     ARBITRATOR ROUMELL:  Yes.
24     MR. LEE:  Thank you.

Page 101

1  BY MR. LEE:
2      Q.   After you were removed from the position
3  of superintendent, were you still employed by the
4  City of Chicago Chicago Police Department?
5      A.   Yes.
6      Q.   In what capacity?
7      A.   I was lieutenant.
8      Q.   Did the mayor fire you from the Chicago
9  Police Department?
10     A.   During the meeting, while she was
11 reading off the letter, she advised me that at that
12 point when I left I was no longer to be able to go
13 to any police department facilities, go to 35th
14 Street.  And at that time I informed her that you
15 can relieve me of my duties as the superintendent
16 but you can't fire me from the Chicago Police
17 Department, that I was still a lieutenant, and as
18 such, I could go anywhere in the police department
19 that I chose to.
20     Q.   So after you were removed by the mayor
21 from the position of superintendent, did you return
22 to the position of lieutenant?
23     A.   Yes.  I was always lieutenant, yes.
24     Q.   How long did you remain with the Chicago

**DON.DEF003412**

Arbitration                                    Lt. E. Johnson & PB & PA v. CPD

Page 102

1  Police Department after you were removed from the
2  position of superintendent?
3      A.   So I remained a lieutenant until I
4  believe it was that Friday, so that would be the
5  6th of December.
6      Q.   And you retired from the Chicago Police
7  Department as a lieutenant, correct?
8      A.   Correct.
9      Q.   Just to be clear, it is your
10 understanding from the time you were placed in the
11 position of superintendent of the Chicago Police
12 Department until you retired on or about
13 December 6th, 2019, you held the rank of
14 lieutenant?
15     A.   Correct.
16     Q.   A civil suit was filed against you and
17 the Chicago Police Department by Ms. Donald on
18 October 14th, 2020, correct?
19     A.   Correct.
20     Q.   You were served a copy of the complaint?
21     A.   Yes.
22     Q.   Showing you Joint Exhibit 2, Joint
23 Exhibit 2.
24         Do you have Joint Exhibit 2 in front

Page 103

1  of you?
2      A.   Yes.
3      Q.   Is that a copy of the complaint you were
4  served with?
5      A.   Yes.
6      Q.   And the case number for that complaint
7  is 2020 L 010986?
8      A.   Yes.
9      Q.   And, to your knowledge, this case was
10 originally filed in the Circuit Court of Cook
11 County?
12     A.   Yes.
13     Q.   And then, to your knowledge, it was
14 subsequently removed to the Northern District of
15 Illinois?
16     A.   Correct.
17     Q.   Did you request the City to provide
18 legal representation to defend you in this action?
19     A.   Yes.
20     Q.   Did you request the City to pay for
21 legal representation regarding this matter?
22     A.   Yes.
23     Q.   When did you make those requests?
24     A.   It would have been sometime after I was

Page 104

1  served with the document.
2      Q.   So some point after October 14th, 2020,
3  you were served with the document?
4      A.   Correct.
5      Q.   And then subsequent to being served with
6  the document you notified who that you wanted legal
7  representation or the City to pay for legal
8  representation?
9      A.   So at the time I retained attorney
10 Walter Jones who then reached out to the City of
11 Chicago to inquire about them paying for my legal
12 representation.
13     Q.   Did you receive a response from the
14 City?
15     A.   Yes.
16     Q.   And how did that response come to you?
17     A.   It was sent to my lawyer at the time,
18 Walter Jones.
19     Q.   And who did you receive a response from?
20     A.   I believe it was Susan O'Keefe.
21     Q.   And did that response indicate that the
22 City would not provide you legal representation or
23 pay for your legal representation for the civil
24 action brought by Cynthia Donald?

Page 105

1      A.   That's correct.
2      Q.   Joint Exhibit 4, please. Please turn
3  your attention to Joint Exhibit 4.
4          Are you at Joint Exhibit 4?
5      A.   Yes.
6      Q.   Is this a copy of the letter that you
7  received from the City of Chicago?
8      A.   Yes.
9      Q.   And this letter is a true and accurate
10 representation of the letter you received from the
11 City saying that they would not pay for legal
12 representation for you?
13     A.   Correct.
14     Q.   Has the City provided you legal
15 representation in a civil suit brought by
16 Ms. Donald?
17     A.   No.
18     Q.   Has the City paid for legal
19 representation in the civil suit brought by
20 Ms. Cynthia Donald?
21     A.   No.
22     MR. LEE:  Nothing further.
23     MR. JOHNSON:  Mr. Arbitrator, can we have
24 about five to ten minutes?

**DON.DEF003413**

Page 106

1   ARBITRATOR ROUMELL:  Sure.
2   MR. JOHNSON:  Thank you.
3       (Short recess.)
4   MR. JOHNSON:  Jennifer, if you're ready.
5       Mr. Arbitrator and Jason, as we
6   explained earlier this morning, Jennifer has some
7   background that I don't have relevant to the
8   individuals in this case.  On behalf of the City,
9   we're asking if she will conduct some of the
10  cross-examination with respect to some of the
11  testimony from Mr. Johnson a little bit today.
12      ARBITRATOR ROUMELL:  Well, the
13  cross-examination will be limited to the area
14  covered.
15      MR. JOHNSON:  Well, we'll see.  As I said, I
16  am not doing the cross.  I think there are several
17  areas that got opened here with respect to this,
18  and I will -- you know, if Jennifer is okay with
19  it, I'm happy with turning it over to her at this
20  point.
21      ARBITRATOR ROUMELL:  All right.  Go ahead.
22      MR. JOHNSON:  It will be responsive to
23  Mr. Johnson's testimony, however.
24      ARBITRATOR ROUMELL:  Go ahead.

Page 107

1   MS. KENEDY:  Thank you very much, and thank
2   you for your courtesy in allowing me to sort of
3   jump in a little bit delayed.
4           CROSS-EXAMINATION
5   BY MS. KENEDY:
6   Q.   Mr. Johnson, can you hear me, sir?
7   A.   Yes.
8   Q.   Good afternoon.  My name is Jennifer
9   Kenedy.
10      I just wanted to follow up.  You made
11  some comments with respect to the mayor, and I
12  wanted to talk to you a little bit about that.  You
13  used some -- it sounded like you were pretty upset
14  with her that she told you to remove Officer Donald
15  from the detail and you used some colorful language
16  in your testimony.
17      Am I accurately describing your
18  demeanor with respect to that?
19  A.   No, I wasn't upset.  I was caught off
20  guard, but I wasn't upset.  But the language that I
21  used was the language that she used at the time of
22  the conference.
23  Q.   Okay.  And you mentioned that you had a
24  meeting with her and Mr. Classen and you said it

Page 108

1   was on October 17th?
2   A.   I believe that was the date, yes.
3   Q.   Okay.  It actually was October 18th.  Do
4   you have any reason to dispute that?
5   A.   No.
6   Q.   Okay.  And that meeting actually took
7   place at the Union League Club.  Do you recall that
8   now?
9   A.   Yes.
10      ARBITRATOR ROUMELL:  The Union what?
11      MS. KENEDY:  Union League Club.  I apologize.
12  Union League.
13      ARBITRATOR ROUMELL:  Okay.
14  BY MS. KENEDY:
15  Q.   And, Mr. Johnson, isn't it true that you
16  had a conversation by phone with Mayor Lightfoot
17  the night before on October 17th?
18  A.   Repeat that.
19  Q.   Isn't it true that you had a phone call
20  with the mayor the night before that meeting on
21  October 17th?
22  A.   Yes.
23  Q.   You actually had reached out to her to
24  give her a heads-up about being found in your car

Page 109

1   and the optics that that might create to give her a
2   heads-up; is that correct?
3   MR. LEE:  Objection, your Honor.  Assumes
4   evidence not admitted into evidence.  I'm sorry.
5   Facts not admitted into evidence.
6   ARBITRATOR ROUMELL:  I can't hear with you
7   that mask.
8   MR. LEE:  My objection is it assumes facts
9   that have not been admitted into evidence.
10  ARBITRATOR ROUMELL:  Well, it's
11  cross-examination.  I'll permit the question.
12  BY MS. KENEDY:
13  Q.   Mr. Johnson, do you remember the
14  question?
15  ARBITRATOR ROUMELL:  No.  Repeat it.
16  BY MS. KENEDY:
17  Q.   Okay.  Isn't it -- wow, I'm echoing.
18      Isn't it true that you had a
19  telephone call with the mayor on the night before
20  that meeting?
21  A.   Yes.
22  Q.   And that was the night after the
23  incident in which you were found in your car and we
24  all know what happened, okay, correct?

Page 110

1      A.   Correct.
2      Q.   Okay.  And you called her to give her a
3  heads-up about this incident because you realized
4  that it might have not the best optics; is that
5  fair?
6      A.   I called her because she was my boss and
7  I didn't want her to get blindsided with it.
8      Q.   Correct.  Because it wasn't the most
9  positive news, correct?
10     A.   I -- that's fair to say.
11     Q.   Okay.  And during that call, did you
12 mention that you -- you said you had a couple
13 drinks, correct?
14     MR. LEE:  Objection; outside the scope of
15 direct testimony.
16     ARBITRATOR ROUMELL:  Well --
17     MS. KENEDY:  Do you want me to respond to
18 that?
19     ARBITRATOR ROUMELL:  Yes, I do.
20     MS. KENEDY:  Okay.  I think it's important to
21 get into the frame of mind of the mayor that he
22 gave very colorful testimony about her making the
23 personnel decision with respect to or the personnel
24 directive to him as superintendent.  So I think

Page 111

1  it's fair to go into what facts she was aware of
2  and what she was told prior to that lunch meeting
3  at the Union League Club that Mr. Johnson testified
4  to.
5      MR. LEE:  Your Honor, that was not brought out
6  during direct testimony in regards to the telephone
7  conversation.
8      ARBITRATOR ROUMELL:  Well, I'll permit the
9  question, but I hope you limit it because I'm not
10 too sure I'm too impressed.
11     MS. KENEDY:  All right.  I'll keep it short.
12 BY MS. KENEDY:
13     Q.   Mr. Johnson, you didn't tell the truth
14 during that conversation; isn't that correct?
15     MR. LEE:  Objection.
16     ARBITRATOR ROUMELL:  Now, wait a minute.  You
17 can ask him what he told the mayor.
18     MS. KENEDY:  Right, in that call.
19     ARBITRATOR ROUMELL:  Go ahead and ask that,
20 but I don't want you to badger him.
21     MS. KENEDY:  Okay.
22 BY MS. KENEDY:
23     Q.   You told the mayor -- all right.  That's
24 fair.

Page 112

1      You told the mayor that you just --
2  during that conversation in passing that you had a
3  couple drinks at dinner, correct?
4      A.   Yeah.  I told her I had a few drinks,
5  yes.
6      Q.   Okay.  In fact, the report says you said
7  you had a couple drinks?
8      MR. LEE:  Objection.  What report?
9  BY MS. KENEDY:
10     Q.   Well, did you tell her you had a couple
11 drinks, or did you tell her you had a few drinks?
12     MR. LEE:  There's a pending objection.
13     ARBITRATOR ROUMELL:  I'll permit the question.
14     THE WITNESS:  I told her I had a few drinks.
15     ARBITRATOR ROUMELL:  Okay.  That's the answer.
16 Let's move on.
17 BY MS. KENEDY:
18     Q.   And then you indicated that the next day
19 you went to a meeting with Mayor Lightfoot and
20 Classen, correct?
21     A.   Correct.
22     Q.   And in that meeting she said she heard
23 you might be having a sexual relationship with
24 your -- a member of your detail, correct?

Page 113

1      A.   Correct.
2      Q.   Did you tell her that that member of
3  your detail was the person you were having the
4  drinks with two nights before?
5      MR. LEE:  Objection; outside the scope of
6  direct.
7      ARBITRATOR ROUMELL:  I'll permit the question.
8      THE WITNESS:  She never asked.  She carried
9  the conversation.  So she didn't really ask me the
10 details of what had occurred that night at that
11 meeting.  She didn't ask me that.
12 BY MS. KENEDY:
13     Q.   I'm sorry and that's my fault.  I asked
14 a confusing question.  I'm talking about the phone
15 call that you made on the 17th to give, what you
16 said, your boss a heads-up about what happened
17 where you said you had a few drinks.
18     In that call where you were trying to
19 advise her what happened, did you tell her that the
20 person you had had the few drinks with was actually
21 Officer Donald, the member of your detail?
22     MR. LEE:  I'll renew my objection because this
23 is outside the scope of direct testimony.  There
24 was no testimony elicited regarding a phone

**DON.DEF003415**

Page 114

1  conversation that occurred on October 17th during
2  the direct testimony of Mr. Johnson.
3      ARBITRATOR ROUMELL: Well, here's the point.
4  You put Mr. Johnson on the stand. You're talking
5  about a conversation, a meeting that he had with
6  the mayor and the chief of staff. And the
7  cross-examination is probing that meeting and what
8  led up to the meeting.
9      I think it's proper
10 cross-examination, but I'm suggesting that I'd like
11 to see the cross-examination limited.
12     MS. KENEDY: I will keep it as short as
13 possible. Thank you.
14 BY MS. KENEDY:
15     Q.  Mr. Johnson, during that phone call the
16 night before that meeting, did you mention to the
17 mayor that the person you were having a few drinks
18 with was the member of your detail?
19     A.  No. During that conversation, I gave
20 her a brief overview of what occurred. She never
21 asked who I was with and, no, I never said.
22     Q.  Okay. You never told her it was a
23 member of your detail because she didn't ask. You
24 didn't think that was important for her to know?

Page 115

1      MR. LEE: Objection. Counsel --
2      ARBITRATOR ROUMELL: I'm going to sustain that
3  one because he's answered the question and you can
4  argue.
5      MS. KENEDY: Okay.
6  BY MS. KENEDY:
7      Q.  Mr. Johnson, so the next day at the
8  meeting the mayor suggests to you that she's
9  received information, whether it's through body cam
10 footage or from other people, that suggests
11 additional information about that night but that
12 she heard from people you were having a sexual
13 relationship with the member of your detail,
14 Officer Donald.
15     Do you remember that testimony?
16     A.  Say it again.
17     Q.  Do you remember your testimony that at
18 this meeting with Mayor Lightfoot she told you that
19 she had heard from others that you were having a
20 sexual relationship with Officer Donald, the member
21 of the detail you had been having a few drinks with
22 the night before?
23     A.  Yes.
24     Q.  And during that meeting with the mayor,

Page 116

1  you denied having a sexual relationship with
2  Officer Donald, correct?
3      MR. LEE: Objection, your Honor. Relevance.
4      ARBITRATOR ROUMELL: I think it's a proper
5  question.
6      THE WITNESS: So at that meeting I told her
7  Officer Donald and I were not sleeping together,
8  yes.
9  BY MS. KENEDY:
10     Q.  And were you, in fact, at that time and
11 prior having a sexual relationship with Officer
12 Donald?
13     ARBITRATOR ROUMELL: Now, wait a minute.
14     MR. LEE: Objection.
15     ARBITRATOR ROUMELL: Is there an objection to
16 that?
17     MR. LEE: Yes, your Honor. Objection;
18 relevance, outside the scope of direct.
19     ARBITRATOR ROUMELL: How is that relevant?
20     MS. KENEDY: Well, what I would suggest is he
21 is questioning the conversation and the tone and
22 what he was told to do by the mayor of Chicago when
23 we are establishing that he lied to her not once,
24 not twice, but several times, including how much he

Page 117

1  drank, who he was with, and whether or not he was
2  having a sexual relationship with her.
3      MR. LEE: That assumes facts not put into
4  evidence. He has not testified to any of that,
5  that he lied to the mayor. He has not said that.
6      MS. KENEDY: I'm not asking if he lied. I'm
7  asking if he, in fact, was having a sexual
8  relationship when he told the mayor he was not at
9  that meeting.
10     MR. LEE: And my objection is relevance,
11 outside the scope of direct, and it's a compound
12 question.
13     MS. KENEDY: I think if you lie to your
14 boss --
15     MR. LEE: Objection.
16     MS. KENEDY: -- that explains the personnel
17 decisions that follow.
18     MR. LEE: This is about legal representation
19 and whether the City --
20     ARBITRATOR ROUMELL: Will you mind letting me
21 speak.
22     The evidence that I have is that the
23 mayor of Chicago believes in her conversation with
24 the superintendent that he was having a sexual

**DON.DEF003416**

Page 118

1 relationship with a subordinate and directed him to
2 transfer that individual to another unit.
3         What more do I need, Ms. Kenedy?
4     MS. KENEDY:  That was a little bit in and out,
5 but I think you said that you understand the
6 testimony to be that she had information suggesting
7 that he was having a sexual relationship and, as a
8 result, he transferred Ms. Donald off his detail.
9 And I do think it's relevant that in that same
10 conversation he denied having a sexual relationship
11 with Officer Donald and I think it's important to
12 know whether, in fact, he was having a sexual
13 relationship with Officer Donald at that time
14 because he's suggesting that that was some order
15 and some, you know -- and colorful language was
16 used and he has denied having a sexual relationship
17 with her at that time.  And my question simply is
18 was that true, were you, in fact, having a
19 sexual --
20     ARBITRATOR ROUMELL:  And I guess my message to
21 you is does that make any difference to me as a
22 decision-maker.
23     MS. KENEDY:  If you're telling me that it does
24 not, I will take that at face value.

Page 119

1     ARBITRATOR ROUMELL:  Well, I don't care what
2 you take it as.  I just don't want to try the
3 underlying case here.
4     MS. KENEDY:  Understood.  And I'm just trying
5 to get at what was in the mind of the mayor when
6 she had the conversation with him about moving the
7 security person off his detail who he was drinking
8 with that night and who she had heard that he was
9 having a sexual relationship and then denied it.
10         So that's really -- if we're going to
11 get into what the mayor said and use colorful
12 language, I just think it's important to then get
13 into the background of the conversations and what
14 was said and whether it was truthful or not that
15 led to the ultimate meeting where that conversation
16 took place.  But, I mean, I think I've covered all
17 that ground.
18     ARBITRATOR ROUMELL:  I think you have.
19     MR. LEE:  Your Honor, I would like to move to
20 strike that narrative, that speaking objection that
21 Ms. Kenedy just elaborated on.  I would like to
22 have that stricken from the record.
23     ARBITRATOR ROUMELL:  On what basis?
24     MR. LEE:  It's irrelevant.  It's a speaking

Page 120

1 objection.  She summed up her argument and there
2 was no question to Mr. Johnson.  She summed up the
3 argument to you.  It's not relevant.
4     ARBITRATOR ROUMELL:  I'll take it under
5 advisement.  Let's move on.
6     MS. KENEDY:  Thank you.  I'm finished.  Thank
7 you very much.
8     MR. JOHNSON:  And if I may, Mr. Arbitrator, as
9 I indicated, Ms. Kenedy was handling the part of
10 the cross dealing with certain issues with which --
11 meetings with which she had some familiarity and
12 some background.  I have a couple of questions for
13 Mr. Johnson.  They have nothing to do with any of
14 the areas that Ms. --
15     ARBITRATOR ROUMELL:  Go ahead and ask the
16 questions.
17     MR. JOHNSON:  Sure.
18     MR. LEE:  Your Honor, I'd just like to make
19 the objection that it's improper for two attorneys
20 to go back and forth to pepper my witness with
21 questions.  It should have been only one attorney
22 to ask the questions on cross-examination.  It
23 should not be two.
24     MR. JOHNSON:  And we've known each other for a

Page 121

1 number of years.  As we know, I don't do
2 tag-teaming.  But this is an unusual case.  First
3 it's handled on an extraordinarily expedited basis.
4 We got this case within the last two weeks.
5     ARBITRATOR ROUMELL:  Hold on.  Hold on.  Let
6 me talk, Mr. Johnson.  This is arbitration.  You
7 guys are getting a little bit too formal.  How many
8 questions do you have, Mr. Johnson?
9     MR. JOHNSON:  Not more than four.
10     ARBITRATOR ROUMELL:  I'll let you ask.
11     MR. JOHNSON:  Thank you.
12     ARBITRATOR ROUMELL:  If Mr. Lee wants to be
13 able to ask on cross or one of his associates wants
14 to ask, that's fine, too.  Keep this short.
15     MR. JOHNSON:  I will.
16         CROSS-EXAMINATION
17 BY MR. JOHNSON:
18     Q.  Good afternoon, Mr. Johnson.
19     A.  Good afternoon.
20     Q.  I just have a couple of questions.
21 Excuse me.
22         Prior to your becoming -- being
23 appointed as superintendent, what position did you
24 hold with the police department prior to I think it

Arbitration                                                    Lt. E. Johnson & PB & PA v. CPD

Page 122

1  was April of 2016?
2      A.  I was the chief of patrol.
3      Q.  And that is also an exempt position?
4      A.  Yes.
5      Q.  And at that point as the chief of patrol
6  you served at the pleasure of whoever was
7  superintendent at the time, correct?
8      A.  Correct.
9      Q.  And for approximately how long were you
10 the chief of patrol, if you recall?
11     A.  I believe I was appointed chief of
12 patrol early December of 2015 and then I served in
13 that position until I was appointed interim
14 superintendent.
15     Q.  Gotcha.  Prior to 2015 when you were
16 appointed to the acting chief of patrol, did you --
17 were you -- what was your assignment or position
18 then?
19     MR. LEE:  I'm going to object, Mr. Arbitrator.
20 Mr. Johnson presented to you that he only had four
21 questions and now we're on question number five.
22     MR. JOHNSON:  First question has to do with
23 his history and the background, if he served in
24 exempt positions within the department.

Page 123

1      ARBITRATOR ROUMELL:  Let's not argue.
2      MR. LEE:  I'm sorry.  You broke up.
3      ARBITRATOR ROUMELL:  What's your question?
4      MR. JOHNSON:  The question is -- what I'm
5  trying to find out is the sequence and the duration
6  of exempt appointments that Mr. Johnson held prior
7  to being appointed as superintendent in 2016.
8      ARBITRATOR ROUMELL:  All right.  That's one
9  question and Mr. Johnson didn't answer that.
10     MR. JOHNSON:  Well, I'm still -- we're getting
11 to what those positions were.  There were a series
12 of these positions.
13     MR. LEE:  It sounds like there are a lot of
14 questions that are coming from Mr. Johnson.
15     MR. JOHNSON:  All in one particular area.
16     ARBITRATOR ROUMELL:  Hold on.  Hold on.  Now,
17 as I understand the position of the association is
18 that the -- regardless of the exempt positions, at
19 all times Eddie Johnson held the rank of
20 lieutenant.  Is that what I understand, Mr. Lee?
21     MR. LEE:  That is correct.
22     ARBITRATOR ROUMELL:  All right.  I'm going to
23 short-circuit this.
24     Tell me, Eddie Johnson, what exempt

Page 124

1  ranks you had in the department and when.
2      THE WITNESS:  Okay.  So I was assigned as
3  commander I believe in February of 2008 and I held
4  that position until August of 2012 when I was
5  assigned as deputy chief of Area 4.  After that --
6  after deputy chief, then that's when I was assigned
7  as chief of patrol in December of 2015.
8      ARBITRATOR ROUMELL:  Then from there you
9  became superintendent?
10     THE WITNESS:  Correct.
11     MR. JOHNSON:  I have a very focused question
12 if I may, Mr. Arbitrator.
13     MR. LEE:  I'll renew my objection.
14     MR. JOHNSON:  Well, this is a response to
15 direct.
16 BY MR. JOHNSON:
17     Q.  So, Mr. Johnson --
18     MR. LEE:  There's a pending objection,
19 Mr. Johnson.
20     ARBITRATOR ROUMELL:  All right.  What's the
21 question?
22     MR. JOHNSON:  The question is this.  I'm going
23 to ask -- I want to ask Mr. Johnson if -- assuming
24 that the commander of Sixth District was his first

Page 125

1  exempt appointment, prior to becoming the commander
2  of the Sixth District, did he go on a leave of
3  absence from his lieutenant rank position.
4      MR. LEE:  What is the relevance of that?
5      MR. JOHNSON:  This has to go -- this has to do
6  with the assertion by the union that somehow
7  Mr. Johnson, in the capacity as superintendent, has
8  the protection of the lieutenants collective
9  bargaining agreement.  It's also in response to the
10 testimony that Mr. Johnson was, quote-unquote,
11 detailed to the position of superintendent.  He was
12 nothing of the sort.  He was on a leave of absence.
13     ARBITRATOR ROUMELL:  I'll take the answer and
14 let the two of you argue about it.
15     What's the answer?
16     THE WITNESS:  So I never looked at it as
17 having a leave of absence.  When I was assigned as
18 commander, I still maintained my lieutenant star,
19 my lieutenant identification.  I was still a union
20 paying member.  For example, if I was involved in a
21 police shooting at the time, the union would be the
22 entity that would come out to represent me at a
23 police-involved shooting.
24     Also, during that entire time that I

Arbitration                                                    Lt. E. Johnson & PB & PA v. CPD

Page 126

1  was exempt rank, all my identifications still
2  identified me as lieutenant. An example of that
3  was in any of the databases I was never given a
4  different star number or badge number as an exempt
5  rank member. I kept my lieutenant's badge number
6  the entire time, and that's how I would be
7  identified in the department's databases or
8  anything like that.
9  BY MR. JOHNSON:
10     Q.  Do you recall whether or not you applied
11  for a leave of absence from your career service
12  position of lieutenant in order to accept the
13  noncareer service appointment of commander, if you
14  recall?
15     A.  No.
16     Q.  With respect to the payment of union
17  dues, the purpose of that, I believe -- I just want
18  to confirm my understanding -- the purpose of that
19  payment of union dues was that you would be covered
20  by the union's legal defense benefit, correct?
21     A.  No. It -- you know, when we continue to
22  pay into the union, it's to have all the rights and
23  protections of that union.
24     Q.  So in terms of the rights and

Page 127

1  protections of that union, does that mean that if
2  you worked more than 40 hours a week as
3  superintendent you were entitled to overtime?
4     ARBITRATOR ROUMELL: Wait a minute.
5     MR. LEE: Objection.
6     ARBITRATOR ROUMELL: Well, let me figure that
7  out.
8  BY MR. JOHNSON:
9     Q.  During the time that you were
10  superintendent, did you file -- between April of
11  2016 through December 2nd of 2019, did you file any
12  grievances under the lieutenants collective
13  bargaining agreement?
14     MR. LEE: Objection; relevance.
15     ARBITRATOR ROUMELL: How is that relevant?
16     MR. JOHNSON: It has to do with their claim
17  that somehow he's covered by, protected by, has all
18  the rights and protections and privileges of the
19  lieutenants collective bargaining agreement. They
20  clearly weren't being applied to him.
21     ARBITRATOR ROUMELL: Well, I'm sure there's a
22  lot of officers who never filed grievances. You
23  can ask, but I don't think it too relevant.
24     MR. JOHNSON: Well, I can take a hint. I have

Page 128

1  nothing further.
2     ARBITRATOR ROUMELL: Okay. Thank you.
3     MR. LEE: Can we have one moment, your Honor,
4  please? Two minutes, please.
5     ARBITRATOR ROUMELL: No. You can have five.
6     MR. LEE: Thank you.
7        (Short recess.)
8     ARBITRATOR ROUMELL: Are you ready?
9     MR. LEE: We are ready.
10     ARBITRATOR ROUMELL: Okay.
11     MR. LEE: We have no redirect, your Honor.
12     ARBITRATOR ROUMELL: No redirect?
13     MR. LEE: That is correct. No redirect.
14     ARBITRATOR ROUMELL: Okay. Thank you very
15  much, Mr. Johnson.
16     THE WITNESS: Thank you, sir.
17     ARBITRATOR ROUMELL: Who is your next witness?
18     MR. ANDRUZZI: Mr. Arbitrator, we're going to
19  call Anthony Guglielmi.
20        Did I do it phonetically correct?
21     THE WITNESS: Close, but no.
22     ARBITRATOR ROUMELL: I want you to do it
23  again.
24     MR. ANDRUZZI: Mr. Guglielmi, would you say

Page 129

1  your name -- last name slowly for --
2     ARBITRATOR ROUMELL: No. Could you spell your
3  last name, please.
4     THE WITNESS: Yes, sir. I will do both. Last
5  name is Guglielmi, G-u-g- --
6     ARBITRATOR ROUMELL: Wait a minute. Hold on.
7  G -- spell it.
8     THE WITNESS: G-u-g-l-i-e-l-m-i.
9     ARBITRATOR ROUMELL: G-u-g-l-i-e-l-i.
10     THE WITNESS: L-i-e-l-m-i.
11     ARBITRATOR ROUMELL: M-i.
12     THE WITNESS: Your Honor, you can call me
13  Anthony if it's easier.
14     ARBITRATOR ROUMELL: Okay.
15        (Witness duly sworn.)
16            ANTHONY GUGLIELMI,
17  called as a witness herein, having been first duly
18  sworn, was examined and testified as follows:
19         DIRECT EXAMINATION
20  BY MR. ANDRUZZI:
21     Q.  Good afternoon, Mr. Guglielmi. I
22  slurred it so it may have been okay. I'm Joe
23  Andruzzi. I represent Eddie Johnson at this
24  hearing.

Arbitration                                                    Lt. E. Johnson & PB & PA v. CPD

Page 130

1    Are you currently employed by the
2  Chicago Police Department?
3    A.   No, sir, I am not.
4    Q.   Have you previously been employed by the
5  Chicago Police Department?
6    A.   Yes, sir, I was.
7    Q.   In what capacity?
8    A.   I was the chief communications officer.
9  I basically led the communications efforts for the
10 department.
11   Q.   And how long did you hold that position?
12   A.   I held that position from May of 2015
13 through May of 2020.
14   Q.   Who was your supervisor while you held
15 that position?
16   A.   The position reported to the
17 superintendent of police, so my supervisors were
18 Eddie Johnson and Garry McCarthy.
19   Q.   I'd like to discuss the time you
20 reported to then superintendent Eddie Johnson. Can
21 you tell me what your interaction was with
22 Mr. Johnson during that time?
23   A.   So I was in charge of all the internal
24 and external communications for the department and

Page 131

1  spokesman for the superintendent. So we had a
2  fairly close relationship regarding matters of
3  public interest, anything that the department was
4  investigating or needed to communicate to the City.
5  I also was the superintendent's public
6  representative -- (video disruption).
7    MR. ANDRUZZI:  Did the reporter -- were you
8  able to get all that?
9    COURT REPORTER:  No.  He broke up after
10 "public representative."
11 BY MR. ANDRUZZI:
12   Q.   Would you mind repeating the last
13 portion, Mr. Guglielmi?
14   A.   Sure.  I was the superintendent's public
15 representative to the media and at other community
16 matters.
17   Q.   During that time, would Mr. Johnson make
18 you aware of his daily schedule?
19   A.   Yes.  I was part of the superintendent's
20 scheduling team, and I reviewed all aspects of his
21 schedule on a daily and weekly basis.
22   Q.   And would that include times where
23 Mr. Johnson would have to meet with the mayor?
24   A.   Sure.  If there was a reason for me to

Page 132

1  know, then yes, I would be briefed on conversations
2  that he may have had with the mayor and I certainly
3  would know, having access to his schedule, when he
4  might meet with her.
5    Q.   And when he had meetings with the mayor
6  during your time you served under him, would you
7  ever accompany him to those meetings?
8    A.   Some.  Many I would not, but sometimes I
9  would be staffing him or accompanying him during
10 those meetings, yes.
11   Q.   And, generally, when Mr. Johnson would
12 meet with the mayor, whether you were present or
13 not or I guess I would say or not, would he meet
14 with you afterwards to discuss the meeting?
15   A.   It depends.  Yeah, if it had an aspect
16 that had some type of communication consideration,
17 whether it be communicating to employees or
18 communicating to the public, then absolutely.
19   Q.   So I'd like to ask you specifically
20 about events that occurred on October 18th, 2019.
21 Do you recall if Superintendent Johnson was to meet
22 with the mayor on that date?
23   A.   I believe, yes, Superintendent Johnson
24 did inform us that he met with the mayor on that

Page 133

1  date.
2    Q.   And do you recall if you were present at
3  that meeting when he met with the mayor?
4    A.   I was not present at the meeting, no.
5    Q.   Did you meet with Mr. Johnson when he
6  returned back from the meeting with the mayor?
7    A.   Yes.  I met with Mr. Johnson after --
8  Superintendent Johnson after.
9    Q.   And did he -- and at that meeting with
10 Mr. Johnson following his meeting with the mayor,
11 did he discuss anything that was said during that
12 meeting?
13   A.   Yes.  The superintendent briefed myself
14 and other members of his executive staff that the
15 mayor had directed him to move Officer Cynthia
16 Donald to the Information Technology Bureau in
17 response to incidents that occurred.
18   Q.   And do you know who Cynthia Donald is?
19   A.   I do.
20   Q.   Let me -- strike that question.
21        Did you know who Cynthia Donald was
22 at that time?
23   A.   I did.
24   Q.   And who was she?

**DON.DEF003420**

Page 134

1    A.    She is a member of the superintendent's
2  office staff and one of his security personnel and
3  driver.
4    Q.    And did you have any follow-up
5  discussions between yourself and Mr. Johnson
6  regarding the mayor's order?
7    A.    No. He briefed us on that directive.
8  And the reason, I'm assuming, for my being briefed
9  was to see if there were any type of considerations
10  for internal communication.
11    Q.    And, to your knowledge, was Officer
12  Donald, in fact, removed from Mr. Johnson's
13  security detail to another position within the
14  department?
15    A.    To my knowledge, yes. She was removed
16  from the Office of the Superintendent and moved to
17  the Information Technology Bureau.
18    Q.    If you can just give me one moment,
19  please. Okay. I'm sorry.
20       Did you make anyone in the mayor's
21  office aware of the movement from -- of Officer
22  Donald from the superintendent detail to another
23  position?
24    A.    I don't believe so. I will say this

Page 135

1  caveat. I mean, I did communicate very closely
2  with the mayor's communications office. I don't
3  recall discussing this matter, but it's possible.
4  But I don't recall -- I wouldn't be the one to
5  communicate that to the mayor's office normally.
6  But if it came up during discussion, I just don't
7  recall.
8    MR. ANDRUZZI: I'll tender the witness.
9    MR. JOHNSON: Give me two seconds, please.
10    ARBITRATOR ROUMELL: Sure.
11    THE WITNESS: Yes, sir.
12    MR. JOHNSON: I'm back. No questions.
13    ARBITRATOR ROUMELL: Thank you.
14    MR. ANDRUZZI: Thank you, Mr. Guglielmi. And
15  I apologize for mispronouncing your name wrong
16  every time.
17    THE WITNESS: No problem.
18    MR. ANDRUZZI: Mr. Arbitrator, we're ready to
19  call -- the union calls Mr. Anthony Riccio as a
20  witness.
21    ARBITRATOR ROUMELL: Okay.
22    MR. ANDRUZZI: Mr. Riccio --
23    ARBITRATOR ROUMELL: Wait a minute. Wait a
24  minute. I've got to write it down. That's

Page 136

1  R-i-c-c-o?
2    THE WITNESS: R-i-c-c-i-o.
3    ARBITRATOR ROUMELL: I apologize.
4       (Witness duly sworn.)
5       ANTHONY RICCIO,
6  called as a witness herein, having been first duly
7  sworn, was examined and testified as follows:
8       DIRECT EXAMINATION
9  BY MR. ANDRUZZI:
10    Q.    Mr. Riccio, good afternoon, and I thank
11  you for your patience today.
12       Are you currently employed with the
13  Chicago Police Department?
14    A.    No, I am not.
15    Q.    Have you previously been employed with
16  the police department -- Chicago Police Department?
17    A.    I was as a Chicago police officer for
18  34 years. I retired August 1st of 2020.
19    Q.    And when you retired, what was your
20  rank?
21    A.    My rank was lieutenant when I retired.
22    Q.    And prior to retiring, what position in
23  the department did you -- were you assigned?
24    A.    I was the first deputy superintendent.

Page 137

1  So in the command structure, I was number two under
2  Superintendent Johnson.
3    Q.    And what were the dates that you were
4  assigned to that position?
5    A.    I was assigned as a first deputy on
6  February 16th, 2018. And stepped down from that
7  position on July 16th, 2020.
8    Q.    Mr. Riccio, you just testified that you
9  retired on August 1st of 2020. From the period of
10  July 16th, 2020, until August 1st, 2020, what
11  position did you hold within the department?
12    A.    I was a lieutenant assigned to the
13  office of the first deputy.
14    Q.    And what were your duties -- what were
15  your duties as first deputy of the Chicago Police
16  Department?
17    A.    So as first deputy, there's a lot of
18  them. Basically you run the day-to-day operation
19  of the department. So I was in charge of virtually
20  everything that the superintendent was in charge of
21  in his absence. But it was really the day-to-day
22  operation of the entire department.
23    Q.    Now, during those two weeks that you
24  said you were in that same position but as a

Page 138

1  lieutenant, what were your duties?
2      A.   So I assisted in the transition with the
3  new first deputy superintendent Eric Carter. And I
4  assisted him until my retirement on August 1st.
5      MR. ANDRUZZI: I'm sorry. Did he come
6  through?
7      ARBITRATOR ROUMELL: Yes, I heard him.
8      MR. ANDRUZZI: Okay.
9  BY MR. ANDRUZZI:
10     Q.   During your time as first deputy --
11 either as first deputy or assigned to the office of
12 the first deputy, who was your immediate
13 supervisor?
14     A.   So there were several. Initially it was
15 Superintendent Eddie Johnson. After Superintendent
16 Eddie Johnson, it was the interim superintendent
17 Charlie Beck and then finally David Brown when he
18 came on board in April.
19     Q.   So I'd like to talk to you specifically
20 about the time that you reported to then
21 superintendent Eddie Johnson. Can you tell me how
22 you interacted with Eddie Johnson during that time?
23     A.   Virtually every way you can think of.
24 So we communicated through e-mails. We

Page 139

1  communicated through telephone conversations. And
2  we communicated face-to-face on a daily basis
3  multiple times -- multiple times a day through
4  every one of those methods.
5      Q.   Would Mr. Johnson make you aware of his
6  daily schedule?
7      A.   Yes. So I would get information about
8  his schedule from him directly, but also I had
9  access to his calendar online. So I could simply
10 log in and see what his calendar looked like for
11 the day. But oftentimes, it was a phone
12 conversation. He would call me up and say, I'm
13 en route to this meeting, I'm en route to that
14 meeting. So we had a lot of conversation about all
15 that.
16     Q.   Would he let you know -- would
17 Mr. Johnson let you know if he was going to meet
18 with the mayor?
19     A.   Oftentimes, he would. If it was a
20 schedule meeting, again, I would see it on his
21 calendar. Oftentimes, if it was something that was
22 not on his calendar, he would call me up and let me
23 know that he was on his way to a meeting. A lot of
24 times I would have to cover meetings at

Page 140

1  headquarters in his absence. So oftentimes, he
2  did. I wouldn't say he always let me know, but I
3  would say most of the time he would let me know.
4      Q.   Were there times you would accompany
5  Mr. Johnson to a mayor -- to a meeting with the
6  mayor?
7      A.   Yes, many times.
8      Q.   When you didn't accompany him, would
9  Mr. Johnson meet with you afterwards to discuss the
10 meeting he had with the mayor?
11     A.   So most of the time he would because
12 as -- in my role as the first deputy
13 superintendent, it was my responsibility to carry
14 whatever directive came from the mayor or came from
15 the superintendent. So that would be relayed to me
16 and then I would relay it out to the wider -- the
17 chiefs or the entire department oftentimes. So,
18 yeah, frequently we did discuss whatever the topic
19 was that he talked to the mayor about.
20     Q.   So I'd like to specifically ask you
21 about events that occurred on October 18th, 2019.
22 Do you recall if Mr. Johnson was to meet with the
23 mayor on that date?
24     A.   Yes, I do. Yes, he was.

Page 141

1      Q.   And did you attend the meeting with the
2  mayor on that date?
3      A.   No, I did not.
4      Q.   Did you meet with Mr. Johnson when he
5  returned back from his meeting with the mayor?
6      A.   Yes, I did.
7      Q.   And who was present during that meeting?
8      A.   It was myself, Bob Boik, who is his
9  chief of staff, Fred Waller, who is the chief of
10 patrol, and Anthony Guglielmi, who was the news
11 affairs director.
12     Q.   And did Mr. Johnson share with you any
13 information that he had obtained from that meeting?
14     A.   He did.
15     Q.   I'm sorry. And what was discussed?
16     A.   Yes, he did.
17     Q.   And can you tell me what you learned
18 from Mr. --
19     A.   There were a couple things. He said
20 that he had discussed a retirement date with the
21 mayor and that that date -- he didn't want it
22 publicly disclosed yet, but that was going to be at
23 the end of the year he was going to retire from the
24 department. And, secondly, that the mayor had

Page 142

1  directed him to remove Cynthia Donald -- Police
2  Officer Cynthia Donald from his security detail and
3  reassign her.
4      Q.   And on October 18th, 2019, did you know
5  who Officer Cynthia Donald was?
6      A.   Yes, I did.  I knew her to be a member
7  of his security detail.
8      Q.   And did you do anything to carry out --
9  to assist Mr. Johnson in carrying out the directive
10  of the mayor of Chicago?
11      A.   Yes, I did.
12      Q.   And what did you do?
13      A.   So in my role as the first deputy, all
14  personnel movement comes through me.  So
15  whatever -- whoever we're moving has to be
16  originated out of my office.  So when the larger
17  meeting ended with the members I just talked to you
18  about, I stuck around and had a private
19  conversation with the superintendent and asked him
20  where he wanted Cynthia to be reassigned.  And he
21  told me hold off momentarily, that he was going to
22  reach out to her and find out if there was an
23  assignment that she preferred or that would work
24  better for her than just reassigning her back to a

Page 143

1  district or a random assignment.
2      Q.   Did Mr. Johnson have the authority to
3  make an assignment within the police department?
4      A.   Yes, he does.
5      Q.   So when he told you that needed to be
6  done, you took that as an order?
7      A.   Correct.
8      Q.   And, to your knowledge, was Officer
9  Donald reassigned from Mr. Johnson's security
10  detail to another unit or position within the
11  department?
12      A.   Yes.  Shortly after that private meeting
13  that we had the superintendent reached out to
14  Cynthia and then he conveyed to me a little bit
15  later, I don't remember how long, maybe an hour,
16  maybe two hours, that she should be reassigned to
17  the records division.  So my office issued the
18  order to reassign her, and that was effective that
19  day.  It was effective immediately as soon as I
20  issued the order.
21          Typically, when we issue orders to
22  move people or transfer people, we do it on a
23  Sunday.  This was a Thursday, I believe, or a
24  Friday.  We did it immediately in light of his

Page 144

1  conversation with the mayor.  So I moved her
2  immediately that day rather than the following
3  Sunday, which is how we would normally do it.
4      MR. ANDRUZZI:  If you can just give me one
5  moment.
6      ARBITRATOR ROUMELL:  Sure.
7      MR. ANDRUZZI:  Okay.  I'm sorry.  I just have
8  two more questions.
9  BY MR. ANDRUZZI:
10      Q.   Mr. Riccio, during the time that you
11  were in the position of first deputy
12  superintendent, did you retain your -- what was
13  your rank at that time?
14      A.   My rank was a lieutenant.
15      Q.   And did you retain your lieutenant star?
16      A.   Yes, I did.
17      Q.   And did you retain your lieutenant's ID
18  card?
19      A.   Yes, I did.
20      MR. ANDRUZZI:  No further questions at this
21  time.  I'll tender over the witness.
22      MR. JOHNSON:  Can I just have three minutes?
23      ARBITRATOR ROUMELL:  Go ahead.
24      MR. JOHNSON:  Thanks.

Page 145

1      (Brief pause in proceedings.)
2      MR. JOHNSON:  I am back.  Just a couple of
3  questions, if I may.
4      ARBITRATOR ROUMELL:  Wait until everybody gets
5  here.  Okay.
6          CROSS-EXAMINATION
7  BY MR. JOHNSON:
8      Q.   Good afternoon, Tony.  It's good to see
9  you again.  I hope you're enjoying your retirement.
10      A.   Thanks, Dave.  Good to see you as well.
11  Thank you.
12      Q.   I just have a couple of questions.
13          Can someone give the witness a copy
14  of Union Exhibit 2?
15      A.   I, unfortunately, am not at the union
16  office.
17      Q.   Oh, okay.
18          So --
19      ARBITRATOR ROUMELL:  Can somebody lift it up
20  and show it to him on the screen?
21      MR. ANDRUZZI:  If you just give me a minute,
22  I'll try to do my best with this.
23      ARBITRATOR ROUMELL:  Can you, Mr. Johnson?
24      MR. JOHNSON:  If you have a copy of that.

**DON.DEF003423**

Page 146

1    MR. ANDRUZZI:  Tell me if this works.
2    THE WITNESS:  You know what, Joe, it's
3  impossible to see like that.
4        I'm sorry, Dave.  I can't see it
5  through the screen.
6  BY MR. JOHNSON:
7    Q.   As I understand your testimony, pursuant
8  to your -- in your capacity as the first deputy at
9  the time, I'm talking about October of 2019, you
10 arranged for the detail of Officer Donald to
11 records, I believe, correct?
12   A.   Correct.
13   Q.   And that's otherwise known as Unit 163?
14   A.   I believe it is 163, yes.
15   Q.   And is there another unit known as
16 evidence and recovered property section, sometimes
17 known as ERPS?
18   A.   Yes.
19   Q.   Do you know where that is located?
20   A.   ERPS is -- gosh, I don't know.  There's
21 a warehouse that it's located.  It's off-site.
22 It's not at headquarters, but I don't know exactly.
23   Q.   Perhaps near Homan Square somewhere?
24   A.   It's possible, yes.

Page 147

1    Q.   Is that Unit 167, if you know?
2    A.   I don't know offhand.  I'm sorry.
3    Q.   Do you know why Officer Donald's detail
4  history, which happens to be Union Exhibit 2, would
5  reflect her being detailed to Unit 167, ERPS, if
6  she was, in fact, working at -- in records?
7    A.   I believe that initially she wanted to
8  go to records and then like within a couple days --
9  she was -- her next couple days after this detail
10 went into effect were her days off.  Sometime over
11 her days off she changed her mind about where she
12 wanted to be assigned, and we accommodated her.
13       So her detail would have changed
14 without her ever actually physically showing up.
15 So we tried to accommodate her request, basically,
16 to be as accommodating as possible.
17   Q.   And her request was to go to records?
18   A.   I believe her initial request was to go
19 to records and then she wanted to go to evidence
20 and recovered property or it may have been vice
21 versa, she wanted to go to evidence and recovered
22 property and then to records.  But whatever it is,
23 she changed her mind and we tried to be as
24 accommodating as possible so we changed the detail

Page 148

1  as well.
2    Q.   And if you changed the detail from ERPS
3  to records, shouldn't that be reflected in her
4  detail history?
5    A.   Possibly.  And now we get into kind of
6  the minutia of how we move people around.  The
7  order to do that would have not come out until
8  Sunday even though she was notified immediately
9  that she was moved and not to report.  So it's very
10 possible that by Sunday we had cleared it up so the
11 initial detail never went into -- never changed on
12 her work history.
13       And I know this gets a little
14 confusing, but if we would have detailed her
15 immediately that day, which we did, she's off the
16 next two days and changes her mind.  Whatever her
17 decision was on Sunday is what's going to show up
18 on her work history.  It was very unusual.
19       I mean, this is not how we normally
20 move people.  Normally we move people at a much
21 more organized fashion, but in light of what was
22 going on here with the mayor, we had to just kind
23 of wing it, to be quite honest.  But we tried to
24 accommodate her as much as possible, and needless

Page 149

1  to say, we had until the end of the day to do it,
2  so we did it.
3    Q.   I appreciate that.  I just have one more
4  question for you.
5        With respect to your holding the rank
6  of lieutenant, I'm guessing that the first deputy
7  position was not your first exempt rank assignment,
8  correct?
9    A.   Correct.
10   Q.   When you first became a member -- an
11 exempt -- when you first held an exempt position,
12 if you recall, did you execute a leave of absence
13 from your career service lieutenant position?
14   A.   I don't recall ever taking a leave of
15 absence.  To be honest, I don't recall.  For
16 clarification, for whatever it's worth, as a
17 commander then a deputy chief then a chief then the
18 first deputy, my signature was always the same, but
19 where it asked for a star number, my lieutenant
20 star number was on every document that I signed
21 whether I was a commander, deputy chief, chief, or
22 as the first deputy.  So my signature was always
23 Anthony Riccio, Star No. 193, which was my
24 lieutenant's star because I did retain that rank of

Page 150

1  lieutenant.
2      Q.   Well, you retained the star number,
3  correct?
4      A.   Correct.
5      Q.   Isn't it a fact that -- or is it true
6  that once you're appointed to an exempt position
7  you retain the star number of your most recent
8  career service rank for the duration of your time
9  as an exempt; isn't that true?
10     A.   Correct.  I always kept that star number
11 193, yes.
12     Q.   And that's true of every person who is
13 appointed to an exempt -- every sworn who is
14 appointed to an exempt position from a career
15 service rank; isn't that true?
16     A.   That is correct.
17     MR. JOHNSON:  Okay.  I have nothing further.
18     ARBITRATOR ROUMELL:  Do you, Joe?
19     MR. ANDRUZZI:  The union has nothing further.
20          EXAMINATION
21 BY ARBITRATOR ROUMELL:
22     Q.   Let me ask you this question.  When you
23 retired, you were a lieutenant?
24     A.   That's correct.

Page 151

1      Q.   Your retirement pay, is that based on
2  the lieutenant?
3      A.   Yes, that's correct.  It was based on
4  being lieutenant.
5      Q.   In other words, as you're retired right
6  now, you are receiving what a lieutenant would
7  receive in retirement?
8      A.   Well, no.  Like, my vacation hours, my
9  court hours, all that is paid to me at the
10 lieutenant's rank.  My pension is based on how much
11 I paid into the pension.  So I'm not sure if you're
12 asking about my pension or my -- like, my buyout,
13 like, my vacation days, for example.  I was paid as
14 a lieutenant for my vacation days.  My court hours,
15 holiday hours, all that I have accrued over my
16 career were all paid to me as lieutenant.  Your
17 pension is something completely different.  That's
18 based how much you pay into it.
19     Q.   Okay.
20     A.   So my pension is completely different,
21 but all the hours that I was paid were paid at the
22 lieutenant's rate.
23     ARBITRATOR ROUMELL:  Thank you.
24          RECROSS-EXAMINATION

Page 152

1  BY MR. JOHNSON:
2      Q.   If I can just follow that up with one
3  question just on the pension issue, Tony.
4          In terms of the pension, your
5  annuity, that is a function of the accommodation of
6  the number of years of service?
7      A.   Correct.
8      Q.   But then also the salary as an exempt
9  like the best four out of the last eight years of
10 your appointment, correct?
11     A.   I think it's for that time.  Yes, that's
12 correct.
13     Q.   But you had more than three years as an
14 exempt, correct?
15     A.   Yes.  I had like 12, I think.
16     Q.   So your -- I think your testimony was
17 you had 34 years on the job?
18     A.   Correct.
19     Q.   Your pension annuity reflects the salary
20 you received as an exempt, correct?
21     A.   That's correct.
22     Q.   And it's higher -- the pension you
23 receive now is higher than if you had spent, say,
24 34 years solely as a bargaining unit lieutenant,

Page 153

1  correct?
2      A.   Yes, it is.
3      MR. JOHNSON:  Thank you.
4      MR. ANDRUZZI:  May I follow up with a --
5      ARBITRATOR ROUMELL:  Of course.
6          REDIRECT EXAMINATION
7  BY MR. ANDRUZZI:
8      Q.   Since we're going to get into your
9  pension, your pension, as you said, is based solely
10 on the amount of money you put into the pension,
11 correct?
12     A.   That's what it is.  It's how much you
13 contribute -- I get 75 percent of what I
14 contributed in the best four of my last ten years.
15     Q.   So the fact that you were first deputy
16 superintendent in and of itself and the ways that
17 you were paid at that position does not matter as
18 far as what pension you would receive, correct?
19     A.   Correct.  It's the amount that you pay
20 in.  It's not the rank that you hold or the
21 position that you hold.  It's the amount that you
22 pay in.  You get 75 percent of that salaried
23 amount.
24     Q.   And so had you been first deputy

Page 154

1 superintendent for only one day prior to your
2 retiring, would that have been -- would you have
3 received a higher pension because you were first
4 deputy superintendent?
5    A.   No, no.  It's the best four years out of
6 your last ten.  So my pension is not based on my
7 superintendent -- my first deputy's salary.  It's
8 partially based on chief, it's partially based on
9 deputy chief.  So it's the best four years out of
10 the last ten years you last worked.
11    Q.   Just one last clarification.  And that's
12 regardless of any position within the police
13 department?
14    A.   Yes, it is.
15    MR. ANDRUZZI:  No further.
16    ARBITRATOR ROUMELL:  Thank you.
17    THE WITNESS:  Thank you.
18    MR. ANDRUZZI:  Thank you, Anthony.
19    ARBITRATOR ROUMELL:  Okay.  Do you have
20 another witness?
21    MR. ANDRUZZI:  Give me one moment.
22    ARBITRATOR ROUMELL:  Take the time you need.
23    MR. ANDRUZZI:  Is everyone here?  The union
24 rests at this point.

Page 155

1    ARBITRATOR ROUMELL:  Mr. Johnson?
2    MR. JOHNSON:  In that case, I think I have one
3 witness.  If I can have five, ten minutes.  I don't
4 think this will be terribly long.
5    ARBITRATOR ROUMELL:  All right.  Who is the
6 witness?
7    MR. ANDRUZZI:  Who is the witness?
8    MR. JOHNSON:  The witness will be Commander
9 Rowling, and it will be addressing -- I'm an open
10 book.  The subject matter of her testimony has to
11 do with the extent to which, if any, one's
12 appointment as an exempt member continues
13 protections under a collective bargaining
14 agreement.  And this has to do with their defense
15 on the substantive arbitrability that somehow
16 notwithstanding their service and appointment and
17 salary as exempt members they are still,
18 quote-unquote, lieutenants.
19    MR. LEE:  Mr. Arbitrator, if I may, we sent a
20 request for information to opposing counsel.  In
21 that request for information we asked for a list of
22 witnesses.  This would be in Mr. Johnson's and
23 employer's case in chief.  They did not inform us
24 that they intended to call Commander Rowling even

Page 156

1 though we had requested them to inform us in the
2 request for information.
3    MR. JOHNSON:  This is rebuttal.
4    MR. LEE:  I would object to her testimony.
5    MR. JOHNSON:  This is rebuttal.
6    ARBITRATOR ROUMELL:  What's she going to
7 rebut?
8    MR. JOHNSON:  She's going to rebut the
9 testimony, for example, from Mr. Johnson that he
10 had all the rights and protection of the
11 lieutenants collective bargaining agreement.  It's
12 also going to contradict his testimony that he
13 doesn't recall filling out a leave of absence form
14 when he first became an exempt member.
15        This goes directly to his testimony.
16 I didn't know that was going to be his testimony
17 today.  This is rebuttal.  Union is trying to make
18 the argument that somehow the lieutenants
19 collective bargaining agreement applies even when
20 you're serving as a superintendent.  Frankly and
21 with all due respect, that's nonsense, but I'll
22 have a witness to testify to that.
23    ARBITRATOR ROUMELL:  Well, it's rebuttal.
24    MR. LEE:  Your Honor, it's our case-in-chief.

Page 157

1 We rested our case-in-chief.  This will be their
2 case-in-chief.  This wouldn't be a rebuttal, per
3 se.
4    MR. JOHNSON:  Oh, come on.
5    MR. LEE:  So if it's their case-in-chief,
6 pursuant to the request for information, they
7 should have informed us that they were intending to
8 call Commander Rowling.  We requested that
9 information.
10    MR. JOHNSON:  Nice try.  Nice try.  This is
11 obviously rebuttal.
12    ARBITRATOR ROUMELL:  What will she testify
13 again?
14    MR. JOHNSON:  In a couple minutes.
15    ARBITRATOR ROUMELL:  No.  What is she going to
16 rebut?
17    MR. JOHNSON:  She's going to rebut the claims
18 that somehow the lieutenant collective bargaining
19 agreement continues to cover an individual when
20 they are serving in an exempt capacity or an exempt
21 appointment, which I understand to be the argument
22 the union is making here this afternoon.
23    ARBITRATOR ROUMELL:  Wouldn't that be made in
24 your case-in-chief?

**DON.DEF003426**

Page 158

1  MR. JOHNSON: I had no idea when we started at
2  10:00 this morning that any of their witnesses
3  would testify that they thought -- or that
4  Mr. Johnson thought that he had -- I think -- I
5  have written down has the rights and protections of
6  the lieutenants collective bargaining agreement
7  when he was the superintendent.
8      MR. LEE: That matter was addressed when we
9  had that conference call based on the employer's --
10     MR. JOHNSON: No, it wasn't.
11     MR. LEE: -- motion to request our request for
12 information. They knew what we were going to
13 present, and they knew our theory.
14     MR. JOHNSON: No, that was not -- we were all
15 on that conference call together. That was not
16 what got discussed.
17     MR. LEE: To my recollection, it was, but
18 okay.
19     ARBITRATOR ROUMELL: And suppose she did
20 testify in rebuttal. Before we go any farther --
21 I'll get back to that -- did you, ladies and
22 gentlemen, enter into a stipulation about the
23 mayor?
24     MR. LEE: No, your Honor.

Page 159

1      ARBITRATOR ROUMELL: Is that correct,
2  Mr. Johnson?
3      MR. JOHNSON: Yes. There is no stipulation.
4  What we do have are two things. One that -- City 1
5  or 2, it's the compilation of ordinance and
6  statutory provision and then we simply had the --
7  we had testimony from the union today from several
8  of their witnesses with respect to how they
9  perceived the authority of the mayor with respect
10 to the superintendent. There is no other
11 stipulation as such.
12     MR. LEE: There is also Union Exhibit 2, I
13 believe it was -- sorry, Union Exhibit 1, the job
14 description of a superintendent.
15     MR. JOHNSON: There's that, yes.
16     ARBITRATOR ROUMELL: So, in other words, if I
17 just -- he does take orders or she takes orders
18 from the mayor. That's the point the union has
19 made.
20     MR. JOHNSON: There's no question that the
21 superintendent serves at the pleasure of the mayor,
22 yes.
23     ARBITRATOR ROUMELL: Well, I'm asking Mr. Lee.
24 That's the point that the union is making?

Page 160

1      MR. LEE: The point that the union is making
2  is that the mayor has the authority to issue an
3  order to the superintendent which he must follow.
4      ARBITRATOR ROUMELL: And you've established
5  that?
6      MR. LEE: We believe we have.
7      ARBITRATOR ROUMELL: I don't think there's any
8  question about that. Well, this is rebuttal. I'll
9  permit to put her on as separate record and I
10 may -- I'll let you make a separate record. I may
11 dismiss it.
12     MR. JOHNSON: Okay.
13     ARBITRATOR ROUMELL: So we'll make a separate
14 record. Okay.
15     MR. JOHNSON: Can I have five minutes?
16     ARBITRATOR ROUMELL: And limit your questions.
17     MR. JOHNSON: I will.
18     ARBITRATOR ROUMELL: And if there's anything
19 you want to add that you want to call, either one
20 of you, if you want to call --
21     MR. JOHNSON: Okay. Can I have five minutes,
22 then?
23     ARBITRATOR ROUMELL: Of course.
24     MR. JOHNSON: All right. Thank you.

Page 161

1      ARBITRATOR ROUMELL: And if the lieutenant
2  wants to testify even though he's counsel, he can.
3      MR. JOHNSON: Got it. Okay. Thank you.
4          (Short recess.)
5      MR. LEE: Your Honor, before we begin, I'd
6  like to renew my objection. The City has just
7  tendered to us City Exhibit 3 via e-mail
8  approximately four minutes ago. They failed to
9  tender this document to us prior to today --
10     ARBITRATOR ROUMELL: I can't hear you with
11 that mask on. City has --
12     MR. LEE: Approximately five minutes ago, your
13 Honor, the City tendered to us a document that I
14 expect for them to use in this upcoming testimony
15 of Commander Rowling. This would be City
16 Exhibit 3.
17     We had requested a whole host of
18 documents in our request for information. The City
19 did not provide this to us. This is a surprise to
20 us. And I think the City should be sanctioned for
21 not supplying us with this document they intend to
22 use and that they should be prohibited from
23 questioning Commander Rowling.
24     MR. JOHNSON: May I respond? We didn't have

DON.DEF003427

Page 162

this document before today. This is in direct response to the testimony from Eddie Johnson that he doesn't think that he filled out a leave of absence when he went from his career service rank of lieutenant to that of his first exempt appointment as a commander.

Everybody does that. It caught me by surprise that he would say that -- profess to not have any knowledge of having done that. And this is the proof in the pudding that he did, in fact, execute a leave of absence.

ARBITRATOR ROUMELL: From the rank of lieutenant?

MR. JOHNSON: From the rank of lieutenant to accept -- this is from back in 2008 to accept his first exempt appointment which at that time was a commander. And he remained on this leave of absence throughout the period of time he served in an exempt capacity which is to say through, what is it, December 2nd of 2019.

MR. LEE: Your Honor, it doesn't say anything about resigning from his rank. It talks about his positions. That's beside the point. We requested this information prior to today's hearing. We had

Page 163

a conference call. And the City had this information. They failed to tender it to us. This is a complete surprise to us. It's prejudicial. They should be sanctioned, not allowed to introduce it nor allowed testimony from Commander Rowling. They had this documentation. They had the obligation to provide it to us. We requested documents relevant to this in our request for information.

MR. JOHNSON: You did not ask for this document. I agree it's prejudicial because it shows your witness was not telling the truth and it completely undercuts the theory of the case that you're advancing here today, but this wasn't requested.

MR. LEE: Number 13, any and all documents that detail the roles, duties, and powers of the superintendent from April 1st, 2016, to December 2nd, 2019. You didn't do that.

ARBITRATOR ROUMELL: All right. I'll render my ruling. I think we're going back and forth. I've got to bring some order to this.

The one thing I noted, Mr. Johnson, is that when they cash out, they cash out for all

Page 164

vacation accumulated, so forth, at the lieutenant rank.

MR. JOHNSON: Assuming they have dropped down to that rank, yes. They have the option of retiring as an exempt, but just about everyone does, retires to the career rank because it's a better payout, a more lucrative payout.

ARBITRATOR ROUMELL: All right. Here's what I'm going to do. What document do you want, Mr. Lee?

MR. LEE: Well, I would like -- the City has provided us City Exhibit 3 which is in conflict to our request for information, a violation of a request for information, which number two says any and all documents that form the basis of the union's claim that the City is not honoring Article 22 of the CBA, and number three, any and all documents that support the union's claim that the City is in violation of Article 22.

So if they had any supporting documentation, they should have provided it to us under the request for information number two, request for information number three. They had this documentation --

Page 165

ARBITRATOR ROUMELL: I'm asking you a specific question.

MR. LEE: Yes, sir.

ARBITRATOR ROUMELL: My specific question is what document should they supply you with?

MR. LEE: Well, at that point we didn't know that this document existed. They should have provided City Exhibit 3 to us prior to today. So they just provided it to us ten minutes ago. And there's an alleged effective date on this document of 2008, so they've been in possession of this document for 12 years.

MR. JOHNSON: And their witness signed it. In our motion to quash the request for production of documents, we made it as clear as we possibly could that our position in this case is that Mr. Johnson, during his entire period of time covered by the civil complaint, was functioning as a superintendent, not as a lieutenant. And I didn't know before today that Mr. Johnson would testify, Oh, I don't know if I ever filled out a request leave of absence. I think I'm still covered by that contract.

MR. LEE: In our conference -- well, anyway.

**DON.DEF003428**

Arbitration                                           Lt. E. Johnson & PB & PA v. CPD

Page 166

1    ARBITRATOR ROUMELL: Well, then I guess we --
2    MR. LEE: You raised the right of
3  arbitrability. You say he shouldn't have been
4  under the contract. So you had your theory of the
5  case. So based on that, this would potentially
6  support your theory of the case, but it should have
7  been tendered to us. I'm not saying it does or
8  doesn't, but you should have supplied it to us if
9  you thought it was going to support your theory of
10 the case that this case isn't arbitrable.
11   MR. JOHNSON: Our theory of the case is that
12 he was superintendent, period. He wasn't covered
13 by the contract.
14   ARBITRATOR ROUMELL: You can argue back and
15 forth. I'm thinking about two alternatives.
16       The one alternative is to adjourn
17 this case for a second day and you make the
18 document available and they -- do what you want to
19 prepare for it.
20       The second approach that I could take
21 is to address the issue of whether under the
22 lieutenant's contract this particular complaint is
23 covered. If I decide that it is covered, then
24 we'll convene again and determine whether or not

Page 167

1  Eddie Johnson is eligible under the lieutenant's
2  contract.
3        In other words, I am determined to
4  give both parties all the leeway to present their
5  cases. Now, we've been arguing back and forth.
6  And if the union needs more time and they want to
7  be able to review the document, we adjourn the
8  case, set another date. Or we can proceed and I
9  decide the issue on the merits and then come back
10 to the issue of whether or not, based on my
11 decision on the merits, whether Eddie Johnson is
12 covered under the lieutenant's contract.
13       I'm going to give both of you ten
14 minutes to decide what you want to do. Or we can
15 go ahead today. And I also indicated that I'd be
16 willing to let Mr. Andruzzi testify as the
17 lieutenant who can explain it a little more even
18 though he's been a counsel in this case. So either
19 way you want to go, let me know. Take ten minutes
20 and come back.
21       (Short recess.)
22   ARBITRATOR ROUMELL: Are you all here?
23   MR. LEE: Yes.
24   MR. JOHNSON: Seems that way.

Page 168

1    ARBITRATOR ROUMELL: Can you hear me, Joe?
2    MR. ANDRUZZI: I can.
3    ARBITRATOR ROUMELL: Yeah. Okay. Fine.
4  Okay.
5        Mr. Lee, what's your pleasure?
6    MR. LEE: We don't want to bifurcate this.
7  We've reviewed the document. We don't think it's
8  relevant, but we'll proceed today without waiving
9  our objection and I will probably renew our
10 objection if they seek to admit this or use it in
11 their examination of Commander Rowling.
12   ARBITRATOR ROUMELL: All right. And then let
13 me respond. I will honor your objections. When I
14 use that word, I will consider your objections as I
15 review this matter. If I agree with your
16 objections, I'll note that in my opinion.
17       Mr. Johnson?
18   MR. JOHNSON: Yes.
19   ARBITRATOR ROUMELL: Want to go ahead?
20   MR. JOHNSON: Yes. We're prepared.
21   ARBITRATOR ROUMELL: All right. I want
22 everybody to understand there's been some objection
23 to certain testimony. In fact, there's a motion to
24 set aside the comments of Attorney Kenedy. And

Page 169

1  they will be given very serious consideration. We
2  don't have a jury here.
3        Please call the commander, and the
4  commander will be called under objection. Mr. Lee,
5  as I indicated, if you want to call Mr. Andruzzi,
6  you may.
7    MR. LEE: Thank you.
8        (Witness duly sworn.)
9        DONNA ROWLING,
10 called as a witness herein, having been first duly
11 sworn, was examined and testified as follows:
12       DIRECT EXAMINATION
13 BY MR. JOHNSON:
14   Q.  Commander, you're employed by the
15 Chicago Police Department?
16   A.  I am.
17   Q.  And in what capacity or what position?
18   A.  I'm the commander of the labor relations
19 division.
20   Q.  Is that formerly known as management and
21 labor affairs section?
22   A.  Yes, it was.
23   ARBITRATOR ROUMELL: You changed the name?
24   THE WITNESS: Yes. Not me personally.

Page 170

1  BY MR. JOHNSON:
2      Q.   As commander of the labor relations
3  division, is that an exempt rank position?
4      A.   It is.
5      Q.   Prior to -- strike that.
6           When were you appointed to the
7  commander position?
8      A.   July 16th, 2020.
9      Q.   And what was your position with the
10 police department prior to July 16th of 2020?
11     A.   I was a lieutenant.
12     Q.   And as a lieutenant, were you covered by
13 the collective bargaining agreement between the
14 lieutenant's association and the City of Chicago?
15     A.   I was.
16     Q.   Prior to --
17     ARBITRATOR ROUMELL: Hold on. Hold on. Were
18 you a lieutenant in charge of labor relations
19 division?
20     THE WITNESS: No. I was a sergeant in the
21 labor relations division a few years ago when I was
22 promoted to --
23     ARBITRATOR ROUMELL: I mean currently.
24     THE WITNESS: I currently am a commander in

Page 171

1  the labor relations division.
2      ARBITRATOR ROUMELL: I know that, but before
3  you became commander, were you in the labor
4  relations division?
5      THE WITNESS: Not as a lieutenant.
6      ARBITRATOR ROUMELL: Okay.
7  BY MR. JOHNSON:
8      Q.   Where were you when you were lieutenant?
9      A.   I was in the Sixth District, and then I
10 worked for the reform management group.
11     Q.   And with respect to both assignments,
12 the Sixth District and the reform management
13 assignment, during those times, were you covered by
14 the lieutenants collective bargaining agreement?
15     A.   I was.
16     Q.   Terms and conditions of your appointment
17 were governed by that contract?
18     A.   Correct.
19     Q.   Prior to becoming appointed as commander
20 of labor relations division, did you take a leave
21 of absence of any kind from your career service
22 rank?
23     MR. LEE: Objection; relevance.
24     THE WITNESS: I did the day --

Page 172

1      ARBITRATOR ROUMELL: Did I hear an objection?
2      MR. LEE: Yes, your Honor. Relevance.
3      ARBITRATOR ROUMELL: Objection noted. Ask
4  your question.
5      MR. JOHNSON: Okay.
6  BY MR. JOHNSON:
7      Q.   Prior to becoming --
8      ARBITRATOR ROUMELL: The answer is -- all
9  right. Go ahead.
10 BY MR. JOHNSON:
11     Q.   Prior to becoming -- being appointed as
12 commander of labor relations division, did you fill
13 out any paperwork with respect to your career
14 service position as lieutenant?
15     A.   Yes. I filled out a leave of absence
16 form. It's a City of Chicago personnel form. And
17 then I also filled out a Chicago Police Department
18 PAR form requesting a leave of absence from my
19 career service position.
20     Q.   When you were lieutenant, you had a star
21 number?
22     A.   I did.
23     Q.   Do you have a star number now?
24     A.   I do.

Page 173

1      Q.   Is it the same star number or a
2  different star number?
3      A.   It's the same star number.
4      Q.   Is that always the case when one goes
5  from a career service position to an exempt
6  appointment?
7      A.   Yes. Your last career service rank star
8  number stays with you. So if you were a lieutenant
9  or captain, that's the star number you would
10 retain.
11     ARBITRATOR ROUMELL: I knew that.
12     MR. JOHNSON: I didn't.
13 BY MR. JOHNSON:
14     Q.   As the commander of the labor relations
15 division, is your salary determined by the
16 lieutenants collective bargaining agreement?
17     A.   No, it is not.
18     Q.   How about overtime? Do you get overtime
19 pursuant to the lieutenants collective bargaining
20 agreement?
21     A.   I do not.
22     Q.   Do you get -- do you receive duty
23 availability allowance?
24     A.   I do not.

**DON.DEF003430**

Arbitration                                    Lt. E. Johnson & PB & PA v. CPD

Page 174

1      Q.   If something happened to you while you
2  were still a labor relations -- commander of labor
3  relations division, could you file a grievance
4  under the lieutenants collective bargaining
5  agreement?
6      A.   I could not.
7      Q.   Now, do you happen -- as we sit here
8  today, January of 2021, do you pay dues to the
9  lieutenant's union?
10     A.   Technically, I do not because there's a
11 hiccup with payroll.  However, I did request
12 payroll to continue paying my dues to the
13 lieutenant's association.
14     Q.   And why would you do that?
15     A.   Because when I was promoted --
16     MR. LEE: Objection.  Objection; relevance,
17 your Honor.
18     ARBITRATOR ROUMELL: I really think -- I'm not
19 so sure it's relevant why she does it.  Johnson
20 said why he does it.  What's the relevance?
21     MR. JOHNSON: This will be brief.  Offer of
22 proof.  You paid dues not so they have the
23 application of the collective bargaining agreement,
24 but to be able to be a beneficiary of the legal

Page 175

1  defense plan so that if you're whistled down to
2  COPA or Internal Affairs to have to give a
3  statement, as any department member, you're
4  entitled to bring a lawyer, your own lawyer.  And
5  by virtue of being a participant or beneficiary of
6  the legal defense plan sponsored by PBPA, she gets
7  a qualified lawyer at a better rate.
8      ARBITRATOR ROUMELL: At a better rate?
9      THE WITNESS: That's my understanding.
10     ARBITRATOR ROUMELL: Okay.  Any other
11 questions?
12     MR. JOHNSON: Just this.
13 BY MR. JOHNSON:
14     Q.   Showing you -- do you have City
15 Exhibit 3 in front of you, Commander?
16     A.   Which is that one?  I'm sorry.
17     Q.   That's the one -- the leave of absence
18 form from Eddie Johnson in 2008.
19     A.   Correct.
20     Q.   Is this substantially --
21     MR. LEE: Objection.  This is not
22 cross-examination.  That was a leading question.
23 Objection; leading.
24

Page 176

1  BY MR. JOHNSON:
2      Q.   What is City Exhibit 3?
3      A.   City Exhibit 3 is a personnel action
4  request form for Eddie Johnson.
5      Q.   And the date?
6      A.   Is 16 March 2008.
7      Q.   Does this bear any -- does this form,
8  City Exhibit 3, bear any resemblance to the leave
9  of absence document when you resigned from the
10 labor relations division?
11     MR. LEE: Once again, your Honor, objection.
12 Relevance.  This is about Mr. Johnson, not
13 Commander Rowling, in this case.
14     ARBITRATOR ROUMELL: Well, is it the same type
15 of form?
16 BY MR. JOHNSON:
17     Q.   Donna?
18     A.   It is, yes.  It is the same form.
19     ARBITRATOR ROUMELL: All right.  Fine.  Can we
20 move on?
21     MR. JOHNSON: Yeah, I think so.  One second,
22 please.
23     ARBITRATOR ROUMELL: Wait a minute.  She
24 changed.  She changed to the other side.

Page 177

1      Any other questions?
2      MR. JOHNSON: Just one question.
3  BY MR. JOHNSON:
4      Q.   Commander, were you present today when
5  Eddie Johnson testified about how the system --
6  quote-unquote, the system reflected that he was a
7  lieutenant at all times?  Were you present for that
8  testimony?
9      A.   I was.
10     Q.   Are you familiar with how this system --
11 the data system records your rank or position
12 within the Chicago Police Department?
13     A.   I am.  I'm assuming he's referring to
14 the CLEAR system.
15     Q.   And what's the CLEAR system?
16     A.   It's a database that lists every
17 department employee and their information, rank,
18 star number, unit of assignment, and other
19 information.
20     Q.   Could it be that the CLEAR system during
21 his -- during Eddie's tenure would have listed him
22 as a lieutenant?
23     MR. LEE: I'm going to object to foundation.
24

**DON.DEF003431**

Arbitration                                              Lt. E. Johnson & PB & PA v. CPD

Page 178

BY MR. JOHNSON:

1   Q.   Do you have occasion to utilize or to be
2   familiar with the CLEAR system?
3   A.   Yes.  I use it on a daily basis.
4   Q.   And with respect to you, if you know, in
5   the CLEAR system, are you recorded as a lieutenant
6   or commander or --
7   A.   As a commander.
8   Q.   So what if -- what's the significance if
9   the CLEAR system records you as a lieutenant?
10  A.   That would show that I'm a lieutenant of
11  police, not a commander of police.  So when I was
12  promoted to commander, this system was changed to
13  reflect that I am now a commander and not a
14  lieutenant.
15  MR. JOHNSON:  Okay.  One second.  Okay.  No
16  more questions.
17  THE WITNESS:  Thank you.
18  ARBITRATOR ROUMELL:  Hold on.  Don't go away.
19  THE WITNESS:  Nope.
20  MR. LEE:  I do have a couple questions for
21  Commander Rowling, preliminary questions first and
22  foremost, and then I'd like to take a short break
23  to determine if I have any further redirect

Page 179

1   questions.
2   ARBITRATOR ROUMELL:  All right.  Go ahead.
3   MR. LEE:  Cross-examination questions.  I
4   believe Commander Rowling needs to unmute.
5           CROSS-EXAMINATION
6   BY MR. LEE:
7   Q.   Commander Rowling, are you in the same
8   office as Mr. Johnson presently?
9   A.   I'm sorry?
10  Q.   Are you currently in the same office as
11  Mr. Johnson?
12  A.   I am.
13  Q.   And during the most recent pause in your
14  testimony, your camera went off.  Do you recall
15  that?
16  A.   Throughout my testimony?
17  Q.   No.  During your most recent testimony
18  with Mr. Johnson, there was a slight pause that
19  Mr. Johnson requested.  Do you recall that?
20  A.   I do.
21  Q.   And during that pause, did you have a
22  conversation with Mr. Johnson?
23  A.   I did not.
24  Q.   Did you have a conversation with

Page 180

1   Ms. Dunn?
2   A.   I did not.
3   MR. LEE:  Okay.  One moment, your Honor.
4       (Brief pause in proceedings.)
5   MR. LEE:  Mr. Arbitrator, we have nothing
6   further for this witness at this time.
7   ARBITRATOR ROUMELL:  Okay.  Thank you.
8   Thank you, Commander.
9   THE WITNESS:  Thank you.
10  ARBITRATOR ROUMELL:  Do we have any other
11  witnesses?  Not from the City?
12  MR. LEE:  You're muted.
13  MR. JOHNSON:  I'm sorry.  As counsel pointed
14  out, I was muted.
15      No further questions.  No further
16  witnesses from the City.
17  ARBITRATOR ROUMELL:  What about the union?
18  MR. LEE:  No one else.  No, your Honor.
19  ARBITRATOR ROUMELL:  Okay.  I'll ask my usual
20  question.  I'll get the usual answer.  Closing
21  statements or briefs?
22  MR. LEE:  Briefs.
23  MR. JOHNSON:  Briefs.
24  ARBITRATOR ROUMELL:  All right.

Page 181

1   MR. LEE:  And, your Honor, this is an
2   expedited arbitration.  So under 22.4, you're to
3   issue your award within 15 days of the hearing.  So
4   we would need the transcripts on an expedited basis
5   and to tender our briefs to you on expedited basis
6   for you to issue your award.
7       We believe the contract allows you to
8   issue a full written decision 30 days at the end of
9   this hearing, but you must at least issue your
10  award within 15 days of this hearing.
11  ARBITRATOR ROUMELL:  Number one, I'm not going
12  to do that.  Number two, I'll do my best to get
13  approval award out in 15 days.  In other words,
14  what I'm saying is it's expedited, I will expedite
15  it.
16  MR. LEE:  Thank you.
17  ARBITRATOR ROUMELL:  I'll try my best to get a
18  full opinion out.
19      Now, you've got two issues, whether
20  Eddie Johnson is covered in the lieutenant
21  contract, number one and, number two, whether under
22  that contract he's covered in this particular
23  lawsuit.
24      Now, you've got a bunch of exhibits,

Bridges Court Reporting

Page 182

Mr. Lee, that you put together. I'm wondering if the two of you can agree and put them in the US Mail or Federal Express and send them to me in hard copy.

MR. LEE: I can certainly send the joint exhibits and the union exhibits to you and City Exhibits 1 and 2 to you via FedEx. I can get that out to you by the end of the day today.

ARBITRATOR ROUMELL: Or tomorrow.

MR. LEE: I don't believe the City has moved to admit City Exhibit 3.

MR. JOHNSON: I might have been muted, but I did move to admit 3, but I was muted at the time.

ARBITRATOR ROUMELL: And there's an objection.

MR. JOHNSON: I believe.

MR. LEE: If they moved to admit it, which I did not hear at all during the testimony --

ARBITRATOR ROUMELL: He just did.

MR. LEE: -- I don't believe there's authenticity or that it was authenticated. We now have -- if you're going to allow that to be admitted, we now have additional questions for Ms. Rowling -- or Commander Rowling.

ARBITRATOR ROUMELL: All right. Ask your

Page 183

questions.

MR. LEE: There's going to be additional. We'll need a few moments, your Honor.

ARBITRATOR ROUMELL: Yeah. Go ahead.

(Brief pause in proceedings.)

MR. LEE: Just to be clear, your Honor, you're going to admit City Exhibit 3 without the City laying foundation or identifying or authenticating the document?

ARBITRATOR ROUMELL: Well, Mr. Johnson, what do you say about that?

MR. JOHNSON: I think the document speaks for itself.

ARBITRATOR ROUMELL: So you have an objection to the document on the grounds it hasn't been authenticated?

MR. LEE: It hasn't been identified. It hasn't been authenticated. No foundation has been laid to introduce the document. Relevance.

ARBITRATOR ROUMELL: Well, I'll take your motion under advisement. In other words, you're saying that I should not admit the document?

MR. LEE: Absolutely correct. You should not admit the document. It has not been authenticated.

Page 184

Foundational support hasn't been laid. And we believe it's irrelevant.

ARBITRATOR ROUMELL: He does make a point, Mr. Johnson.

MR. JOHNSON: I'd be happy to ask Commander Rowling to explain how she obtained the document.

MR. LEE: That's fine with us. We'd like to know how Commander Rowling obtained this document and when she obtained this document, when she came into possession of this document, if she tendered the document to anyone else and at what point.

ARBITRATOR ROUMELL: Okay. Because he does make the point.

MR. JOHNSON: Okay. I have a couple questions for Commander Rowling then.

ARBITRATOR ROUMELL: Go ahead.

REDIRECT EXAMINATION

BY MR. JOHNSON:

Q. Commander Rowling, do you have City Exhibit 3 in front of you?

A. I do.

Q. Did you obtain this?

A. I did.

Q. When did you obtain it?

Page 185

A. This morning.

Q. How did you obtain it?

A. I e-mailed a representative in the human resources division to see if they had a copy of Mr. Johnson's leave of absence PAR form from when he was promoted to commander.

Q. And how was -- is this what you received in response?

A. This is what I received in response.

Q. How was it sent to you?

A. Via e-mail in a PDF.

Q. And do you have -- are you familiar with this general form?

A. The PAR form, yes I am.

Q. Does this -- is this identical or substantially similar to other PAR forms you see when people -- when employees -- when officers apply for a leave of absence to accept a noncareer service position?

A. It is.

Q. And is this something that's kept by the human resources division in the usual and ordinary course of business?

MR. LEE: Objection; foundation. How would

Page 186

1  she know that? I'd like some foundation, your
2  Honor.
3  BY MR. JOHNSON:
4     Q.   How do you know it's kept in the usual
5  and ordinary course of business in the human
6  resources division?
7     A.   Because forms that are relevant to
8  someone's personnel file are retained by the human
9  resources division of the police department.
10 During my regular job duties, I go to human
11 resources for many forms, copies of many forms that
12 I know them to retain.
13    MR. JOHNSON:  I offer City Exhibit 3.
14    MR. LEE:  Renew my objection, your Honor.
15 Relevance. I think it's been not properly
16 authenticated. She didn't complete this form. She
17 requested the form.
18    ARBITRATOR ROUMELL:  The objection is noted.
19 I will address it in my opinion. In other words,
20 what they're objecting to is two-fold. It wasn't
21 produced until today. Number two, they are
22 maintaining that there was an insufficient
23 foundation.
24    Am I correct, Mr. Lee?

Page 187

1     MR. LEE:  And relevance, yes.
2     ARBITRATOR ROUMELL:  Okay. Fine. Any
3  questions that you have?
4     MR. LEE:  I do, your Honor.
5           RECROSS-EXAMINATION
6  BY MR. LEE:
7     Q.   Commander Rowling, you testified that
8  you requested this documentation, City Exhibit 3,
9  this morning; is that correct?
10    A.   That's correct.
11    Q.   What time was that?
12    A.   I'm not sure of the time. I'd have to
13 check my e-mail to verify.
14    Q.   All right. I would like you to check
15 your e-mail to verify, please.
16    A.   Okay. Give me one minute.
17    Q.   Thank you.
18    A.   I requested the form at 11:08, and I
19 received it at 11:24 on today's date.
20    Q.   You were present for Mr. Johnson's
21 testimony, correct?
22    A.   I was.
23    Q.   He didn't testify until 12:30 this
24 afternoon, correct?

Page 188

1     A.   I don't recall what time he testified.
2     Q.   He testified after you requested this
3  documentation; is that correct?
4     A.   I believe so.
5     Q.   Why did you request this documentation?
6     A.   At some point during the earlier
7  testimony or at the earlier case it was brought up
8  that Superintendent Johnson was acting as a
9  lieutenant. And it's my knowledge that when you
10 accept a career service rank you fill out this form
11 relinquishing your lieutenant position.
12    Q.   Were you directed by anyone to request
13 this form?
14    A.   I was not.
15    Q.   What testimony are you referring to in
16 regards to the career service rank of lieutenant
17 that you just testified to? What are you referring
18 to specifically?
19    A.   There were statements by you that
20 Superintendent Johnson was a lieutenant of police.
21    Q.   Do you have that individual's name who
22 you requested this document from?
23    A.   Yes.
24    Q.   And who was that?

Page 189

1     A.   I requested it from someone in my
2  office. That's assistant director Kevin O'Brien.
3  And he obtained it from Jermeka Johnson, who works
4  in HR.
5     Q.   And at what time of day did you receive
6  this document?
7     A.   11:24.
8     Q.   One moment.
9        Commander Rowling, with respect to --
10 turning your attention to City Exhibit 3, please.
11       Do you have City Exhibit 3 in front
12 of you?
13    A.   I do.
14    Q.   There's an expiration date listed on
15 this document, correct?
16    A.   There is.
17    Q.   And that expiration date is March 16th,
18 2019, correct?
19    A.   Correct.
20    Q.   This document is expired?
21    A.   This document is not expired or it may
22 be expired, but it's only valid for a year. It
23 gets passed over from year to year.
24    Q.   So you don't know if this document is

Arbitration
Lt. E. Johnson & PB & PA v. CPD

Page 190

1 expired or not expired?
2   A.   I don't know that for this particular
3 document.
4   Q.   Is there some indication on the
5 expiration date on this document?
6   A.   There is.
7   Q.   And what is that expiration date?
8   A.   3/16/2009.
9   Q.   Does this document in front of you have
10 the terminology "rank" anywhere listed on this
11 document?
12   A.   The term "rank"?
13   Q.   That is correct.  Does the term "rank,"
14 does that appear anywhere on the document that the
15 City tendered 30 minutes ago?
16   A.   It does not.
17   MR. LEE:  Nothing further with this witness,
18 your Honor.
19   MR. JOHNSON:  I have nothing further.
20   ARBITRATOR ROUMELL:  Thank you, Commander.
21      Any other rebuttal from the City?
22   MR. JOHNSON:  Not from the City.
23   ARBITRATOR ROUMELL:  From the union?
24   MR. LEE:  No, sir.

Page 191

1   ARBITRATOR ROUMELL:  Okay.  First you need the
2 transcript, and second of all, you need briefs.
3 And you need an opinion within 15 days of today.
4 Is that what you're saying, Mr. Lee?
5   MR. LEE:  Yes.  So we would need the
6 transcript before that, if it's possible, from the
7 court reporter.
8   COURT REPORTER:  Okay.
9   ARBITRATOR ROUMELL:  And I would need the
10 brief before issuing an opinion, or do you want
11 closing statements.  I don't care.
12   MR. LEE:  I guess the question is how fast can
13 the court reporter get us the transcripts.
14   COURT REPORTER:  I would say by Tuesday next
15 week.  Monday might be a stretch.  So by the 12th.
16   MR. JOHNSON:  City's position, Mr. Arbitrator,
17 is that you should take as much time as you need to
18 issue a fully informed opinion with which you are
19 comfortable.
20   MR. LEE:  Our position is the CBA allows you
21 to issue an award within 15 days and that you can
22 then write a full decision within 30 days of
23 today's date.  So you can either -- you can issue a
24 brief award and then a more fully flushed out

Page 192

1 award.
2   ARBITRATOR ROUMELL:  Brief will be due on
3 Wednesday the -- let's see.  Wednesday the 13th,
4 right?
5   MR. LEE:  That would give us one day after we
6 receive the transcript to write the briefs.
7   MR. JOHNSON:  You wanted it expedited.
8   MR. LEE:  I can do it as long as you will,
9 Mr. Johnson.  I can get it done.
10   MR. JOHNSON:  I can get it done.
11   ARBITRATOR ROUMELL:  No, no, you're not going
12 to do that.  Mr. Lee, are you relying on any
13 opinions written by other arbitrators between the
14 parties, between the --
15   MR. LEE:  I'll be relying on some opinions
16 authored by you as well as maybe some other ones.
17   ARBITRATOR ROUMELL:  By me?
18   MR. LEE:  By you, yes, and some other ones,
19 yes.  Some other arbitrators and you as well.
20   ARBITRATOR ROUMELL:  Well, I don't know what
21 the hell I'm doing.  Can you get that to me by the
22 20th?
23   MR. LEE:  The briefs, yes.
24   MR. JOHNSON:  Frankly, Mr. Arbitrator, if the

Page 193

1 union is going to be taking the position that you
2 know, it's ironclad 15 days you've got to do it,
3 frankly, I think you need to have -- I want to make
4 sure you have enough time to fully consider this.
5 And if that means we have to get the briefs to you
6 a little bit earlier, we get the briefs to you
7 earlier.
8   MR. LEE:  That's fine.  How much time do you
9 need, Mr. Arbitrator, to write your award after the
10 submission of briefs?
11   ARBITRATOR ROUMELL:  Usually 30 days, but I
12 think in this case I have a good idea what the
13 facts are.  I think both of you ought to give me
14 your arguments.  I also would expect you to ship
15 all your citations and all your briefs including
16 what you've had already and your e-mail,
17 Mr. Johnson.
18   MR. JOHNSON:  Correct.
19   ARBITRATOR ROUMELL:  Including the pleadings,
20 which make great bedtime reading, which I read last
21 night.  Ship them to me in hard copy.  I want any
22 opinions you're going to cite in the hard copy.
23 She's going to get you the transcript, with a copy
24 to me, by the 13th and I would like a minuscript

**DON.DEF003435**

Arbitration                                                      Lt. E. Johnson & PB & PA v. CPD

Page 194

1  when I have it.  It makes it a little easier.
2      COURT REPORTER:  Yes.
3      MR. LEE:  Mr. Arbitrator, you do not want me
4  to ship the exhibits to you today or tomorrow?
5      ARBITRATOR ROUMELL:  Oh, I don't care.
6      MR. LEE:  If you would like the exhibits
7  before you receive the briefs, I can ship them to
8  you today.  Whatever will make your job easier.
9      ARBITRATOR ROUMELL:  As long as I -- ship them
10 to me in the next week.
11     MR. LEE:  Okay.  And then, Mr. Johnson, I will
12 include City Exhibit 3 when I ship them.
13     MR. JOHNSON:  Okay.  Appreciate that.
14         Since the union is taking the
15 position they want strict adherence to the
16 collective bargaining agreement on this one, what
17 do you suggest is the due date for the arbitrator's
18 award in this?
19     ARBITRATOR ROUMELL:  The 23rd of January.
20 That means starting Sunday that means -- well, it's
21 going to be around the 23rd, 24th.  Mr. Lee, I like
22 to write things out.  I'll try to make the 23rd.  I
23 want the transcript.  And do you have a pretty good
24 idea of what opinions you're going to cite?

Page 195

1      MR. LEE:  I do, but I don't have that list in
2  front of me.
3      ARBITRATOR ROUMELL:  Okay.  Mr. Johnson, you
4  have a pretty good idea?
5      MR. JOHNSON:  I have a pretty good idea.  If
6  this is -- I think it's ridiculous to have an award
7  by the 23rd, but if that's going to be the
8  stipulation from the union or that's going to be
9  the demand from the union, then I think we need to
10 have the briefs done earlier.  I would say have the
11 briefs due by the 15th, that Friday.
12     ARBITRATOR ROUMELL:  Let me get a calendar.  I
13 think the briefs should be limited to about eight
14 pages.
15     MR. JOHNSON:  Oh, that's not possible.
16     ARBITRATOR ROUMELL:  Huh?
17     MR. JOHNSON:  That's not possible.
18     ARBITRATOR ROUMELL:  What do you mean?
19 Abraham Lincoln wrote the Gettysburg Address when
20 he was an Illinois attorney and Clarence Darrow
21 never wrote briefs.  Those were two good Illinois
22 attorneys.
23     MR. JOHNSON:  It won't be a Brandeis brief,
24 but 8 pages is a little --

Page 196

1      MR. LEE:  I'm fine with putting a page
2  limitation on it because it's an expedited hearing.
3      ARBITRATOR ROUMELL:  23rd is on the Saturday.
4      MR. JOHNSON:  We should have until the 25th at
5  least.
6      ARBITRATOR ROUMELL:  Well, I'll probably get
7  it to you around the 26th or 27th because I have to
8  have a typist type it.  Is that all right, Mr. Lee?
9      MR. LEE:  That's fine.
10     ARBITRATOR ROUMELL:  You'll get me all your
11 material -- if you get it to me on the 20th, it
12 will be okay.
13     MR. LEE:  The 20th?
14     ARBITRATOR ROUMELL:  Yeah.  Does that work for
15 you, Mr. Lee and Mr. Johnson?
16     MR. LEE:  That works for the union.  Just to
17 be clear, you want hard copies delivered on the
18 20th, not shipped on the 20th?
19     ARBITRATOR ROUMELL:  That's right.
20     MR. LEE:  Delivered?
21     ARBITRATOR ROUMELL:  Well, you can deliver it
22 on the 21st.
23     MR. LEE:  Very well.
24     ARBITRATOR ROUMELL:  Because I want the

Page 197

1  transcript as soon as I can get it.
2      MR. LEE:  I'll send out the exhibits today.
3      ARBITRATOR ROUMELL:  Well, it's late in the
4  day.  Do it tomorrow.  There's going to be another
5  riot tonight and you want to watch that on the TV.
6      MR. LEE:  I wasn't able to last night.
7      ARBITRATOR ROUMELL:  Well, and you understand
8  what I'm saying, Mr. Johnson.  Everything you sent
9  me e-mailed, I want it repeated in hard copy.
10     MR. JOHNSON:  Hard copy, yes.
11     ARBITRATOR ROUMELL:  And I want copies of your
12 opinions that you're going to cite, both sides, I
13 want copies of those opinions.  And what I'll do is
14 I'll set aside the weekend of the 23rd to work on
15 the opinion, and we will get the thing out right
16 away.
17     MR. JOHNSON:  And I assume you would like the
18 briefs in Word?
19     ARBITRATOR ROUMELL:  I don't know the
20 difference.
21     MR. JOHNSON:  That's all right.  And do you
22 want these shipped to your office or to your home
23 address?
24     ARBITRATOR ROUMELL:  Come on.  I'm a big boy.

Arbitration                                                     Lt. E. Johnson & PB & PA v. CPD

Page 198

1  I go to the office.  And I got the solution to the
2  COVID.  Cod liver oil every morning.
3     MR. JOHNSON:  That'll do it.
4     ARBITRATOR ROUMELL:  Yes.  1717 Ford Building.
5     And, Court Reporter, you send it to
6  my e-mail, roumell2000@yahoo.com, and I'll do my
7  best to get it out.
8     MR. LEE:  We appreciate that.  Thank you.
9     ARBITRATOR ROUMELL:  There's a very
10  interesting aspect of this case that I've dealt
11  with before, and the two of you might want to
12  consider addressing it.  The union is saying that
13  the lieutenant followed an order of the mayor and
14  there's one count dealing with retaliation.
15     MR. JOHNSON:  No, there's not.
16     ARBITRATOR ROUMELL:  What?
17     MR. JOHNSON:  There's not.  That's not true.
18     MR. LEE:  That count didn't incorporate the
19  allegation.
20     MR. JOHNSON:  The reason there was so much
21  evidence and so much testimony about being directed
22  to, you know, cease the detail of Officer Donald is
23  because the union is on this quest for the Holy
24  Grail trying to find something that might look like

Page 199

1  a performance review.
2     ARBITRATOR ROUMELL:  All right.  We won't
3  argue that.  Okay.  Do what you want.  We know what
4  the rules are.  And I'll do my best to get it out
5  in order to make the contract work.  But, Mr. Lee,
6  my preference is to try to write a full opinion
7  rather than just give a -- shoot it from the hip.
8  So I'll do that.
9     MR. LEE:  Thank you.
10     ARBITRATOR ROUMELL:  Okay.  It's a pleasure
11  working with both of you and all of you.  And
12  January 23rd -- well, at least you didn't do it on
13  January 30th because if you would have done that,
14  you would have been in deep deep doo because --
15     MR. JOHNSON:  You've got a birthday?
16     ARBITRATOR ROUMELL:  No.  I think I've been
17  married 68 years to the same woman on that date.
18  That's what happens when you marry Aphrodite.
19  That's my wife's name.
20     Okay.  Thank you very much.
21     COURT REPORTER:  Mr. Lee, what did you want
22  for your transcript?
23     MR. LEE:  Yes, e-mail, please.
24     ARBITRATOR ROUMELL:  Thanks a lot.  Take care.

Page 200

1     MR. LEE:  PDF is preferable.
2        (Which were all the proceedings
3        had in the above-entitled cause
4        on this date.)

Bridges Court Reporting

**DON.DEF003437**
Page: 51 (198 - 200)

```
 1   STATE OF ILLINOIS      )
                            )    SS:
 2   COUNTY OF COOK         )

 3

 4              Valerie Calabria, CSR, RPR, being

 5   first duly sworn, on oath says that she is a court

 6   reporter doing business in the State of Illinois;

 7   and that she reported in shorthand the proceedings

 8   of said arbitration and that the foregoing is a true

 9   and correct transcript of her shorthand notes so

10   taken as aforesaid, and contains the proceedings

11   given at said arbitration.

12

13

14

15
                      VALERIE CALABRIA, CSR, RPR
16                    License No. 84-003928

17

18

19

20

21

22

23

24
```