**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CYNTHIA DONALD, | ) | |
| | ) | Case No. 20 cv 6815 |
| Plaintiff, | ) | |
| v. | ) | Hon. Elaine E. Bucklo |
| | ) | |
| CITY OF CHICAGO *et al.*, | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CITY OF CHICAGO'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Mark J. Bereyso
Matthew E. Suhl
City of Chicago Department of Law
2 North La Salle Street, Ste. 640
Chicago, IL 60602
(312) 744-6951
(312) 742- 1935
mark.bereyso@cityofchicago.org
matthew.suhl@cityofchicago.org

Attorneys for Defendant City of Chicago

## TABLE OF CONTENTS

**INTRODUCTION**     **1**

**SUMMARY OF FACTS**     **2**

   a. **City and CPD policies on sexual harassment**     **3**

   b. **Sexual relationship between Donald and Johnson**     **4**

   c. **October 16, 2019 incident and Donald's transfer**     **6**

   d. **OIG Investigation and EEOC Charge**     **8**

**LEGAL STANDARD**     **8**

**ARGUMENT**     **9**

  I. **Donald cannot demonstrate Johnson's conduct was unwelcome or objectively hostile (Counts I and III).**     **9**

  II. **Donald cannot demonstrate a basis for employer liability under Title VII (Count I).**     **11**

    a. **Donald did not suffer a tangible employment action.**     **12**

    b. **Donald failed to avail herself of the City and CPD's reporting processes.**     **14**

  III. **Donald cannot show a basis for municipal liability under Section 1983 (Count III).**     **17**

    a. **No express City policy caused a constitutional deprivation.**     **17**

    b. **Johnson was not a City final policy maker on employment policies including prevention of sexual harassment.**     **18**

    c. **Donald's alleged injury was not caused by a condoned, widespread practice of sexual harassment.**     **19**

**CONCLUSION**     **22**

## INDEX OF AUTHORITIES

**Cases**

*Argyropoulos v. City of Alton,* 539 F.3d 724 (7th Cir.2008) 18

*Auriemma v. Rice,* 957 F.2d 397 (7th Cir.1992) 18

*Beverly v. Kaupas*, 2008 WL 624045 (N.D. Ill. Feb. 29, 2008) 16

*Black v. City of Chicago*, 2022 WL 425586 (N.D. Ill. Feb. 11, 2022) 17, 20

*Board of Commissioners of Bryan County v. Brown*, 520 U.S. 397 (1997) 21

*Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) 11, 12

*Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572 (7th Cir. 2019) 8

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) 19, 20

*Condon v. City of Chicago*, 2011 WL 5546009 (N.D. Ill. Nov. 9, 2011) 20

*Doe v. Vigo County*, 905 F.3d 1038 (7th Cir. 2018) 20, 21

*Durkin v. City of Chicago*, 199 F. Supp. 2d 836 (N.D. Ill. 2002) 18

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) 12

*Foley v. City of Lafayette*, F.3d 925 (7th Cir. 2004) 9

*Gawley v. Indiana Univrsity*, 276 F.3d 301 (7th Cir. 2001) 15

*Hakim v. Accenture United States Pension Plan*, 718 F.3d 675 (7th Cir. 2013) 8, 9

*Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742 (7th Cir. 2002) 12, 13, 14

*Holloway v. City of Milwaukee*, 43 F.4th 760 (7th Cir. 2022) 17

*Hunt v. Wal-Mart Stores, Inc.* 931 F.3d 624 (7th Cir. 2019) 12, 15, 17

*Johnson v. Rimmer*, 936 F.3d 695 (7th Cir. 2019) 8

*Kujawski v. Board of Commissioners of Bartholomew County,* 183 F.3d 734 (7th Cir.1999) 18

*Lapka v. Chertoff*, 517 F.3d 974 (7th Cir. 2008) 16

*Madlock v. WEC Energy Group, Inc.*, 885 F.3d 465 (7th Cir. 2018)  14

*McKenzie v. Milwaukee County*, 381 F.3d 619 (7th Cir. 2004)  13

*Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986)  9, 10, 11

*Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690-94 (1978)  17

*Mosher v. Dollar Tree Stores, Inc.*, 240 F.3d 662 (7th Cir. 2001)  9, 10

*Murray v. Chicago Transit Authority*, 252 F. 3d 880 (7th Cir. 2001)  9, 15

*Nixon v. Kysela Pere et Fils, Ltd.*, 2022 WL 819562 (W.D. Va. March 17, 2022)  10

*O'Neal v. City of Chicago*, 392 F.3d 909 (7th Cir. 2004)  12, 13, 14

*Phelan v. Cook County*, 463 F.3d 773 (7th Cir. 2006)  20, 21

*Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629 (7th Cir. 2009)  16

*Roney v. Illinois Department of Transportation*, 474 F.3d 455 (7th Cir. 2007)  13

*Rossi v. City of Chicago*, 790 F.3d 729 (7th Cir. 2015)  19

*Sanders v. Chicago Transit Authority*, 2022 WL 971879 (N.D. Ill. March 31, 2022)  10

*Savino v. C.P. Hall Co.*, 199 F.3d 925 (7th Cir. 1999)  14

*Shaw v. AutoZone, Inc.*, 180 F.3d 808 (7th Cir. 1999)  15, 16, 17

*Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509 (7th Cir. 2007)  21

*Trahanas v. Northwestern University*, 64 F.4th 842 (7th Cir. 2023)  9, 10, 14, 15, 17

*Vance v. Ball State University*, 570 U.S. 421 (2013)  11, 12

*Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011)  19

*Waters v. City of Chicago*, 580 F.3d 575 (7th Cir. 2009)  18

*Wilson v. Cook County*, 742 F.3d 775 (7th Cir. 2014)  20, 21

**Statutes**

42 U.S.C. §§ 2000e *et seq.*                                    2

42 U.S.C. § 1983                                               2

65 ILCS 5/1-1-10                                              18

Municipal Code of Chicago § 2-74-050                         18

Municipal Code of Chicago § 2-84-040                         19

**Rules**

Fed. R. Civ. P. 56(a)                                         8

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CYNTHIA DONALD, | ) | |
| | ) | Case No. 20 cv 6815 |
| Plaintiff, | ) | |
| v. | ) | Hon. Elaine E. Bucklo |
| | ) | |
| CITY OF CHICAGO *et al.*, | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CITY OF CHICAGO'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant City of Chicago ("the City"), through the Office of the Corporation Counsel, submits the following Memorandum of Law in Support of its Motion for Summary Judgment on Counts I and III of the Amended Complaint.

## INTRODUCTION

Chicago Police Officer Cynthia Donald ("Donald") and former Police Superintendent Eddie Johnson ("Johnson") were involved in a sexual relationship between 2016 and 2019 while Donald was detailed to the Office of the Superintendent. Shortly after an incident on October 16, 2019 when Johnson was found asleep in his vehicle after having consumed alcoholic beverages with Donald earlier in the evening, Johnson transferred Donald to another office in police headquarters which Donald specifically requested. Donald worked in the records office for about two weeks and then went on medical leave. Donald remains on leave and has not returned to the CPD. Meanwhile, Johnson was removed as Superintendent on December 2, 2019 for reasons relating to the October 16, 2019 incident and retired from the CPD two days later on December 4, 2019.

In February 2020, Donald filed a charge of discrimination with the EEOC alleging, for the first time, that Johnson subjected her to sexual harassment beginning in 2016. Donald brought this action asserting two claims against the City: Count I for sexual harassment under Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); and Count III for deprivation of due process and equal protection rights pursuant to section 1 of the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983 ("Section 1983").

The City moves for summary judgment on these claims because there is no genuine issue of material fact as to the following: (1) Donald admits she lied to and affirmatively misled Johnson into believing their affair was consensual, thereby precluding a showing the alleged harassment was unwelcome or objectively hostile; (2) Donald cannot show a basis for employer liability for Johnson's alleged harassment because Donald suffered no tangible employment action and failed to report the alleged harassment pursuant to the City and CPD policies, as was her duty; (3) there is no evidence that a widespread practice of sexual harassment was condoned by City policy makers or was the moving force behind Johnson's alleged misconduct; and (4) there is no evidence Johnson was a final policy maker on behalf of the City on the subject of sexual harassment.

## SUMMARY OF FACTS

The Chicago Police Department ("the CPD" or "the Department") is an organizational department within the City, tasked with preserving order and enforcing laws and ordinances throughout the City. SOF ¶ 1. The chief executive officer of the CPD is the Superintendent of Police, who is authorized to administer the Department in a manner consistent with the ordinances of the City, the laws of the state, and the rules and regulations of the Police Board. *Id.* ¶ 2.

Donald began working as a CPD Officer in November of 2006. SOF ¶ 3. Donald mostly worked as a patrol officer in CPD's First District until she was detailed to the Office of the Superintendent in May 2016. *Id.*

Johnson was a member of CPD for 31 years, holding various ranks before being appointed Superintendent of Police in April 2016. SOF ¶ 4. Johnson served as Superintendent until December

2, 2019, when he was demoted to lieutenant. *Id.* Johnson retired from the CPD two days later, on December 4, 2019. *Id.*

### a. City and CPD policies on sexual harassment

The City maintains a steadfast commitment to providing a workplace where all individuals are treated with dignity and respect. The City's Human Rights Ordinance and Personnel Rules expressly prohibit discrimination and harassment based on sex, and forbid retaliation against those who engage in protected activities. SOF ¶¶ 7, 8. Similarly, the City's EEO Policy sets forth a commitment to "ensure the full and active participation of all employees in the City's workforce," provides "an effective means for the resolution of complaints of discrimination and harassment brought by City employees" and prohibits retaliation against those who assert their rights. *Id.* ¶¶ 9, 10.

CPD policies also prohibit "all forms of harassment, including sexual harassment." SOF ¶ 11. The CPD policies further prohibit "any form of retaliation against an employee for making or filing internal or external charges or complaints." *Id.* The CPD policy set forth four external reporting options as well as four internal reporting options, specifying that members need not report a complaint to their immediate supervisor. *Id.* ¶ 12. CPD's Office of Legal Affairs ("OLA") accepted anonymous reports. *Id.* ¶ 19. In addition, CPD General Orders and Rules *required* CPD members to promptly report information concerning a crime, a violation of rules or other improper conduct. *Id.* ¶¶ 13, 14.

Donald was trained on CPD's EEO policies and CPD directives between January 2016 and 2019. SOF ¶¶ 16, 18. Donald knew the City and CPD's policies prohibited sexual harassment and knew she had an affirmative duty to report misconduct and any information concerning a crime. *Id.* ¶¶ 16, 17. Donald believed as of 2016 that she was being sexually harassed and believed that Johnson's conduct constituted criminal offenses. *Id.* ¶ 36. Donald knew how to report the alleged

harassment. *Id.* ¶ 16. Donald admits that the first time she made the City aware of Johnson's conduct was when she filed a charge of discrimination in February 2020, three and a half years after it allegedly began. *Id.* ¶ 23.

  **b.**  **<u>Sexual relationship between Donald and Johnson</u>**

  In April 2016, shortly after Johnson was appointed Superintendent, Johnson sought to hire an assistant to help Johnson keep notes and follow up on questions presented at community meetings. SOF ¶ 22. Donald heard about the opening and put in her bid to transfer from First District patrol to the Office of the Superintendent. *Id.* ¶¶ 5, 22, 23. She also sought the help of a mutual friend and former colleague to put in a word for her with Johnson. *Id.* ¶¶ 23, 24. Johnson knew Donald socially, and despite her "flirtatious" behavior, felt comfortable around her. *Id.* ¶ 27. Following an interview, Johnson arranged for Donald to be detailed to the Office of the Superintendent in May 2016. *Id.* ¶¶ 3, 28. In the position, Donald followed Johnson in the field, took notes and performed administrative type duties in an office environment. *Id.* ¶ 28. About a year and a half later, beginning in December 2017, Donald also began to fill in as part of Johnson's security detail and driver when Johnson's two regular drivers were not available. *Id.* ¶ 29.

  Beginning sometime between late July and September 2016, Donald and Johnson became involved in a sexual relationship. SOF ¶ 30. Donald claims the relationship was unwanted; Johnson claims it was consensual. *Id.* ¶ 31. Donald concedes she never told Johnson "no," either verbally or in writing, when Donald believed Johnson engaged in misconduct. *Id.* ¶ 32. More significantly, Donald admits that over the course of three years, she repeatedly lied to and affirmatively misled Johnson into believing their relationship was consensual. *Id.* ¶ 33. Donald repeatedly lied when she told Johnson she loved him numerous times. *Id.* Donald "faked" having fun with Johnson for three years. *Id.* Donald "acted" as "normal" for three years despite being continually assaulted and harassed. *Id.* Donald wanted Johnson to think she cared for him and sent him text messages to

"make him believe she was going along with [the] affair." *Id.* Donald introduced Johnson to her sisters, her mother and friends. *Id.* ¶ 35.

The text messages themselves reflect a mutual, genuine relationship between Donald and Johnson. SOF ¶ 34.

a. On July 28, 2017, Donald texted Johnson stating "Happy Birthday Bae!!! Gotta make this one up." *Id.*

b. On July 29, 2017, Donald texted Johnson a concert was "great" and "[y]ou should have come with us." *Id.*

c. In August 2017, Donald texted Johnson "Thanks for the flowers. They are lovely." *Id.*

d. On August 30, 2017, Donald texted Johnson "Love you much and I'll see you after your recovery." *Id.*

e. On September 30, 2017, Donald texted Johnson "These are so beautiful! Thank you. I needed this smile," along with a kissing emoji. *Id.*

f. On September 28, 2017, Donald texted Johnson "This is how imma be on you," to which Johnson responded "Lm6. I want you to." *Id.*

g. On September 29, 2017, Donald texted Johnson "My 'yo ass got fat' picture." *Id.*

h. On October 10, 2017, Donald texted Johnson "lol sorry Bae. something came up. coming up." *Id.* On October 11, 2017, Donald texted Johnson "GM ok handsome." *Id.*

i. On November 8, 2017, Johnson texted Donald asking "What's for lunch?" *Id.* Donald responded two minutes later with "Me." *Id.*

j. On December 25, 2017, Donald texted Johnson "Merry Christmas handsome. I pray you also have a great day." *Id.*

k. On March 5, 2018, Johnson texted Donald the room number at a hotel where Donald "hung out with Eddie" during the day. *Id.*

l. On April 27, 2018, Donald texted Johnson she was "taking my bath." *Id.* Johnson responded "Yummy. I'm gonna have to come down," to which Donald replied, "Come on." *Id.*

m. On May 26, 2018, Donald texted Johnson "Good morning handsome" and "I love you great man." *Id.*

5

n.  On July 17, 2018, Donald texted Johnson "Happy Father's Day to a very special man. Please enjoy and reflect on this day your accomplishments as one of the greatest black dads in the world. I love you." *Id.* Johnson responded "Thank you Huney. I love you too and thank for such sweet words." *Id.*

o.  On August 12, 2019, Donald and Johnson texted each other "I love you" and "I love you right back." *Id.*

p.  On November 27, 2019, Donald sent Johnson pictures of Donald's son dressed in native American dress. *Id.* Donald admitted the text showed her relationship with Johnson was "sometimes" close. *Id.*

In late 2018, Johnson alleges he ended the sexual relationship after Donald revealed matters which prompted Johnson to encourage Donald to "seek some help." SOF ¶ 45. In late 2018, Donald alleges she told Johnson she could not continue the relationship due to issues at home with her husband. *Id.* ¶ 43. On or about October 24, 2018, Donald texted Johnson:

> We are all human, we ALL fuck up, forget, make mistakes, sometimes over achieve, more times under achieve. I don't know what's wrong with you asking me 'what's wrong with me' but right now what's wrong with me' is you speaking to me in that way. I don't know what's going on in your personal space but whatever it is don't come at me. I WILL NOT put up with weak ass persons weaknesses. You deal with yo shit without unconsciously or consciously trying to make the situation out to be 'I'm the man.' That very well may be but it ain't with me. So... we can do this the easy way and be cordial for the sake of work or not. You decide.

*Id.* ¶ 44. Johnson testified he remained "really close" and still "hung out" with Donald but did not engage in sexual intercourse with Donald after 2018. *Id.* ¶ 45.

**c.  October 16, 2019 incident and Donald's transfer**

During the evening of October 16, 2019, Donald and Johnson ate and consumed alcohol at a restaurant in downtown Chicago. SOF ¶ 46. Later that night, Johnson was found by CPD officers to be asleep at the wheel of his car at a stop sign. *Id.* ¶ 47. The next day, CPD opened an investigation, which was referred to the City's Office of the Inspector General. *Id.* ¶ 48.

On October 18, 2019, Johnson met with the then-Mayor and her then-Chief of Staff, during which Johnson's retirement was discussed. SOF ¶ 49. Johnson testified the Mayor instructed him to

transfer Donald away from the Superintendent's Office. *Id.* ¶ 49. Johnson alleged he asked the Mayor if he could provide Donald with options on where to go and the Mayor agreed. *Id.* Later that day, Johnson and Donald discussed where Donald would not mind being placed. *Id.* ¶ 50. Johnson initially arranged for Donald to be detailed to CPD's Evidence and Recovered Property Section ("ERPS"), but Donald later told Johnson she did not like the work schedule at ERPS and preferred to be detailed to a records office on the second floor of CPD Headquarters. *Id.* ¶ 51.

Donald's detail to the records office involved performing data entry and administrative duties. SOF ¶ 52. The office served as the CPD's records processor and repository for field-generated reports. *Id.* Functions included entering data into the CHRIS system, disseminating records according to prescribed Department directives and statutory requirements, processing records requests, and processing applications and renewals for firearm ownership. *Id.* Former Chief of the Bureau of Technical Services Jonathan Lewin testified it was not unprecedented that someone requested to work in records as a "desirable place to work." *Id.* Donald told Johnson she preferred the work schedule in records over the schedule at ERPS. *Id.* The hours in the records office were daytime hours. *Id.* Donald never told Johnson or Chief of Staff Robert Boik that she preferred to go back to patrol in the First District. *Id.*

According to Donald, the records detail was not a worse place to work than her detail to the Superintendent's Office. SOF ¶ 54. Other than Johnson's calls to Donald to come to his office, Donald testified there was nothing about the records detail which was worse than Donald's prior detail to the Superintendent's Office. *Id.* Plaintiff worked in the records office for about two weeks. *Id.* ¶ 55. On about November 4, 2019, Donald sustained an injury from falling out of a chair and went on medical leave. *Id.* Donald has remained on leave through the present. *Id.*

### d. OIG Investigation and EEOC Charge

On December 2, 2019, Johnson was removed from the position of Superintendent. **SOF** ¶ 56. Johnson retired from the CPD two days later, on December 4, 2019. *Id.* ¶ 57. The OIG also investigated Donald's role in the October 16, 2019 incident as well as a missing SIM card from Donald's CPD-issued cell phone. *Id.* ¶ 58. Because of the OIG's investigation into the missing SIM card and the threat of losing her job, Donald "exposed" Johnson's alleged misconduct. *Id.* ¶ 59.

On February 19, 2020, Donald filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). **SOF** ¶ 60. Donald's EEOC charge was the first time Donald made the City aware of her complaints regarding Johnson's alleged misconduct. ***Id.*** ¶ 61. The City retained outside counsel to investigate Donald's charge, **but** Donald's attorneys did not cooperate in allowing Donald to be interviewed. *Id.* ¶ 62. The EEOC issued a right to sue letter to Donald on or about July 20, 2020 **and** Donald commenced this action on October 14, 2020. *Id.* at ¶ 63. Other facts relevant to Donald's claims are referenced in the Argument section below.

### LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when a reasonable jury could return a verdict for the nonmoving party. *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019). A nonmoving party must do more than simply show some metaphysical doubt as to material facts. *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019). Inferences supported only by speculation or conjecture are insufficient. *Johnson, supra*, 936 F.3d at 706. Likewise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to show a genuine issue of material fact." *Burton, supra*, 934 F.3d at 579. Summary judgment is warranted "against a party who fails to make a showing sufficient to establish the existence of an element essential to a party's case, and on which that party will bear the burden of proof at trial." *Hakim v.*

*Accenture United States Pension Plan*, 718 F.3d 675, 681 (7th Cir. 2013) (internal quotation marks and citation omitted). The court construes the evidence in the light most favorable to the non-moving party. *Foley v. City of Lafayette*, F.3d 925, 928 (7th Cir. 2004).

## ARGUMENT

**I.     Donald cannot demonstrate Johnson's conduct was unwelcome or objectively hostile (Counts I and III).**

The standard of proof as to what constitutes sexual harassment under Title VII and Section 1983 is essentially the same, with some exceptions. *Murray v. Chicago Transit Authority*, 252 F. 3d 880, 887 (7th Cir. 2001). To establish a hostile work environment claim, Donald must show: (1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Trahanas v. Northwestern University*, 64 F.4th 842, 853 (7th Cir. 2023). "The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 68 (1986). In *Meritor*, the Supreme Court held the correct inquiry is "whether respondent *by her conduct* indicated that the alleged sexual advances *were unwelcome*, not whether her actual participation in sexual intercourse was voluntary." *Id.* (emphasis added).

In *Mosher v. Dollar Tree Stores, Inc.*, 240 F.3d 662 (7th Cir. 2001), a newly-hired cashier accepted her manager's invitation to go to dinner after her first day of work, allegedly out of fear that declining the invitation would jeopardize her job. *Id.* at 664-65. On the cashier's third day of work, the manager pulled her onto his lap and fondled her breasts. *Id.* at 665. A few weeks later, the manager visited plaintiff at her home where they engaged in consensual sex. *Id.* Within months, the manager regularly stayed the night at the plaintiff's home, purchased items for the home and began paying half plaintiff's rent. *Id.* Over the course of their relationship, plaintiff accepted gifts, met the manager's parents, and referred to him as her boyfriend. *Id.* at 666. The relationship continued for five months or so after plaintiff voluntarily quit working for the store. The cashier later filed suit,

9

claiming she was constructively discharged and that her living arrangements with the manager were involuntary and agreed to only because she needed to keep her job. *Id.* at 666-67. The Seventh Circuit affirmed summary judgment on plaintiff's hostile work environment claim, finding "no reasonable jury could conclude that [the plaintiff] was anything other than a willing participant in a long consensual relationship with her boss." *Id.* at 668. *See also, Nixon v. Kysela Pere et Fils, Ltd.*, 2022 WL 819562 at *8 (W.D. Va. March 17, 2022) ("Courts have long recognized that when a plaintiff was in a consensual relationship with a work colleague at the time the sexual advances were made, it is difficult, if not impossible, to establish that they were unwelcome").

Here, Donald admits her behavior and statements toward Johnson were all lies and carried out to mislead Johnson into believing their sexual relationship was consensual. SOF ¶¶ 33, 34. At the same time, Donald never reported Johnson's alleged misconduct, as was her duty, even when she was specifically asked about her relationship in interviews with the OIG. *Id.* ¶¶ 36-39. Assuming, for purposes of this motion, Donald is not simply lying now about lying to Johnson, Donald's conduct still demonstrated her relationship with Johnson was not *objectively* hostile or "unwelcome." Donald's conduct here goes beyond mere silence or acquiescence. Donald admits she acted and communicated with Johnson purposefully to lead him to believe she was consenting to an affair. Her texts to Johnson objectively reflected a genuine relationship. *Id.* ¶ 35. Donald's objective behavior and statements toward Johnson prevent her from demonstrating that "by her conduct [she] indicated that the alleged sexual advances were unwelcome." *Meritor Savings Bank v. Vinson*, 477 U.S. at 68; *Sanders v. Chicago Transit Authority*, 2022 WL 971879 at *5 (N.D. Ill. March 31, 2022).

Donald's after-the-fact assertion that she was forced to repeatedly lie, mislead and "fake" having fun for three years out of intimidation or fear cannot defeat summary judgment for two reasons. First, Donald's *subjective* state of mind is only half the test. *Trahanas v. Northwestern University*, 64 F.4th at 853. Donald cannot dispute, and already admitted, that her words and actions *objectively*

showed, and were intended to show, a genuine relationship. SOF ¶¶ 33-35. Second, Donald's own text of October 24, 2018 clearly reflected she was not even subjectively intimidated or threatened by Johnson. To the contrary, Donald berated Johnson for "speaking to me in that way," stated she "WILL NOT" put up with "weak ass persons weaknesses," and that Johnson might be "the man" but that was not the situation with her. SOF ¶ 44. Donald told Johnson they could do "this the easy way and be cordial for the sake of work or not." *Id.* No person in genuine fear of retaliation speaks to their boss, in this case the *Superintendent* (as Donald frequently emphasizes), in such a manner. Donald's text reflected the *opposite* of fear or intimidation. For these reasons, summary judgment should be granted on Donald's hostile work environment claims in Counts I and III of the Amended Complaint. *Meritor Savings Bank v. Vinson*, 477 U.S. at 68.

## II.  Donald cannot demonstrate a basis for employer liability under Title VII (Count I).

Donald cannot demonstrate a basis for employer liability on her Title VII hostile work environment claim in Count I. An employer's liability for sexual harassment under Title VII in part depends on whether the harassment was carried out by a "supervisor," defined as someone who has the authority to take "tangible employment actions" against the employee. *Vance v. Ball State University*, 570 U.S. 421, 424 (2013). Here, the City does not contest Johnson was a "supervisor" for purposes of Title VII under the *Vance* definition.

If the harassment is carried out by a supervisor *and* "culminates in a tangible employment action," the employer is strictly liable. *Vance v. Ball State University*, 570 U.S. at 424. A "tangible employment action" is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 429, *citing Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

11

If no tangible employment action is taken, the employer may avoid liability by demonstrating two elements of an affirmative defense set forth in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). Those elements are: (1) the employer exercised reasonable care to prevent and promptly correct any harassing behavior and (2) plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided. *Vance v. Ball State University, supra*, 570 U.S. at 430; *Hunt v. Wal-Mart Stores, Inc.* 931 F.3d 624, 627-28 (7th Cir. 2019). The record here establishes both elements of a *Faragher/Ellerth* defense.

   **a.      Donald did not suffer a tangible employment action.**

An actionable tangible employment action for purposes of Title VII sexual harassment "in most cases inflicts direct economic harm." *Ellerth*, 524 U.S. at 761. The cases that find the statutory criteria satisfied can be divided into three groups: 1) actual changes to compensation and benefits; 2) a nominally lateral transfer or change in job duties with no financial change that reduces an employee's career prospects by reducing the use of their trained skills; and 3) no transfer or change in job duties but the conditions in which the employee works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment. *Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742, 744 (7th Cir. 2002). Tangible, by its very definition, requires more than a bruised ego or an inconvenient, less preferred assignment. *Ellerth*, 524 U.S. at 761 ("A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors."). *See also O'Neal v. City of Chicago*, 392 F.3d 909, 913 (7th Cir. 2004) (a "purely subjective preference for one position over another," is insufficient to press an employment discrimination claim); *Herrnreiter v. Chicago Housing Authority*, 315 F.3d at 745 (transfer to assignment based on pure subjective preference for one position over another is not a tangible employment action).

Donald's transfer from the Office of the Superintendent to the records office in police headquarters did not constitute a tangible employment action. Donald's detail to the records office involved performing data entry and administrative duties, a job not significantly different than following Johnson in the field, taking notes and performing administrative duties in the Superintendent's Office. SOF ¶¶ 28, 52. Both details involved performing administrative duties in an office environment. SOF ¶¶ 28, 52. Both details involved the performance of duties of a police officer, and the performance of responsibilities within the scope of a position does not constitute an adverse action. *O'Neal v. City of Chicago*, 392 F.3d at 913 (transfer from narcotics unit to district patrol required performance of duties as a CPD sergeant and was not materially adverse); *McKenzie v. Milwaukee County*, 381 F.3d 619, 625-26 (7th Cir. 2004) (deputy reassignment from undercover unit to patrol involved equivalent work "other than in idiosyncratic terms that do not justify trundling out the heavy artillery of federal discrimination law"). Donald no longer had the need of a car for her work in records, "but not having to run around all day might be considered by others ample compensation for giving up [that particular perk]." *Herrnreiter v. Chicago Housing Authority*, 315 F.3d at 745. *See also Roney v. Illinois Department of Transportation*, 474 F.3d 455, 461 (7th Cir. 2007) (denial of vehicle not a materially adverse action).

Moreover, Donald was given an opportunity to propose where she preferred to be detailed. *Id.* ¶ 50. Donald specifically requested to be detailed to the records office on the second floor of police headquarters instead of ERPS because the workday schedule in records was preferrable to her. *Id.* ¶¶ 51, 52. Donald was "extremely relieved" and "more than excited" to be detailed away from the Superintendent's Office. *Id.* ¶ 53. Donald stated that other than Johnson's calls to Donald to come to his office, there was nothing about the detail to the records office which Donald found worse than her prior detail to the Superintendent's Office. SOF ¶ 54. In fact Donald was not mad

13

about being detailed away from the Superintendent's Office; she was mad about how Johnson described the way the transfer was done. *Id.*

Donald's characterization of her transfer away from the Office of the Superintendent as adverse is purely subjective and unsupported by the record. Subjectively, Donald did not view the transfer as adverse. SOF ¶¶ 53, 54. Any subjective opinion, furthermore, would be insufficient to establish a tangible employment action under Title VII. *Madlock v. WEC Energy Group, Inc.*, 885 F.3d 465, 471 (7th Cir. 2018) (lateral transfer to smaller billing section not an actionable adverse action despite colleagues' opinions that transfer was a demotion or a humiliation); *O'Neal v. City of Chicago*, 392 F.3d at 913; *Herrnreiter v. Chicago Housing Authority*, 315 F.3d at 745; *see also Savino v. C.P. Hall Co.*, 199 F.3d 925, fn. 8 (7th Cir. 1999) (finding the plaintiff did not suffer a tangible employment decision for purposes of a *Faragher/Ellerth* analysis because her reassignment to a comparable office away from the alleged harasser was neither sufficiently adverse nor significant). Donald cannot point to any significant, tangible adverse effect of her transfer to records. The City may raise a *Faragher/Ellerth* defense because Donald did not suffer a tangible employment action. *Trahanas v. Northwestern University*, 64 F.4th at 853-54.

**b. Donald failed to avail herself of the City and CPD's reporting processes.**

The City and CPD implemented policies and procedures which expressly prohibited sexual harassment and provided multi-channel processes for reporting harassment. SOF ¶¶ 7-12. Donald knew the City and CPD prohibited sexual harassment. *Id.* ¶ 16. Donald was trained on the sexual harassment policy in January 2016. *Id.* ¶ 18. Donald further admitted she believed she was being sexually harassed by Johnson in 2016. *Id.* ¶ 36. She further believed Johnson's conduct amounted to criminal offenses. *Id.* Donald knew she not only could report, but had an affirmative duty to report, Johnson's misconduct during the three years she claims it was occurring. *Id.* ¶¶ 16, 17, 37. Donald failed to report Johnson's alleged misconduct until February 2020, more than three and a half years

14

after it began. *Id.* ¶¶ 38, 60, 61. When Donald finally reported her claims to the EEOC, Johnson had already retired from the CPD for two months and Donald had been transferred out of the Office of the Superintendent for four months (and had been on leave from CPD for two months). *Id.* ¶¶ 5, 38, 39, 57, 60, 61. Upon receipt of Donald's EEOC Charge, the City retained outside counsel to internally investigate Donald's allegations but Donald's attorneys did not allow Donald to be interviewed unless her attorneys' demands were met. *Id.* ¶ 62.

The City and CPD policies and procedures setting forth the processes for preventing and addressing sexual harassment were extensive and reasonable. SOF ¶¶ 7-12. *See Trahanas v. Northwestern University*, 64 F.4th at 854 (existence of anti-harassment policy and multiple avenues for filing complaints (including ways to report outside of the supervisory chain of command) showed reasonable care to prevent harassing behavior); *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 629 (7th Cir. 2019). Donald was aware of the policies and knew she could report and was under a duty to report. SOF ¶¶ 16, 17, 37. The City's efforts to prevent and address sexual harassment satisfy the first element of the *Faragher/Ellerth* defense. *Trahanas v. Northwestern University*, 64 F.4th at 854.

Donald's reporting delay of three and a half years from the time she claims Johnson's conduct began, on the other hand, was objectively unreasonable. *Trahanas v. Northwestern University*, 64 F.4th at 854 (filing suit three years after alleged harassment began constituted unreasonable failure to take advantage of preventive measures of employer); *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d at 631 (four month delay unreasonable); *Murray v. Chicago Transit Authority*, 252 F.3d 880, 889 (7th Cir. 20010 (nine-month delay unreasonable); *Gawley v. Indiana Univrsity*, 276 F.3d 301, 312 (7th Cir. 2001) (seven-month delay unreasonable); *Shaw v. AutoZone, Inc.*, 180 F.3d 808, 813 (7th Cir. 1999) (". . . an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists. . . . Shaw acted in precisely the manner that a victim of sexual harassment should *not* act in order to win recovery . . . ") (emphasis in original).

Despite her actual knowledge that she could and was obligated to report, Donald waited three and a half years - until neither she nor Johnson were working at CPD - to report Johnson's alleged misconduct. SOF ¶¶ 5, 38, 39, 57, 60, 61. Donald's failure to report Johnson's alleged misconduct denied the City any chance to remedy the situation. *See Beverly v. Kaupas*, 2008 WL 624045, at *13 (N.D. Ill. Feb. 29, 2008) (finding that a six-month delay in reporting denied an employer the opportunity to remedy the harassing conduct). When Donald complained, the City retained an outside law firm to conduct an internal investigation but even then, Donald's attorneys refused to allow her to be interviewed. SOF ¶ 62. "[A] prompt investigation is the 'hallmark of a reasonable corrective action.'" *Porter v. Erie Foods Intern., Inc.*, 576 F.3d 629, 637 (7th Cir. 2009) *quoting Lapka v. Chertoff*, 517 F.3d 974, 984 (7th Cir. 2008). The steps taken by the City in response to Donald's report of alleged harassment demonstrated that the City took her complaints seriously. *See Porter*, 576 F.3d at 636 (finding an employer that promptly investigated and responded to harassment complaints was not negligent).

Donald cannot excuse her failure to report by reason of her subjective fears. *Porter v. Erie Food Int'l, Inc.*, 576 F.3d 629, 638 (7th Cir. 2009) (It is well-established that "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty … to alert the employer to the allegedly hostile environment."); *Shaw v. AutoZone*, 180 F.3d 806, 814 (7th Cir. 1999). Furthermore, Donald's text message demonstrates she was not fearful or intimidated by Johnson, at least as of October 24, 2018. SOF ¶ 44. But even then, Donald did not report. When Donald was specifically questioned by the OIG about her relationship with Johnson in 2019 and again in 2020, she *still* did not report. *Id.* ¶ 39. For all these reasons, the City has established both elements of the *Faragher/Ellerth* affirmative defense. Summary judgment on Donald's Title VII hostile work environment claim is therefore warranted for failure to show a basis for employer

liability. *Trahanas v. Northwestern University,* 64 F.4th at 855; *Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 630 (7th Cir. 2019); *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 811 (7th Cir. 1999).

**III.**    **Donald cannot show a basis for municipal liability under Section 1983 (Count III).**

Donald claims the City is liable to her for deprivation of her due process and equal protection rights pursuant to Section 1983 in Count III. Amended Complaint, CM/ECF # 34 at ¶¶ 152-157. Under Section 1983, a municipality is liable only when it is directly responsible for the deprivation of federal rights. A municipality cannot be held liable under a *respondeat superior* theory of liability. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690-94 (1978). To show a constitutional violation was the act of the local government itself, a plaintiff must show: (1) an express municipal policy which caused the constitutional deprivation; (2) a widespread practice that is so permanent and well-settled that it constituted a custom or practice; or (3) a constitutional injury caused by a person with final policymaking authority. *Id.* at 690-92; *Holloway v. City of Milwaukee*, 43 F.4th 760, 770 (7th Cir. 2022). To maintain a Section 1983 claim against a municipality, one must establish the requisite culpability and causation. *Black v. City of Chicago*, Case No. 2022 WL 425586 at *4 (N.D. Ill. Feb. 11, 2022).

**a.    No express City policy caused a constitutional deprivation.**

The express municipal policy theory applies where a policy explicitly violates a constitutional right when enforced. *Monell*, 436 U.S. at 658. Here, Donald cannot point to any express municipal policy that caused Johnson's alleged deprivation of her due process or equal protection rights. To the contrary, the City and CPD policies expressed a commitment to a workplace free from discrimination and harassment, prohibited sexual harassment, identified multiple channels for reporting and investigating complaints of harassment, and made clear that retaliation for reporting or cooperating in an investigation into harassment was prohibited. SOF ¶¶ 7-12. Any Section 1983 claim based on an express City policy must necessarily fail.

17

**b.** **Johnson was not a City final policy maker on employment policies including prevention of sexual harassment.**

Summary judgment should be entered on Donald's Section 1983 claim based on Johnson's alleged status as a final policy maker for the City. Amended Complaint, CM/ECF # 34 at ¶¶ 152-157. Final policy making authority "may be granted directly by statute or delegated or ratified by an official having policymaking authority." *Kujawski v. Board of Commissioners of Bartholomew County,* 183 F.3d 734, 737 (7th Cir.1999); *see also Auriemma v. Rice,* 957 F.2d 397, 399 (7th Cir.1992) (defining "policy" as either "legislative power" over a jurisdiction or "executive power" to take final action in the name of the jurisdiction). The Seventh Circuit has distinguished a "final policymaker" as an "authority, under state or local law, to *set* policy – *i.e.,* to 'adopt rules for the conduct of government,'" rather than an official who "merely possesses 'authority to *implement* pre-existing rules.'" *Argyropoulos v. City of Alton,* 539 F.3d 724, 740 (7th Cir.2008).

Illinois law grants the City, as a home rule municipality, the authority "to exercise any power and perform any function pertaining to [its] government and affairs . . . ." 65 ILCS 5/1-1-10. The City Council has in turn directed the City's Commissioner of Human Resources to "issue human resources rules, which may also be referred to as personnel rules." Municipal Code of Chicago § 2-74-050. Pursuant to this authority, the City Council and the Commissioner of Human Resources have enacted ordinances, rules and policies prohibiting sexual harassment in employment and provided means for addressing reports of sexual harassment. SOF ¶¶ 7-10. Under Illinois law, therefore, courts have held that the City Council and the Commissioner of Human Resources are the final policy makers for the City in the area of employment. *Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009); *Auriemma v. Rice*, 957 F.2d at 401 (CPD Superintendent not a final policy maker with respect to alleged discriminatory promotions); *Durkin v. City of Chicago*, 199 F. Supp. 2d 836, 843 (N.D. Ill. 2002) (CPD supervisors not final policy makers regarding sexual harassment). That is

likewise the case here. The City Council and the Commissioner of Human Resources were the City's final policy makers on the issue of sexual harassment.

The Superintendent of Police has authority to administer the CPD in a manner consistent with the ordinances of the City, the laws of the state, and the rules and regulations of the Police Board. MCC § 2-84-040. By ordinance, Johnson lacked any authority to make sexual harassment policy which was inconsistent with the City's policies. *Id.*; SOF ¶ 15. Johnson further admits he could not perform any act or omission inconsistent with the City's policy on sexual harassment. *Id.* Unlike policies relating to the manner of deploying CPD resources, where the Superintendent may be considered a final policy maker, *see e.g., Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011), the policy sought to be imputed to the City here is sexual harassment in employment - a matter on which the City Council and Commissioner of Human Resources have spoken, and spoken in a manner directly contrary to the alleged actions of Johnson. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality"). Johnson was not a final policy maker with respect to Donald's alleged constitutional injury. Therefore, the City is entitled to summary judgment on Donald's "final policy maker" claim in Count III.

      **c.**      **Donald's alleged injury was not caused by a condoned, widespread practice.**

Donald did not assert a *Monell* claim based on a widespread custom or practice. *See* Amended Complaint, CM/ECF # 34 at ¶¶ 152-157. Nevertheless, any attempt to show the City condoned a widespread practice of sexual harassment on this motion would be unavailing. *Monell* claims "focus on institutional behavior; … misbehavior by one or a group of officials is only relevant where it can be tied to the policy, customs, or practices of the institution as a whole." *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015). "Testimony that there is 'a problem' is not enough to support a

finding that there is a widespread practice." *Black v. City of Chicago*, 2022 WL 425586 at *9 (N.D. Ill. Feb. 11, 2022). Similarly, random instances when the City's policy was violated do not suffice to demonstrate acquiescence by City policymakers. *City of St. Louis v. Praprotnik, supra*, 485 U.S. at 127; *Wilson v. Cook County*, 742 F.3d 775, 780 (7th Cir. 2014) (three incidents insufficient to demonstrate a widespread practice).

As explained in *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006):

> The unifying theme in these decisions is the acknowledgement that the word "widespread" must be taken seriously. It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once. The plaintiff must produce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of the policymakers was apparent and amounted to a policy decision.

*See also Condon v. City of Chicago*, 2011 WL 5546009 at *3 (N.D. Ill. Nov. 9, 2011) (plaintiff cannot extrapolate a widespread practice from discrete actions of individuals relating to a single incident).

Donald lacks evidence that sexual harassment was so widespread that acquiescence on the part of City policy makers was apparent and amounted to a policy decision. *Phelan*, 463 F.3d at 790. Johnson was not personally aware of any instance when sexual harassment was permitted by CPD. SOF ¶ 65. Johnson was not aware of any instance when sexual harassment was not reported. *Id.*. Johnson was not aware of any instance when the CPD's policy prohibiting sexual harassment was not enforced. *Id.* Johnson was not aware of an instance where CPD's enforcement procedures regarding sexual harassment were determined to be inadequate. *Id.* Johnson discharged a probationary police officer for sexual harassment in November 2018. *Id.* ¶ 64.

Even if Donald had evidence of "widespread" sexual harassment, her *Monell* claim still fails because there is no evidence that City policy makers were deliberately indifferent to the known or obvious consequences of their inaction or failed to take appropriate steps to protect against it. *See Doe v. Vigo County*, 905 F.3d 1038, 1045 (7th Cir. 2018) (no evidence prior incidents of sexual

misconduct "occasioned impunity"). To the contrary, the City and CPD enacted extensive policies with multiple reporting mechanisms to address allegations of sexual harassment. SOF ¶¶ 7-12. The CPD went further; it *required* sworn officers to report sexual misconduct and crimes. *Id.* ¶¶ 13-14. Furthermore, Donald lacks any evidence that a widespread practice was the cause or "moving force" behind Johnson's alleged assaults and harassment. *See Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007). Donald must show a "direct causal link" between the alleged deliberate act or omission of the municipality and the deprivation of her federal rights. *Board of Commissioners of Bryan County v. Brown*, 520 U.S. 397, 404 (1997); *Wilson v. Cook County*, 742 F.3d 775, 783 (7th Cir. 2014) (County not liable when offender's past conduct did not present high likelihood of inflicting particular injury suffered by plaintiff). For all these reasons, the City is entitled to summary judgment on Donald's *Monell* claim in Count III.

Donald likewise did not premise her Section 1983 claim on an alleged widespread "code of silence." Amended Complaint, CM/ECF # 34 at ¶¶ 152-157. As with any claim of a widespread practice of sexual harassment, any such claim cannot survive summary judgment. There is no evidence of an alleged widespread "code of silence" when Donald was allegedly harassed, the City did not condone any such practice, and Donald cannot trace Johnson's alleged conduct directly to the City's own acts or omissions. *Doe v. Vigo County*, 905 F.3d 1038, 1045 (7th Cir. 2018); *Wilson v. Cook County*, 742 F.3d 775, 783 (7th Cir. 2014); *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006).

Donald testified she was personally aware (apparently by hearsay) of only one alleged instance of retaliation, undated and occurring in the Sixth District, against an officer for reporting sexual harassment. SOF ¶ 72. Johnson believed the CPD made progress in addressing any alleged "code of silence" as of the time Johnson became Superintendent and continued to make progress during Johnson's tenure as Superintendent. *Id.* ¶ 67. The CPD did not condone an alleged "code of

silence" and enacted policies prohibiting retaliation and requiring reporting of misconduct. *Id.* Former Chief of Patrol Fred Waller likewise did not see people "being as fearful as they might have been in the past" to report misconduct by someone like Johnson. *Id.* ¶ 69. Waller believed that unwanted harassment does not often happen currently because of the available resources to report it, the ramifications of lawsuits and the possibility it could end one's career. *Id.* Every day, former First Deputy Superintendent Anthony Riccio saw officers make statements that were very damning to other officers. *Id.* ¶ 71. Former EEO Officer Robert Flores testified that CPD's Office of Legal Affairs received about 25-30 complaints under the EEO policy every year. *Id.* ¶ 21. Flores does not believe an alleged code of silence exists in CPD. *Id.* ¶ 71.

For all these reasons, the City is entitled to summary judgment on Count III of Plaintiff's Amended Complaint.

## **CONCLUSION**

For the foregoing reasons, Defendant City of Chicago respectfully requests summary judgment be granted in its favor on Counts I and III of the Amended Complaint and further relief the Court deems appropriate.

Dated: May 26, 2023

Respectfully submitted,

Corporation Counsel of the City of Chicago

By: *s/Mark J. Bereyso*
Mark J. Bereyso
Chief Assistant Corporation Counsel

Matthew E. Suhl
Assistant Corporation Counsel

City of Chicago, Department of Law
2 North La Salle Street, Ste. 640
Chicago, IL 60602
mark.bereyso@cityofchicago.org
matthew.suhl@cityofchicago.org
(312) 744-6951
(312) 742-1935