IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Cynthia Donald, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 20 C 6815 |
| | ) |
| The City of Chicago, a municipal corporation; and Eddie Johnson, individually and as an agent of the City of Chicago, | ) |
| | ) |
| Defendants. | ) |

Memorandum Opinion and Order

In May 2016, Chicago police officer Cynthia Donald began working on the detail of Chicago Police Department ("CPD") Superintendent Eddie Johnson. After Johnson retired, Donald came forward with claims that Johnson had for years sexually harassed and assaulted her. She filed this lawsuit, in which the following claims remain: a claim under 42 U.S.C. § 1983 for violation of her equal protection rights; a claim under the Illinois Gender Violence Act, 749 Ill. Comp. Stat. 82/1 *et seq.*; and common law spoliation of evidence. Against the City of Chicago ("the City"), Donald asserts a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, for sexual harassment, as well as a § 1983 claim under *Monell* for violation of various Fourteenth

Amendment rights stemming from the sexual harassment she claims to have endured. Defendants have moved for summary judgment on all claims, and Johnson has filed a separate motion to strike Donald's statement of additional material facts.[1] For the following reasons, the City's and Johnson's motions for summary judgment are granted, and Johnson's motion to strike Donald's statement of additional material facts in its entirety is denied.

I.

Defendants raise instances in which Donald failed to comply with Local Rule 56.1, both in responding to defendants' statements of material facts, and in submitting her statement of additional material facts. One issue is that Donald greatly exceeds the 40 paragraphs she is allowed in her statement of additional facts pursuant to Local Rule 56.1(d)(5), if each subparagraph is counted as a paragraph. Counting subparagraphs as discrete paragraphs is consistent with the Local Rules' demand for "concise numbered paragraphs," Local Rule 56.1(d)(1), and makes sense because litigants could easily circumvent the Local Rules' limits if they could simply nest additional facts in subparagraphs. *See Keen v. Merck Sharp v. Dohme Corp.*, No. 15-cv-1178, 2018 WL 1156203, at *3 (N.D. Ill. Mar. 5, 2018) (counting subparts as separate

---

[1] As discussed below, the City also objects to Donald's statement, but does so within the confines of its summary judgment reply brief.

2

paragraphs). Defendants' broad request that I disregard Donald's statement of additional material facts in its entirety, due to this and other shortcomings they identify, is denied because I conclude the better course is to reach the merits of Donald's claims and deal with defendants' objections individually. *See Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011) ("[T]he decision whether to apply the [local] rule[s] strictly or to overlook any transgression is one left to the district court's discretion." (citation and internal quotation marks omitted)).

Defendants alternatively ask that I disregard any facts beyond the 40-paragraph limit, a remedy courts regularly employ. *See Green v. Harrah's Ill. Corp.*, No. 03 C 2203, 2004 WL 1102272, at *2–3 (N.D. Ill. Apr. 30, 2004) (declining to consider facts in excess of those allowed by standing order); *Akpa v. Nw. Mem'l Healthcare*, No. 18 C 7512, 2023 WL 5348758, at *1–2 (N.D. Ill. Aug. 21, 2023) (considering twice the number of facts contemplated by the Local Rules, but nothing beyond that); *Connell v. KLN Steel Prods. Ltd.*, No. 04 C 194, 2009 WL 691292, at *2 (N.D. Ill. Mar. 16, 2009) (declining to consider facts beyond 40 permitted by Local Rules). I agree that enforcing the Local Rules is important "[b]ecause of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law," *Stevo*, 662 F.3d at 886–87, and that Donald's failure to abide by the rules should not go without consequence. But because Donald's

3

statement responds to two separate summary judgment motions brought by two separate parties, I will allow her double the Local Rules' limit--that is, I will allow her 80 paragraphs--meaning that anything beyond paragraph 29(l) is disregarded.[2]

In fairness, the City must play by the same rules it seeks to enforce against Donald. Its own statement of facts exceeds its limit of 80 if subparagraphs are included. *See* Local Rule 56.1(d)(5) (allowing the moving party 80 paragraphs in its statement of fact and the nonmoving party 40 paragraphs in its statement of additional facts). Applying the same method as I applied to Donald's statement of additional facts, facts beyond paragraph 58 in the City's statement are disregarded.[3]

Defendants identify other issues in Donald's responses to their statements of facts and in her statement of additional facts, including mischaracterizations of the record, inappropriate additional facts given in responses, general denials, evidentiary

---

[2] For those counting, I decline to consider defendants' contention that some paragraphs or subparagraphs contain multiple facts. The work required to parse what counts as a fact at that level of detail would exceed the benefit here. Also, for those paragraphs containing lettered subparagraphs, I count the numbered paragraph and the first subparagraph--subparagraph (a)--as a single paragraph, since the lead, numbered paragraph typically introduces a general fact before listing specific instances in the lettered subparagraphs.

[3] Ultimately, as will become clear below, the facts disregarded in both Donald's and the City's statements are unnecessary to resolve the summary judgment motions anyway.

4

issues, facts unsupported by the record, and inappropriate legal argument. I will address these concerns below only where relevant to resolving the summary judgment motions.

II.

The following factual background notes in certain places where the parties disagree, but I am mindful that at this stage I must resolve all evidentiary conflicts in Donald's favor and give her "the benefit of all reasonable inferences that may be drawn from the record." *Coleman v. Donahoe*, 667 F.3d 835, 842 (7th Cir. 2012) (citation omitted).

Donald began her career as a CPD officer in 2006, primarily working as a patrol officer. She was detailed to the Office of the Superintendent in May 2016, where she worked directly for Johnson. She claims that he approached her about the role and did not interview any other candidates; Johnson maintains Donald put in a bid for the position after hearing about it from a friend. Her work initially consisted of taking notes for Johnson at community meetings and following up on questions presented at those meetings, and she eventually served as a driver for Johnson as well.

All agree that Donald and Johnson engaged in sexual contact beginning in the summer of 2016 and continuing until at least late 2018, but the parties' versions of events diverge beyond that basic fact. Donald alleges Johnson's advances were unwelcome and that he harassed her by, for example, asking her what color underwear she

5

was wearing. Donald claims to have resisted some of Johnson's advances, and on several occasions in 2018 verbally requested that he stop doing things like kissing her or asking her what color underwear she was wearing. Many times, however, Donald acknowledges that she acquiesced to his sexual advances and engaged with him in friendly and affectionate ways. All of this, she explains, was because she was intimidated by Johnson and did not believe she could make him stop.

Johnson saw things differently. He claims that the two were in a consensual, if clandestine--both were married at the time--sexual relationship. He points to loving text messages she sent him, their social outings together, and the fact that she introduced him to her close friends and family as evidence of the consensual nature of their relationship. To the extent Donald in fact did not want the relationship, Johnson asserts that she intentionally misled him into thinking she did.

The sex apparently stopped sometime in 2018, but their working relationship continued until an incident that led to Johnson's departure from the CPD and Donald's transfer. On October 16, 2019, Donald and Johnson went out to eat at Ceres Café, where they also consumed alcohol. Later that night, CPD officers found Johnson asleep at the wheel of his car at a stop sign. News of the incident got out and prompted then-Mayor Lori Lightfoot to meet with Johnson on October 18, 2019. At that meeting, it was agreed that Johnson

would soon retire as Superintendent. Also at that meeting, Lightfoot instructed Johnson to transfer Donald away from her office.

Donald was transferred to the Records Division, located in the same building as the Superintendent's Office. Donald claims Johnson orchestrated this transfer so that she would remain in close physical proximity to him, and that her transfer was because of the discovery of the relationship between her and Johnson. About two weeks after her transfer, Donald was injured and went on medical leave, on which she remained at least through the filing of the parties' summary judgment materials.

The City's Office of the Inspector General ("OIG") investigated the October 16, 2019 incident, including Donald's role. During that investigation, OIG inspectors confronted Donald about a SIM card missing from her CPD-issued cell phone. It was at that point that Donald came forward with her allegations of Johnson's misconduct. She later filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission and initiated this suit after receiving a right-to-sue letter.

### III.

#### A.

Donald's Title VII claim against the City requires, as one element, that she was "subject to unwelcome sexual harassment." *Benders v. Bellows & Bellows*, 515 F.3d 757, 768 (7th Cir. 2008)

7

(citing *Robinson v. Sappington*, 351 F.3d 317, 328-29 (7th Cir. 2003)). Similarly, Donald's § 1983 claims--one against Johnson based on equal protection, and one against the City under *Monell* --are both premised on theories of sexual harassment, and require the same showing that Johnson's sexual conduct was unwelcome. *Murray v. Chi. Transit Auth.*, 252 F.3d 880, 887 (7th Cir. 2001) ("[W]e note that the standard of proof as to what constitutes sexual harassment under § 1983 is essentially the same as that under Title VII." (citations omitted)).

Merely setting forth some evidence in support of a claim does not insulate a plaintiff from summary judgment. Instead, a plaintiff must marshal evidence that would allow a reasonable jury to find for her on her claim. *See Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018) ("A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)). And in the context of a sexual harassment claim, it is insufficient that a plaintiff harbor subjective aversion to the claimed sexual conduct. A plaintiff must "by her conduct indicate[] that the alleged sexual advances were unwelcome." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986). Here, though Donald presents some evidence that could be construed as signals to Johnson that his conduct was unwelcome, it is overwhelmed by evidence to the contrary. The record is replete

8

with instances in which Donald's actions suggested Johnson's conduct was not unwelcome and Donald even admits that she sought to avoid tipping Johnson off to the fact that she was uninterested.

Starting with Donald's evidence, she testifies that during her first sexual encounter with Johnson in the summer of 2016, she was changing in a hallway area within Johnson's office when Johnson entered and started kissing her. She claims she held her pants up when Johnson tried to pull them down before they engaged in oral sex. *See* Donald Statement of Add'l Material Facts ("Donald SAMF") ¶ 2, ECF 237. The first of three verbal indications to Johnson that Donald found his conduct unwelcome did not come until 2018 when she told Johnson for the first and only time to stop kissing her and "to stop the sexual conduct." *See* Donald Dep. 232:1–233:7, ECF 241. Next, again sometime in 2018, she asked him to "just stop" and leave her alone while she dealt with problems between her and her then-husband. *Id.* at 234:6–235:17. Finally, in 2019, Donald asked Johnson to stop asking her what color underwear she was wearing. *Id.* at 236:5–13. Additionally, at some unspecified time before the October 2019 incident when Johnson was found asleep in his car, Donald's friend Trice Alexander witnessed Johnson lean in toward Donald for a kiss at a bar and saw Donald "move back." Alexander Dep. 18:9–19, 20:1–21:4, ECF 241-2.[4]

---

[4] At first, Alexander testified that the incident occurred at most --as she says, "max"--two years before her deposition, which took

9

Aside from this evidence, Donald testifies that she used much subtler means to communicate to Johnson that his conduct was unwelcome. For example, she says she would sometimes tell Johnson she was menstruating or that she had a urinary tract infection, and pretend to be asleep, sick, or drunk in order to avoid sexual activity with him. Donald Dep. 144:11-24, 412:17-414:24.

Donald also points to testimony from others that she had expressed on different occasions that she was uncomfortable with Johnson's conduct, conversations which appear to have happened in 2018 and 2019. *See, e.g.*, Feazell Dep. 22:3-19, ECF 243-6 (testifying that Donald told him sometime before December 2019 that she was been sexually harassed, but that he did not know at the time by whom); Green Dep. 22:15-23:16, ECF 242 (testifying that Donald, her daughter, told her for the first time in 2018 that Johnson "kep[t] trying to kiss her"); Vally Dep. 65:3-68:9, ECF 243-2 (testifying that between 2018 and October 2019, Donald told her that she "couldn't handle working with [Johnson] anymore" and that she had told Johnson to "stop"). Whatever this testimony might reveal about Donald's feelings toward Johnson, confiding in third parties would not have given Johnson "reason to think the conduct was welcome or unwelcome," which is the relevant inquiry.

---

place on June 8, 2022. Alexander Dep. 20:1-13. That would place the incident, at the earliest, around June 2020. But when questioned whether it occurred before the October 2019 incident, Alexander testified that it did. *Id.* at 20:20-21:4.

*Hespe v. City of Chicago*, 307 F. Supp. 3d 874, 887 (N.D. Ill. 2018).

On the other hand, defendants point to undisputed evidence suggesting that the relationship between Donald and Johnson was consensual and that Donald's conduct did not indicate the relationship was unwelcome. For instance, during her time on Johnson's detail, Donald admits she repeatedly told him she loved him and shared information about her personal life with him. Donald Resp. to Johnson Statement of Material Facts ("Donald Resp. to Johnson SMF") ¶¶ 2–3, 8, ECF 236. It is also undisputed that Donald introduced Johnson to her sisters, mother, and friends. *Id.* ¶¶ 5, 7, 12–13. On one occasion in 2018 or 2019, Donald invited Johnson to her mother's house, where they spent about two hours with Donald's mother and sisters. *Id.* ¶ 6. Donald organized a birthday party for Johnson. *Id.* ¶ 10. Donald and Johnson also sometimes-- Donald says it was about six times--went to hotel rooms with each other, *id.* ¶ 30, and socialized at bars and restaurants together with other friends, *id.* ¶ 31.

Furthermore, there are multiple undisputed text messages exchanged between Donald and Johnson from 2017 through 2019 that paint Donald as an active, willing participant in the relationship. In some of those texts, Donald called Johnson "bae" (short for "babe") and "handsome," and told him she loved him. *See* Donald Resp. to City Statement of Material Facts ("Donald Resp. to City

11

SMF") ¶¶ 34(a), (d), (h), (j), (m), (o), ECF 216. She wished him a happy birthday in 2017, *id.* ¶ 34(a), and a Merry Christmas that same year, *id.* ¶ 34(j). Also in 2017, Donald texted Johnson that a concert was "great" and "[y]ou should have come with us." *Id.* ¶ 34(b). About one month later, she thanked him for flowers, *id.* ¶ 34(c), and a month after that texted, "These are so beautiful! Thank you. I needed this smile," with a kissing emoji, *id.* ¶ 34(e). Donald texted Johnson "This is how imma be on you," apparently along with a photo or video of something. *Id.* ¶ 34(f). When Johnson texted Donald in November 2017, "What's for lunch?" she responded, "Me." *Id.* ¶ 34(i). In 2018, Donald texted Johnson that she was taking a bath, and when Johnson responded, "Yummy. I'm gonna have to come down," she replied, "Come on." *Id.* ¶ 34(l). She wished him a happy Father's Day in June 2018, calling him a "very special man" and "one of the greatest black dads in the world," adding that she loved him. *Id.* ¶ 34(n).

Donald also sent Johnson pictures of her underwear, breasts, and other body parts on numerous occasions. Donald Resp. to Johnson SMF ¶¶ 16–17. As discussed above, the only evidence suggesting she did not want to send these pictures is when she asked Johnson in 2019 to stop asking for pictures of her underwear.

Even after the October 2019 incident when Johnson was found asleep at the wheel, Donald texted Johnson a picture of her son in Native American dress on November 27, 2019. Donald Resp. to City

12

SMF ¶ 34(p). She also met with Johnson during this period, including once at her house and once at a restaurant downtown. Donald Resp. to Johnson SMF ¶¶ 46–48. According to Donald, both meetings were initiated by Johnson to go over Donald's testimony in connection with the investigation into the October 2019 incident. *Id.* ¶¶ 47–48. And in February 2020, Donald was invited by a friend to go to a bar. When she arrived, she saw Johnson was there, too, but opted to stay and sit at a table with the group. *Id.* ¶ 49.

Donald claims that she "faked" having fun with Johnson and telling him she loved him, and she admits she wanted Johnson to believe that she cared for him. *Id.* ¶ 34–35; Donald Resp. to City SMF ¶ 33. When asked at her deposition whether she "sen[t] those texts in order to appease Mr. Johnson and make him believe that you were going along with this affair," Donald responded, "Yes." Donald Dep. 325:12–16. In other words, she fashioned aspects of her conduct not to express displeasure with Johnson's actions, but to make him think his actions were welcome.

She justifies this approach by claiming she was intimidated by Johnson and that she sought to appease him to avoid harm and to make her workdays more bearable. She claims Johnson told her that "he had planned on killing his wife with a rifle" and that he had "the exact location picked out," *id.* at 296:8–18, and that he "often" told her that he was going to "bust" her head, *id.* at

13

420:21–421:5. But there is no evidence, even in the form of Donald's own testimony, connecting these particular statements to moments Donald resisted Johnson or expressed a desire not to engage in sexual activity. Johnson also allegedly told Donald about how he choked his ex-wife and "put his hands on" his current wife. *Id.* at 388:19–389:11. And though Donald testifies that Johnson told her these things "maybe a couple of days" after she had asked him to stop certain behavior, *id.*, a two-day gap makes it difficult to draw the reasonable inference that Johnson made these comments as threats. Indeed, in *Mosher v. Dollar Tree Stores, Inc.*, the supervisor defendant made statements that if the plaintiff "played [her] cards right," she would "go places," and during the period of time when he repeatedly asked her out to dinner would also ask her "out of the blue" how she liked her job. 240 F.3d 662, 665 (7th Cir. 2001). Though the plaintiff perceived these comments as threatening, the Seventh Circuit concluded they were insufficient to defeat summary judgment in the face of evidence that the plaintiff and defendant were in a mutual relationship.[5]

---

[5] In her response brief, Donald relies on the expert report of Dr. Barbara Ziv to argue, among other things, that those subject to unwelcome sexual advances will sometimes act in ways that appear to invite, or at least tolerate, the conduct. Donald's citations directly to the report, rather than to the submitted statements of material fact, is inappropriate. *See FirstMerit Bank, N.A. v. 2200 N. Ashland, LLC*, No. 12 C 572, 2014 WL 6065817, at *4 (N.D. Ill. Nov. 13, 2014) ("Courts in this district . . . repeatedly have held that, in memoranda of law filed in support of, or in opposition to, motions for summary judgment, parties should cite

Donald's claim that she felt so threatened by Johnson that she was compelled to affirmatively act as she did is also belied by undisputed evidence in the record. For example, in October 2018, she sent him the following text message:

> We are all human, we ALL fuck up, forget, make mistakes, sometimes over achieve, more times under achieve. I don't know what's wrong with you asking me "what's wrong with me" but right now 'what's wrong with me' is you speaking to me in that way. I don't know what's going on in your personal space but whatever it is don't come at me. I WILL NOT put up with weak ass persons weaknesses. You deal with yo shit without unconsciously or consciously trying to make the situation out to be 'I'm the man.' That very well may be but it ain't with me. So . . . we can do this the easy way and be cordial for the sake of work or not. You decide.

---

to the specific Local Rule 56.1 statement or statements of fact in support of their arguments, not to the record directly." (citing cases)). Additionally, Donald fails to cite specific portions of the report in her statement of additional material facts or to identify the propositions for which she is relying on the report, instead citing to the entire report and deposition in a single paragraph for the proposition that "Dr. Barbara Ziv has opined on various facts and conclusions to a reasonable degree of psychiatric and medical certainty regarding the unwanted nature of Superintendent Johnson's sexual assaults and harassments towards Ms. Donald." Donald SAMF ¶ 6. Wholesale citations to an expert report or deposition fail to meet the Local Rules' requirement that each asserted fact "must be supported by citation to the specific evidentiary material, including the specific page number, that supports it." Local Rule 56.1(d)(2). Indeed, the rule contemplates that "[t]he court may disregard any asserted fact that is not supported with such a citation." *Id*. In light of these departures from the Local Rules, I decline to consider Dr. Ziv's report or deposition. At any rate, this evidence does not help Donald, since the focus of the present inquiry is on how Donald's conduct would come across to Johnson, not how it might come across to a trained psychiatrist.

Donald Resp. to City SMF ¶ 44 (ellipsis in original text message). That message does not evince fear. Nor is her claim of fear consistent with the previously discussed instances in which she asked Johnson to stop certain conduct. Further, even after Johnson left the CPD, when Donald would presumably no longer have reason to fear him (at least any more than she would have when she filed this suit), she was asked in OIG interviews in 2019 and 2020 about her relationship with Johnson and said nothing about sexual harassment or intimidation, instead calling him a "friend." *Id.* ¶ 39. Also in early 2020, as discussed above, when she arrived at a bar to socialize with friends and saw Johnson was part of the group, she chose to stay.

The basic problem with Donald's claim is that virtually all the evidence of her conduct suggests that she welcomed and was an active participant in her relationship with Johnson. The explanation that her friendly, welcoming behavior was an attempt to appease Johnson and make her life more bearable is unavailing because the relevant inquiry considers the objective nature of her conduct as it would appear to Johnson, not solely her subjective intent.

Donald's reliance on *Hespe* is misplaced because in that case there was evidence that the defendant, who supervised the plaintiff at work, had "threatened to destroy plaintiff's career and threatened to hold an outdoor roll call if plaintiff would not be

16

in a relationship with him." 307 F. Supp. 3d at 880. The *Hespe* court reasoned that this explicit threat distinguished that case from *Mosher*, where virtually all the evidence--aside from the plaintiff's testimony that the relationship was unwanted, the perceived threats discussed above, and an instance in which the plaintiff protested and walked away after the defendant pulled her into his lap and fondled her--suggested a consensual relationship. *See Hespe*, 307 F. Supp. 3d at 888 n.6 ("That threat distinguishes this case from *Mosher*."). That type of clear threat tying continued employment or some other benefit to participation in the relationship is absent here. This case bears closer similarity to *Mosher*, discussed above, and *Sanders v. Chicago Transit Authority*, where the plaintiff claimed to have employed deflection strategies to avoid romantic contact with her supervisor, but where her overall conduct appeared to pursue that contact. No. 1:19-CV-04656, 2022 WL 971879, at *5 (N.D. Ill. Mar. 31, 2022).

The unfortunate reality is that relationships between supervisors and subordinates can be fraught. It may well be that Donald in fact did not want or enjoy her relationship with Johnson. The problem is one of proof: she has not come forward with evidence from which a reasonable jury could find in her favor on her Title VII claim against the City or her § 1983 claim against Johnson, given the standards the law imposes to prevail on those claims. Accordingly, summary judgment on those claims is granted. And

17

because Donald is unable to prove a constitutional violation committed by Johnson by way of sexual harassment, she cannot maintain a *Monell* claim against the City premised on that harassment. So summary judgment is granted on the *Monell* claim, too.

### B.

Having disposed of Donald's federal claims, what remains are her state-law claims against Johnson for violation of the Illinois Gender Violence Act and spoliation of evidence. "It is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). I see no reason to depart from that practice, especially since Donald fails to explicitly address either state-law claim in her brief. Accordingly, those claims are dismissed without prejudice.

### C.

Though I have dismissed Donald's spoliation of evidence claim for lack of subject-matter jurisdiction, a brief comment on that claim is warranted because Johnson asserts that the claim was brought in bad faith and that he therefore deserves an award of attorneys' fees for defending against it. Specifically, Johnson argues that Donald has provided no evidence that he destroyed her SIM card, and in fact that she testified at her deposition that

her husband told her that he had destroyed the SIM card. Johnson argues the deposition testimony demonstrates that Donald knew all along that her husband destroyed the SIM card, but sought to pin the blame on Johnson. Setting aside that Donald's testimony is consistent with her initially believing, at the time she filed her complaint, that Johnson destroyed the SIM card only to later learn that it was probably her husband, Johnson's argument fails for a more basic reason: he misreads the claim. Donald claims Johnson breached his duty to preserve relevant text messages when he destroyed *his own* cell phone. *See* Am. Compl. ¶ 170, ECF 34. The claim as it appears in the amended complaint says nothing about the destruction of Donald's SIM card. Accordingly, Johnson fails to persuade me that the claim was brought in bad faith, so he is not entitled to attorneys' fees on that basis.

IV.

Johnson also argues in his motion--though the City does not join him--that summary judgment should be granted on all claims against him because Donald attempted to commit a fraud on the court. In support, Johnson supplies deposition testimony given in this case by Chicago police officer Claudio Edwardo Salgado Yanez to the effect that Donald attempted to bribe him to testify against Johnson in this lawsuit. Because I have granted summary judgment on the merits, I decline to reach this issue.

V.

For the foregoing reasons, the City's and Johnson's motions for summary judgment are granted.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: March 20, 2024